UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                        :

CACHET FINANCIAL SERVICES,
                        :

              Plaintiff,         :   Civil Action No. 19-CV-1181-FJS-CFH

                        :
    -against-

                        :

MYPAYROLLHR, LLC; MICHAEL MANN;
VALUEWISE CORPORATION; ROSS PERSONNEL  :
CONSULTANTS INC.; SOUTHWESTERN
PAYROLL SERVICES INC.; ESSQUE, INC. (D/B/A  :
HEUTMAKER BUSINESS ADVISORS); AND DOES
1-10,                        :

           Defendants.      :
-------------------------------------------------------------------X

## PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANTS MYPAYROLLHR, LLC, MICHAEL MANN, VALUEWISE CORPORATION, AND ROSS PERSONNEL CONSULTANTS INC.

Pursuant to Fed. R. Civ. P. 55(a) and L.R. 55.2(b), Plaintiff Cachet Financial Services ("Cachet") requests entry of default judgment against Defendants MyPayrollHR, LLC; Michael Mann; Valuewise Corporation; and Ross Personnel Consultants Inc.  In support thereof, Cachet submits the following:

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...........................................................................................1

II.   FACTUAL BACKGROUND...........................................................................................3

    A.   Cachet is a Third-Party ACH Service Provider ......................................................3

    B.   Cachet had an 11-Year Contractual Relationship with MyPayrollHR ...................4

    C.   Mann and MyPayrollHR Stole More Than $26 Million from Cachet....................6

        1.    The $19 Million Theft...................................................................................6

        2.    The $7 Million Theft.....................................................................................9

    D.   Cachet Attempted to Communicate with MyPayrollHR and Mann .......................9

    E.   Mann is Arrested, Admits to Stealing the $7 Million and Perpetrating a
        Fraudulent Scheme to Defraud Creditors, and is Charged with Bank Fraud.........10

    F.   Cachet Covered the $26 Million Loss Caused by the Actions of the
        Defendants ............................................................................................................11

    G.   Cachet's Bankruptcy Filing ..................................................................................12

    H.   Procedural Status of This Case ..............................................................................13

III.  ARGUMENT..................................................................................................................14

    A.   Standard for Default Judgment. .............................................................................14

    B.   Judgment Should Be Entered Against MyPayrollHR on Cachet's First
        Cause of Action for Breach of Contract. ...............................................................14

    C.   Judgment Should Be Entered Against MyPayrollHR and Mann on
        Cachet's Second Cause of Action for Fraud..........................................................15

    D.   Judgment Should Be Entered Against Defendants on Cachet's Third
        Cause of Action for Conversion. ...........................................................................17

    E.   Judgment Should Be Entered Against Defendants on Cachet's Fourth
        Cause of Action for Unjust Enrichment.................................................................19

    F.   Calculation of Judgment Amount ..........................................................................19

        1.    Compensatory Damages ..............................................................................19

        2.    Consequential Damages................................................................................19

        3.    Pre-judgment Interest...................................................................................20

        4.    Punitive Damages ........................................................................................21

        5.    Total Calculation of Damages .....................................................................22

IV.   CONCLUSION................................................................................................................22

## I.    **PRELIMINARY STATEMENT**

By this Motion, Cachet seeks entry of default judgment for general damages in the amount of $26,418,517.04 plus consequential damages of $27,575,000.00 plus pre-judgment interest of $2,154,903.92 plus punitive damages of $52,837,034.08 against Defendants MyPayrollHR, LLC; Michael Mann; Valuewise Corporation; and Ross Personnel Consultants Inc. (collectively, "Defendants") on Cachet's First, Second, Third, and Fourth Causes of Action named in its Complaint.

As will be discussed in greater detail below, Cachet is a national financial services company which processes automated clearing house ("ACH") transactions for the payroll industry. Cachet's patented ACH system electronically routes funds from employers' bank accounts to Cachet's settlement account, and from there to the bank accounts of the employers' employees. This automated process is effectuated by digital files sent to Cachet by payroll processors, which files tell Cachet how much to withdraw from employers' bank accounts and how much to deposit into employees' accounts.

Defendant MyPayrollHR, LLC ("MyPayrollHR"), a payroll processing company, was one of Cachet's clients, what are referred to as "remarketers." Pursuant to their 11-year contractual relationship, MyPayrollHR used Cachet's ACH services to satisfy the payroll needs of MyPayrollHR's employer-clients.

That all changed in or around the end of August 2019, when MyPayrollHR and its CEO, Defendant Michael Mann ("Mann"), fraudulently manipulated Cachet's electronic files dictating the direction, timing, and flow of funds to cause more than $26 million to be diverted to numerous bank accounts mostly controlled by MyPayrollHR, Mann, and numerous other entities controlled

by Mann – namely, defendants ValueWise Corporation and Ross Personnel Consultants Inc. (collectively, the "Mann Entities").

The fraud was twofold. First, MyPayrollHR and Mann used Cachet's ACH system fraudulently (and for non-payroll purposes) to make it *appear* that they were moving $19 million from accounts they control to various other accounts they also control,[1] ultimately diverting $19 million from Cachet. Second, MyPayrollHR and Mann manipulated Cachet's specifications to divert more than $7 million from the accounts of MyPayrollHR's employer-clients to MyPayrollHR's own account at Pioneer Bank ("Pioneer"), instead of being deposited in Cachet's settlement account to ultimately be paid to the employer-clients' employees. This ultimately caused Cachet to pay – with its own funds – the same amount to the employer-clients' employees, effectively footing the bill for Defendants' fraud.

Defendants' actions involve not merely a breach of contract, but rather a complete disregard for moral guidelines and their civil obligations not only to Cachet, but also to all of Cachet's remarketers, the remarketers' clients (i.e., the employers), and the employees of those employers. The facts provided herein evidence a nearly ten year scheme to cheat people out of tens of millions of dollars. Such actions can be described as nothing less than morally reprehensible and gross dishonesty, justifying punitive damages.

Defendants' actions not only caused Cachet to come out of pocket for over $26 million, but their actions also resulted in Cachet's bank freezing all of Cachet's accounts and thus terminating its ability to process ACH transactions. Defendants' actions required Cachet to respond to numerous class actions and ultimately to file for bankruptcy protection. In addition,

---

[1] Apparently, one or more of the Defendants had loan agreements with other companies (such as Millennium and P2Bi) and some of the funds were fraudulently transferred to accounts not controlled by Mann but to accounts controlled by those entities with which one or more of the Defendants had loan agreements.

Cachet was required to use its own funds to cover the losses caused by MyPayrollHR's fraudulent activities. Cachet had to use approximately $20 million from its own cash on hand plus had to borrow another $7.050 million in order to cover the loss.

Cachet filed the instant action against Defendants (and others) to recover damages it suffered as a result of the actions summarized above. Defendants failed to respond to the Complaint and the Defendants' default has been entered in this case. For the reasons set forth in detail herein, Cachet now asks the Court to enter default judgment against the Defendants to include (1) general damages of $26,418,517.04; (2) consequential damages of $27,575,000.00; (3) pre-judgment interest of $2,154,903.92; and (4) punitive damages of $52,837,034.08.

## II. FACTUAL BACKGROUND

### A. Cachet is a Third-Party ACH Service Provider

Cachet is a national financial services company focused on processing ACH transactions and providing related services for the payroll industry. *See* Declaration of Aberash Afsaw submitted in support of Motion for Temporary Restraining Order and Preliminary Injunction ("Afsaw TRO Decl.")[2] which is attached to the Request for Judicial Notice ("RJN") as **Exhibit 1** at ¶ 2. Used correctly, Cachet's ACH system provides the electronic mechanism through which funds from employers' bank accounts are withdrawn and then ultimately deposited into the bank accounts of the employers' employees. *Id.* Payroll processors (i.e., the remarketers) contract with Cachet to process tens-of-billions of dollars annually in ACH transactions for tens-of-thousands of employers and millions of employees. *Id.*

---

[2] The Court can take judicial notice of the Asfaw TRO Decl. pursuant to Fed. R. Evid. 201. *See Jacques v. United States R. Retirement Bd.*, 736 F.2d 34, 40 (2nd Cir. 1984); *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277-78 n. 33 (5th Cir. 1978) ("courts are particularly apt to take notice of material in court files").

Cachet's patented ACH transaction process works as follows: A payroll processor, such as MyPayrollHR, sends a digital specification batch file to Cachet's automated system, which file includes, among other things, (i) bank and account information of each of the payroll processor's employer-clients; (ii) the amount of deposits to be made by each of the payroll processor's employer-clients into Cachet's settlement account at Cachet's bank; and (iii) the amounts to be directly deposited from Cachet's settlement account to each of the payroll processor's employer-clients' employees. *Id.* ¶ 3. The batch file also includes the bank information for Cachet's settlement account (albeit through the use of a fictitious account number to protect Cachet), so that funds from the payroll processor's employer-clients transfer directly from their accounts to Cachet's settlement account. *Id.*

Once Cachet's system receives the batch file from the payroll processor, and the file is "balanced" (that is, the amounts to be withdrawn from the employer-clients equals the amounts to be deposited into the employees' accounts), Cachet's system automatically initiates the transfer of funds from the employer-clients' accounts to Cachet's settlement account, as delineated in the specifications batch file, on the "settlement date" indicated in the file. *Id.* ¶ 4. Cachet's system then automatically disburses funds from its settlement account into the bank accounts of the employees, as provided in the specifications by the payroll processor, on the "settlement date" indicated in the file. *Id.*

Significantly, banks have up to <u>two banking days</u> to reject an ACH transaction. *Id.* ¶ 5.

**B.** **Cachet had an 11-Year Contractual Relationship with MyPayrollHR**

MyPayrollHR is an employer-outsource payroll processing company that contracts with employers to manage the employers' payroll. *Id.* ¶ 6. MyPayrollHR is one of Cachet's clients (i.e., a remarketer). *Id*. The business relationship between Cachet and MyPayrollHR, which began

approximately eleven years ago, is governed by two written agreements – the Rules, Regulations, and Binding Policies (the "Rules"), and the Cachet Terms and Conditions (the "Terms," and with the Rules, the "Agreement") – the most recent versions of which were executed by MyPayrollHR on May 1, 2019. *Id.* ¶ 7, Exs. A (Rules) and B (Terms).

Pursuant to the Agreement, MyPayrollHR agreed, among other things:

- To use Cachet's ACH settlement and processing services only for payroll-related transactions, and not to use Cachet's services for non-payroll-related transactions, such as company-to-company transfers (Ex. B (Terms) at Introduction Para., §§ 1B, 2B, 7F);

- Not to use Cachet's ACH settlement and processing services in a way that violates the laws of the United States (Ex. A (Rules) § 1D);

- Not to allow unauthorized access to Cachet's ACH settlement and processing services (*id.* § 5B; Ex. B (Terms) § 1A);

- To provide accurate information in Cachet's specifications batch files (Ex. A (Rules) § 4E); and

- To pay Cachet for all credit entries directed by MyPayrollHR that were made by Cachet on MyPayrollHR's behalf (*id.* § 8A) (collectively, the "Security Provisions").

The Agreement further provides as follows: "4.F. Offset and Security Interest. To secure the payment and performance of [MyPayrollHR]'s obligations set forth herein, [MyPayrollHR] grants CACHET a security interest in the funds collected by [MyPayrollHR] into the Settlement Account, as collateral for the obligations contained in this Remarketer Agreement, and any other agreement Remarketer has signed with CACHET." *Id.* § 4F.

## C.    **Mann and MyPayrollHR Stole More Than $26 Million from Cachet**

In or about late-August and/or early-September 2019, unbeknownst to Cachet at the time, MyPayrollHR and Mann manipulated Cachet's specifications batch files to cause in excess of $26 million to be routed to MyPayrollHR, the Mann Entities, and other entities (such as non-parties Millennium and P2Bi) to which Mann or MyPayrollHR apparently owed an obligation. *See* Asfaw TRO Decl. ¶ 10. This occurred by way of two separate sets of transactions and two different means of theft – one for more than $19 million (the "$19 Million") and another for more than $7 million (the "$7 Million," and with the $19 Million, the "26 Million").[3]  *Id.*

### 1.    The $19 Million Theft

In the first set of transactions, Mann and MyPayrollHR used Cachet's settlement account for non-payroll purposes to steal the $19 Million directly from Cachet using classic kiting techniques. *Id.* ¶ 11. They did this by manipulating Cachet's specifications to make it appear as if $19 Million was being transferred from various entities controlled by Mann to Cachet's settlement account, and that the same amount was then being transferred from Cachet's settlement account to various other entities (*i.e.*, some of the Mann Entities). *Id.* In reality, no funds were transferred to Cachet's settlement account because the accounts from which the funds were supposed to be transferred (*i.e.,* some of the Mann Entities' accounts) were frozen, and the $19 Million (which was Cachet's money) was transferred from Cachet's settlement account to various accounts controlled by Defendants, which accounts purportedly were also then frozen by the "receiving" banks. *Id.* ¶¶ 11-20, Exs. C, D. Technical details concerning how Defendants effectuated the theft of the $19 Million are set forth in detail in the Asfaw TRO Declaration.

---

[3]    The exact amounts are $19,199,175.74 and $7,219,341.34, for a total of $26,418,517.04. *See* Asfaw TRO Decl. ¶¶ 13, 16, 21.

MyPayrollHR's specifications appeared that the entire $19 million that was to be credited to Cachet's settlement account was to come from various accounts at Pioneer (i.e., routing number 021000322), called "Primacy-Pioneer," "Optix-Pioneer," "Apogee-Pioneer," "Ross Consultants," and "OptumInsight" (collectively, the "Mann Originating Accounts"). *Id.* ¶13, 14 and Exhibit D.

Cachet's ACH system automatically executed the instructions indicated in the specifications provided by MyPayrollHR and Mann. Specifically, on Friday, August 30, 2019, the various accounts at Pioneer making up the $19 Million – i.e., the Mann Originating Accounts – were debited, and the $19 Million was credited to Cachet's settlement account (the "Collection Transactions"). *Id.* ¶15.

On Friday, August 30, 2019 and Tuesday, September 3, 2019, as instructed in the specifications prepared by MyPayrollHR and Mann, Cachet's settlement account was automatically debited and the various accounts indicated in the specifications were automatically credited. Significantly, Monday, September 2, 2019, was Labor Day, a bank holiday, which did not count toward the two banking days that Pioneer had to reject the Collection Transactions. *Id.* ¶15.

The $19 Million was then deposited as follows (the "Disbursement Transactions"):

| Entity/Account Name | Amount | Bank |
|---|---|---|
| Heutmaker | $7,713,026.23 | BofA |
| ValueWise Corporation | $7,661,261.57 | BofA |
| Weitz & Associates | $669,746.99 | Wells Fargo |
| Weitz and Associates | $655,006.76 | Pioneer |
| Cloud Inc. | $660,045.85 | Pioneer |
| Millennium Funding | $415,973.00 | Key Bank |

| Entity/Account Name | Amount | Bank |
|---|---|---|
| P2B Inc. | $849,357.19 | Wells Fargo |
| FPG BofI | $574,758.15 | Bank of Internet |
| **TOTAL** | **$19,199,175.74** | |

*Id.* ¶16, Exhibits C and D.  The accounts called "Heutmaker," "ValueWise Corporation," "Weitz and Associates," "Weitz & Associates," "Cloud Inc.," "Millennium Funding," "P2B Inc.," and "FPG BofI" are referred to collectively as the "Mann Receiving Accounts," since these accounts received the $19 Million as a result of the Disbursement Transactions.

Then, on September 4, 2019, after Cachet's settlement account had already been debited (and the Mann Receiving Accounts credited) for the Disbursement Transactions, Pioneer rejected the Collection Transactions purportedly within its two-day window, because, according to the returns issued by Pioneer, the Mann Originating Accounts were frozen.  *Id.* ¶17.

Having received notice of Pioneer's rejection of the Collection Transactions for the frozen accounts, Cachet immediately sought to reverse the Disbursement Transactions and thereby claw back the $19 Million that went to the Mann Receiving Accounts.  However, Cachet learned that each of the Mann Receiving Accounts had purportedly been frozen by the relevant "receiving" banks (i.e., Pioneer, BofA, Wells Fargo, Key Bank, and Bank of Internet).  As such, Cachet could not reverse the Disbursement Transactions.  *Id.* ¶18.

Thus, because the Mann Originating Accounts were frozen, no funds were actually transferred to Cachet's settlement account.  As such, to effectuate the Disbursement Transactions, $19 million of Cachet's funds were transferred from Cachet's settlement account to the Mann Receiving Accounts.  *Id.* ¶19.    But Cachet never received the $19 Million from the Mann Originating Accounts or any other source.

2.    The $7 Million Theft

In the second set of transactions, Mann and MyPayrollHR diverted the $7 Million from MyPayrollHR's employer-clients, which was supposed to be transferred to Cachet to be used for payroll for the employees of MyPayrollHR's employer-clients.    Asfaw TRO Decl. ¶ 21. Specifically, Mann and MyPayrollHR altered account information in the Cachet ACH specifications so that the $7 Million, which belonged to MyPayrollHR's employer-clients, was diverted from their accounts and deposited in a bank account controlled by MyPayrollHR and Mann at Pioneer (the "MPHR Account"), instead of being deposited in Cachet's settlement account, as required by the Agreement. *Id.* Then, pursuant to the ACH specifications created by MyPayrollHR and Mann, the employees' accounts were credited via direct deposits in the amount of $7 million. *Id.* ¶ 24.   However, Pioneer then froze the MPHR Account (purportedly within the two bank day rejection window), which means that the $7 million of credits to the employees' accounts were not funded by MyPayrollHR and instead came from Cachet. *Id.* Pioneer is purportedly still in possession of the $7 Million. *Id.* ¶ 25.   Technical details concerning how Defendants effectuated the theft of the $7 Million are set forth in the Asfaw TRO Declaration. *Id.* ¶¶ 22-23, Ex. E.

**D.    Cachet Attempted to Communicate with MyPayrollHR and Mann**

On September 3, 2019, Cachet's Director of Operations called MyPayrollHR and spoke with a MyPayrollHR representative, and was informed that Mann was at Pioneer attempting to have Pioneer release funds to Cachet. Asfaw TRO Decl. ¶ 26. On the same day, Cachet's Director of Sales spoke with MyPayrollHR's Chief Financial Officer, and was advised that Pioneer would release the funds shortly. *Id.* However, when Cachet's President spoke with two Pioneer officers, they refused to provide information on the frozen account, and blamed Mann for the situation. *Id.*

The next day, September 4, 2019, Cachet representatives called MyPayrollHR and this time spoke with Mann, who said that he would call back "in a few minutes." *Id.* ¶ 27. Mann never called back. *Id.* MyPayrollHR thereafter advised its employer-clients that it had ceased operations effective immediately. *Id.* ¶ 28, Ex. F.

## E.    Mann is Arrested, Admits to Stealing the $7 Million and Perpetrating a Fraudulent Scheme to Defraud Creditors, and is Charged with Bank Fraud

On September 20, 2019, a criminal complaint was filed against Mann in this Court charging him with bank fraud in violation of 18 U.S.C. § 1344. Declaration of Evan K. Farber filed in support or the Motion for Temporary Restraining Order and Preliminary Injunction ("Farber TRO Decl.") which is attached to the RJN as **Exhibit 2** at Ex. 2.[4] According to the Affidavit of FBI Special Agent Matthew J. Wabby (the "Wabby Aff.") filed with the criminal complaint: "On September 10, 2019, Mann appeared with counsel at the United States Attorney's Office in Albany," where he underwent a tape-recorded interview with FBI agents. *Id.*, Wabby Aff. ¶ 11.

In the interview, "Mann stated that he wished to accept responsibility for his conduct, and confess to a fraudulent scheme that he had been running for years." *Id.* ¶ 12. He confessed that beginning in 2010 or 2011, "he began borrowing large sums of money from banks and financing companies under false pretenses." *Id.* ¶ 13. He further "admitted to creating . . . companies that had no purpose other than to be used in the fraud; fraudulently representing to banks and financing companies that his fake businesses had certain receivables that they did not have; and obtaining

---

[4]    The Court may take judicial notice of the criminal proceeding against Mann and the documents filed in connection with the criminal proceeding. *See Wright v. Rutulante*, No. 16-cv-10068, 2018 U.S. Dist. LEXIS 51571, at *2 n.2 (S.D.N.Y. Mar. 26, 2018) ("The [c]ourt properly takes judicial notice of [p]laintiff's state criminal proceedings as matters of public record.").

loans and lines of credit by borrowing against these non-existent receivables." *Id.* According to Mann, he "fraudulently obtained about $70 million that has not been paid back." *Id.* ¶ 14.

Mann also admitted that he stole the $7 Million "in order to temporarily reduce the amount of money he owed to Pioneer," which Mann claimed is his "largest creditor." *Id.* ¶ 15. Specifically, Mann confessed that on or about September 5, 2019, he made a "decision to route MyPayroll's clients' payroll payments to an account at Pioneer instead of directly to Cachet," as described above and in the Complaint. *Id.* ¶¶ 9, 15.

Finally, Mann "admitted to kiting checks between Bank of America and Pioneer, as part of the fraudulent scheme." *Id.* ¶ 14. According to Special Agent Wabby, "BOA has reported that it froze the accounts [of certain of Mann's companies] because Mann was 'kiting' millions of dollars in checks between his accounts at BOA and Pioneer, from August 1, 2019 through August 30, 2019." *Id.* ¶ 10. Special Agent Wabby explained that "kiting" is "a common form of fraud in which an individual writes checks drawn on one account and deposits them to a second account (with the accounts at different banks), and then reverses the process by immediately writing checks from the second account back to the first account" (*id.*) – a process remarkably similar to the mechanism described above by which MyPayrollHR and Mann stole the $19 Million from Cachet, but instead of checks, Mann used the ACH network (Asfaw TRO Decl. ¶ 20).

**F.    Cachet Covered the $26 Million Loss Caused by the Actions of the Defendants**

Defendants stole the $26 Million from Cachet and as a result, Cachet was forced to use its own funds to cover the $26 Million loss. Specifically, Cachet used $20 million from its operating accounts to help cover the $26 Million loss. A true and correct copy of Financial Business Group Holdings' consolidated balance sheet, which reflects Cachet's cash on hand as of August 31, 2019 of $27,831,985.51, is attached to the Asfaw Default Decl. as Exhibit H. In

addition, Cachet borrowed $6.050 million from National Services, Inc. ("NSI") and another $1 million from HB Foundation pursuant to Secured Promissory Notes executed on or about October 22, 2019. Copies of the Secured Promissory Notes with NSI and HB Foundation are attached to the Asfaw Default Decl. as Exhibit I.

## G.    **Cachet's Bankruptcy Filing**

Unexpectedly, on October 23, 2019, Bancorp gave notice to Cachet that it (1) terminated its Payroll Processing ODFI Agreement with Cachet, thus terminating Cachet's ability to originate ACH transactions, (2) froze all of Cachet's accounts (including its settlement account which had over $100 million in it, which funds were transferred by remarketers and employers, and Cachet's operating account), and (3) swept over $5 million from Cachet's operating account. *Id.* at ¶5.

As a result of the freeze on the accounts and Cachet's inability to process any ACH transactions, Cachet was effectively out of the ACH processing business and is no longer operating in such capacity. *Id.* at ¶6.

As a result of the freeze on Cachet's accounts by Bancorp and thus, Cachet's inability to process its ACH transactions on or around October 23, 2019, various employers and employees have filed class action claims for damages against Cachet. Generally, the class actions allege damages for fees and penalties suffered by employers and employees for overdrawn accounts, damages for being unable to pay bills, care for their families, etc., as well as more general damages for negligence, unjust enrichment, and violation of California's unfair competition laws and the like. Cachet generally disputes these claims. There are four pending class action lawsuits.[5]

---

[5] On September 19, 2019, a class action was commenced against Debtor in the United States District for the Central District of California, commencing Case No. 2:19-cv-08120-RSWL (JEMx). On November 20, 2019, a class action

As a result of the above, Cachet filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Los Angeles Division ("Bankruptcy Court") on January 21, 2020 ("Petition Date").

## H.    Procedural Status of This Case

On September 23, 2019, Cachet filed a Complaint against the Defendants and others for (1) breach of contract, (2) fraud, (3) conversion, (4) unjust enrichment, and (5) RICO violations. A true and correct copy of the Complaint is attached to the RJN as **Exhibit 3.**

Defendants failed to respond to the Complaint.  On January 22, 2020, Cachet filed a request for entry of default against the Defendants.

On January 23, 2020, the clerk entered the default of the Defendants.  A true and correct copy of the clerk's certificate of entry of default is attached to the RJN as **Exhibit 4.**

As set forth in the Declaration of Donald A. Miller filed concurrently herewith: (1) none of the Defendants are infants or incompetent; (2) none of the Defendants are in the military service; (3) all of the Defendants have defaulted in appearance in this case; (4) service was properly effected under Fed. R. Civ. P. 4, as evidenced by the Waiver of Service filed by each of the Defendants on October 7, 2019 (ECF Nos. 8-11); (5) the amount shown below is justly due and owing and no part has been paid; and (6) the disbursements sought to be taxed have been made in the action or will necessarily be made or incurred.

---

was commenced against Debtor in the United States District for the Central District of California, commencing Case No. 8:19-cv-02267.  On September 16, 2019, a class action was commenced against Debtor in the United States District for the District of Nevada, commencing Case No. 2:19-cv-01624-KJD-VCF.  On October 30, 2019, a class action was commenced against Debtor and others in the Court of Common Pleas for the County of Cuyahoga, Ohio, commencing Case No. 19-924236.

## III.    ARGUMENT

### A.    Standard for Default Judgment.

Federal Rule of Civil Procedure 55 permits a court, following a default by a defendant, to enter a final default judgment in a case.  Fed. R. Civ. P. 55.  Upon default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.  S*ee, Muldowney v. Merit Recovery Sys.,* 2019 U.S. Dist. LEXIS 115249 (N.D.N.Y. July 11, 2019) (*quoting TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987)); *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.,* 722 F.2d 1319, 1323 (7th Cir. 1983).

Rule 55 is discretionary and requires "some proof" of the facts that are necessary to a valid cause of action.  *See, Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392 (9th Cir. 1988); *Erwin DeMarino Trucking Co. v. Jackson,* 838 F. Supp. 160, 162 (S.D.N.Y. 1993).  In exercising discretion to enter a default judgment, a court may consider the following factors:  (1) the merits of plaintiff's substantive claim; (2) the possibility of prejudice to the plaintiff; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute considering material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the federal rules of civil procedure favoring decisions on the merits. *See, Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

### B.    Judgment Should Be Entered Against MyPayrollHR on Cachet's First Cause of Action for Breach of Contract.

Cachet's first cause of action is for breach of contract against MyPayrollHR.  A successful claim for breach of contract under New York law must allege "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant;

and (4) damages." *Muench Photography, Inc. v. McGraw-Hill Cos.*, No. 12-cv-6595, 2013 U.S. Dist. LEXIS 138611, at *7 (S.D.N.Y. Aug. 14, 2013).

There is no question that the foregoing elements for breach of contract are met here. First, Cachet and MyPayrollHR entered into the Agreement. Second, there is no question that Cachet performed all of its obligations under the Agreement. Third, the evidence clearly demonstrates that MyPayrollHR breached the Agreement's Security Provisions by fraudulently manipulating Cachet's specifications batch files to cause the $19 Million to be diverted from Cachet to Defendants and others, and the $7 Million to be diverted from MyPayrollHR's employer-clients to Defendants. Indeed, with respect to the $7 Million, Mann has ***admitted*** that he made a calculated "decision to route MyPayroll's clients' payroll payments to an account at Pioneer instead of directly to Cachet." Farber Aff., Ex. 2 (Wabby Aff.) ¶ 15. Finally, Cachet suffered damages in the amount of $26,418,517.04 as a result of MyPayrollHR's breach of the Agreement since Mann and MyPayrollHR caused Cachet's ACH system to transfer the $26 Million to various accounts without actually providing $26 million to Cachet to fund the transfers, thus causing Cachet to fund the transfers with its own money.

Accordingly, Cachet has proven all elements to prevail on its breach of contract claim against MyPayrollHR and as such, judgment should be entered in favor of Cachet and against MyPayrollHR on the First Cause of Action in the amount of $26,418,517.04.

**C.**    **Judgment Should Be Entered Against MyPayrollHR and Mann on Cachet's Second Cause of Action for Fraud.**

As to Cachet's Second Cause of Action for fraud against MyPayrollHR and Mann, to prevail on a fraud claim under New York law, a plaintiff must show: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to

defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Allstate Ins. Co. v. Rozenberg*, 2009 U.S. Dist. LEXIS 132654 at *9-10 (E.D.N.Y. Jan. 26, 2009).

Each of these elements is satisfied here. As to the first element, the specifications batch files contained two sets of material misrepresentations – first, that the $19 Million would be transferred from various entities, including MyPayrollHR, to Cachet's settlement account, and that the same $19 million would be transferred from the settlement account to various other entities; and second, that MyPayrollHR's employer-clients would deposit $7 million into MyPayrollHR's account (albeit in breach of the Agreement, since the funds should have gone into Cachet's settlement account) and the employer-clients' employees would be paid $7 million from MyPayrollHR's account. Both representations were false, as (1) the $19 Million never went to Cachet's settlement account, but the same amount was diverted from the settlement account to accounts controlled by Defendants and others, and (2) the $7 million was never deposited in Cachet's settlement account, but instead was diverted to accounts owned and controlled by Defendants (and other entities such as non-parties Millennium and P2Bi).

As to the second element, MyPayrollHR and Mann knew the misrepresentations were false because they provided the fraudulent information to Cachet through the specification batch files. In fact, Mann admitted to borrowing large sums of money "under false pretenses" and specifically admitted to stealing and fraudulently obtaining the $7 Million. *See* Farber TRO Decl. ¶¶9, 10, 13-15.

Third, MyPayrollHR and Mann intended to defraud Cachet by submitting false specifications batch files upon which MyPayrollHR and Mann knew Cachet would rely due to the very nature of the ACH process. Moreover, they submitted automated ACH instructions to move

the $19 Million that they did not actually have in their accounts, thus clearly intended to defraud Cachet. As to the $7 Million, Mann and MyPayrollHR deposited the funds into MyPayrollHR's account rather than into Cachet's accounts and Mann disappeared when Cachet attempted to rectify the $7 Million loss by recouping such funds from Pioneer. Based on such actions, there can be no conclusion other than Mann and MyPayrollHR intended to defraud Cachet.

Fourth, Cachet's reliance was reasonable in light of the parties' 11-year business relationship, the fact that ACH transactions are processed automatically, and the fact that the specifications were otherwise properly submitted.

Finally, as a result of MyPayrollHR and Mann's misrepresentations to Cachet, Cachet suffered a loss by using over $26 million of its own funds to advance the funds to cover the loss.

Cachet has submitted detailed evidence of the foregoing and therefore, judgment should be granted in Cachet's favor and against MyPayrollHR and Mann on Cachet's Second Cause of Action for fraud.

D.   **Judgment Should Be Entered Against Defendants on Cachet's Third Cause of Action for Conversion.**

Judgment should also be entered against all of the Defendants on Cachet's Third Cause of Action for conversion. New York law defines conversion as "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987). "To recover judgment on a theory of conversion, the plaintiff must establish title, possession or right to possession, or some property interest in the subject matter which [the] plaintiff claims the defendants converted for their own use and which provides the basis for the lawsuit." *Fleet Capital Corp. v. Yamaha Motor Corp.,*

*U.S.A.*, No. 01-cv-1047, 2002 U.S. Dist. LEXIS 18115, at *51 (S.D.N.Y. Sept. 25, 2002); *See also, Rentrak Corp. v. Handsman*, No. 12-cv-1576, 2014 U.S. Dist. LEXIS 46919, at *24-25 (E.D.N.Y. Mar. 31, 2014) (holding corporate executive personally liable for conversion "separate and apart from any breach of contract claim" when he "exercised dominion and control over [the plaintiff]'s property such that he used the proceeds to pay, not only Video U.S.A.'s creditors, but also debts that he had personally guaranteed").

"Money may be the subject of conversion if it is specifically identifiable and there is an obligation to return it or treat it in a particular manner. When funds are provided for a particular purpose, the use of those funds for an unauthorized purpose constitutes conversion." *See Fannie Mae v. Olympia Mortg. Corp.*, No. 04-cv-4971, 2006 U.S. Dist. LEXIS 70175, at *45 (S.D.N.Y. Sept. 28, 2006) (citing *Hoffman v. Unterberg*, 9 A.D.3d 386, 388 (2d Dep't 2004)).

Defendants' conduct falls squarely within this doctrine. There is no dispute that Cachet was forced to use its own property (namely, $26,418,517.04) to fund Defendants' fraudulent activity. MyPayrollHR and Mann used Cachet's ACH system in an attempt to move funds that did not actually exist (and MyPayrollHR and Mann knew the funds did not exist), so that when they were caught, Cachet was left holding the (empty) bag. Specifically, Mann admitted to conversion with respect to the $7 Million and there is no dispute that Cachet footed the bill for Defendants' theft of the $7 Million by disbursing Cachet's property to pay the employers' employees to make them whole. As to the $19 Million, the Asfaw TRO Decl. and exhibits thereto clearly demonstrate that Defendants converted Cachet's funds to their own by causing Cachet to transfer $19 million of its own funds to accounts controlled by one or more of the Defendants.

Based on the foregoing, judgment in Cachet's favor and against the Defendants on Cachet's Third Cause of Action for conversion is appropriate.

E.      **Judgment Should Be Entered Against Defendants on Cachet's Fourth Cause of**
        **Action for Unjust Enrichment**

Finally, judgment should be entered against Defendants and in favor of Cachet on Cachet's

Fourth Cause of Action for unjust enrichment.  An unjust enrichment claim under New York law

requires a showing "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that

equity and good conscience require restitution." *Amusement Indus. v. Stern*, 786 F. Supp. 2d 758,

784 (S.D.N.Y. 2011) (citation omitted).  "The 'essence' of an unjust enrichment claim is that one

party has received money or a benefit at the expense of another." *Id.* (quotation omitted).

Here, the evidence presented demonstrates that Defendants stole the $19 Million directly

from Cachet, and that MyPayrollHR forced Cachet to foot the bill for Defendants' theft of the $7

Million from the employer-clients by advancing the same amount to the employees.  Therefore,

Defendants have been unjustly enriched and Cachet is entitled to restitution of the foregoing

amounts.

Accordingly, judgment on Cachet's Fourth Cause of Action for unjust enrichment in the

amount of $26,418,517.04 should be entered in Cachet's favor and against the Defendants.

F.      **Calculation of Judgment Amount**

        1.      Compensatory Damages

As evidenced and discussed in detail above, Cachet incurred damages in the amount of

$26,418,517.04 as a result of the actions of Defendants.  As such, compensatory damages of

$26,418,517.04 should be awarded to Cachet and against all Defendants.

        2.      Consequential Damages

Cachet has further been damaged as a direct consequence of Defendants' fraudulent

actions.  In particular, Cachet has been forced to incur attorneys' fees in responding to and

litigating the various class actions and also in filing the Bankruptcy Case. Had it not been for the actions of the Defendants, which led to Bancorp's freezing of Cachet's accounts and termination of its contracts with Cachet which put Cachet out of business, Cachet would not have had to respond to multiple class action and other lawsuits. Cachet also would not have been forced to shut down and file bankruptcy.

Further, Cachet's Terms and Conditions signed by MyPayrollHR at Section 7.B. state as follows: "In the event of default by Employer and/or REMARKETER, REMARKETER shall be responsible for all costs of collection arising out of the default, including, without limitation, court costs and attorneys' fees."

Cachet incurred $275,000.00 in legal fees related to defending the class actions and asserting Cachet's rights to recover its losses, and paid a retainer to its bankruptcy counsel for the Bankruptcy Case of $250,000.00 as a direct consequence of Defendants' actions.

In addition to the attorneys' fees Cachet has incurred as a result of Defendants' fraudulent conduct, Cachet has been further damaged by having to spend its own funds and borrow funds in order to cover the $26 Million loss. Because Defendants stole the $26 Million from Cachet, Cachet had to fund the loss with its own funds. To do so, Cachet used $20 million from its cash on hand plus borrowed another $7.050 million, or a total of $27.050 million.

Based on the above, the judgment in Cachet's favor should also include consequential damages in the amount of $27,575,000.00 against all Defendants.

3.    Pre-judgment Interest

Pre-judgment interest should also be added to the judgment using a rate of 4.75% which is the current federal prime rate. *See, Frommert v. Conkright*, 913 F.3d 101, 109-110 (2nd Cir. 2019). The current federal prime rate can be found at www.fedprimerate.com. This results in

pre-judgment interest in the amount of $2,154,903.92 from the filing of the Complaint through
February 24, 2020.

       4.    <u>Punitive Damages</u>

Finally, based on the evidence submitted in support of the Motion, the fraudulent actions
of Defendants were willful, wanton, malicious, egregious, and done in conscious disregard of
Cachet's rights.  Pursuant to the laws of the state of New York, while punitive damages are not
recoverable in an ordinary fraud case, they are recoverable "where the fraud, aimed at the public
generally, is gross and involves high moral culpability" or where there is a "wrongdoing
evincing a high degree of moral turpitude that demonstrates such wanton dishonesty as to imply
a criminal indifference to civil obligations."  *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961);
*Ross v. Louise Wise Services, Inc.,* 8 N.Y. 3d 478, 489 (2007); *see also, Smith v. Lightning Bolt
Products*, 861 F.2d 363, 371-72 (2nd Cir. 1988).

Here, Mann and the Defendants evidenced a complete disregard for moral guidelines and
their civil obligations not only to Cachet but to all of Cachet's remarketers, the remarketers'
employer-clients, and the employers' employees.  Mann has not only injured Cachet and its
clients but also many others.  To wit, Mann was arrested by the FBI and confessed that he had
been running a fraudulent scheme since 2010 or 2011 which resulted in him obtaining over $70
million that had not been paid back.  Defendants' conduct does not involve a mere breach of
contract but rather a nearly ten year scheme to cheat people out of tens of millions of dollars.
Such actions can be described as nothing less than morally reprehensible and gross dishonesty.

Accordingly, Cachet requests the judgment against Defendants include punitive damages
in the amount of $52,837,034.08 which is two times the amount of compensatory damages.  *See,
Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 165-67 (2nd Cir. 2014).

21

5.    Total Calculation of Damages

Based on the above, Cachet seeks entry of default judgment against the Defendants,

jointly and severally, as follows:

| | |
|---|---|
| Principal Amount | $26,418,517.04 |
| Credits | ($0.00) |
| Consequential Damages | $27,575,000.00 |
| Punitive Damages | $52,837,034.08 |
| Accrued Interest Pre-judgment | $2,154,903.92 |
| Costs and Taxable Disbursements | $0.00 |
| **Total** | **$108,985,455.04** |
| **Per Diem Rate of Post-Judgment Interest at a rate of 1.47%** | **$4,389.28** |

## IV.    CONCLUSION

For all the reasons stated herein and as evidenced in detail in the Declaration of Aberash

Asfaw and other documents filed in this case, Cachet's motion should be granted in its entirety,

such that default judgment is entered in favor of Cachet and against Defendants in the amount of

$108,985,455.04 in substantially the same form as the **Proposed Default Judgment** lodged

concurrently herewith, together with such other and further relief as the Court deems just, proper,

and equitable.

Dated: Los Angeles, California

February 24, 2020

LOEB & LOEB LLP

By:    */s/ Donald A. Miller*

Daniel A. Platt (NDNY Bar No. 518951)
Donald A. Miller (admitted *pro hac vice*)
Matthew C. Anderson (NDNY Bar No. 701311)
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
(310) 282-2000

SHULMAN BASTIAN FRIEDMAN & BUI LLP

By:   */s/ Melissa Davis Lowe*
James C. Bastian, Jr. (PHV admission pending)
Melissa Davis Lowe (PHV admission pending)
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
(949) 340-3400

*Attorneys for Plaintiff Cachet Financial Services*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2020 I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

1. Southwestern Payroll Services Inc., d/b/a Southwestern Payroll

2. Essque, Inc., d/b/a Heutmaker Business Advisors

And, I hereby certify that I have mailed by the United States Postal Service the document to the following non-CM/ECF Participants, with an electronic courtesy sent via email to:

1. MyPayrollHR, f/k/a Cloud Payroll LLC

2. Michael Mann

3. ValueWise Corporation

4. Ross Personnel Consultants Inc., d/b/a Ross Consultants

   c/o Micahel L. Koenig
   Hinckley Allen
   30 South Pearl Street, Suite 901
   Albany, New York 12207
   mkoenig@hinckleyallen.com

Dated:  Los Angeles, California                /s/ *Donald A. Miller*____
        February 24, 2020                      Donald A. Miller

3