# EXHIBIT I

## SECURED PROMISSORY NOTE

$1,000,000.00

Pasadena, California
*October 22, 2019*

      FOR VALUE RECEIVED, the undersigned CACHET FINANCIAL SERVICES, a California corporation ("Borrower") having its principal office located at 175 Lake Avenue, Suite 200, Pasadena, California 91101, hereby promises to pay to the order of HB Foundation, a Minnesota nonprofit public benefit corporation ("HB Foundation" or "Holder", depending on the context), at its principal office located at 175 S. Lake Avenue, Suite 200, Pasadena, CA 91101, or at such other place as the Holder hereof may designate, in lawful money of the United States of America and in immediately available funds, the principal sum of One Million Dollars ($1,000,000.00) (the "Loan Amount") at HB Foundation's office, or so much thereof as may be advanced and be outstanding, with interest thereon, to be computed on each advance from the date of disbursement as set forth herein.

### DEFINITIONS:

      As used herein, the following terms shall have the meanings set forth after each, and any other term defined in this Note shall have the meaning set forth at the place defined:

      (a) "Business Day" means any day except a Saturday, Sunday or any other day on which commercial banks in California are authorized or required by law to close.

      (b) "Loan Documents" means, cumulatively, the Security Agreements, as defined hereinbelow, together with this Note and all other documents to or of which CACHET is a party or beneficiary now or hereafter evidencing, securing, guarantying, modifying or otherwise relating to the secured indebtedness evidenced hereby.

      (d) "Note" means this Secured Promissory Note.

      (f) "Prime Rate" means at any time the rate of interest most recently announced by Citibank as Prime Rate, with the understanding that the Prime Rate as published by Citibank is HB Foundation's basic rate and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto.

      (g) "Secured Indebtedness" means the Loan Amount, accrued interest thereon and all other amounts due and payable under this Note and the Loan Documents.

      (h) "Term" means the period commencing on the execution and delivery of this Note and ending October 21, 2020.

### BORROWING AND REPAYMENT:

      (a) Borrowing and Repayment. Borrower may from time to time during the Term of this Note borrow, partially or wholly repay its outstanding borrowings, subject to all of the limitations, terms and conditions of this Note, and of any document executed in connection with or governing this Note; provided however, that the total outstanding borrowings under this Note shall not at any time exceed the Maximum Revolver Amount. The unpaid principal balance of this obligation at any time shall be the total amounts advanced hereunder by the Holder hereof less the amount of principal payments made hereon by or for any Borrower, which balance may be endorsed hereon from time to time by the Holder. The outstanding principal balance of this Note, together with any accrued interest shall be due and payable in full on October 21, 2020.

      (b) Application of Payments. Each payment made on this Note shall be credited first, to any interest then due and second, to the outstanding principal balance hereof.

### INTEREST RATES AND FEES:

      (a) Interest on Borrowings. The outstanding principal balance of this Note shall bear interest (computed on the basis of a three hundred sixty (360) day year, actual days elapsed) at a fluctuating rate per annum five percent (5.0%) above the Prime Rate in effect from time to time, or in effect on the first day of the applicable Fixed Rate

Term. When interest is determined in relation to the Prime Rate, each change in the rate of interest hereunder shall become effective on the date each Prime Rate change is announced.

(b) Payment of Principal and Interest. Principal and Interest payments on the outstanding principal balance of this Note are due no later than October 21, 2020.

(c) Default Interest on Borrowings. From and after the maturity date of this Note, or such earlier date as all principal owing hereunder becomes due and payable by acceleration or otherwise, the outstanding principal balance of this Note shall bear interest until paid in full at an increased rate per annum (computed on the basis of a three hundred sixty (360)-day year, actual days elapsed) equal to two percent (2.0%) above the rate of interest from time to time applicable to this Note.

(d) Secured Promissory Note Fee. An amount equal to the product of (i) two percent (2.0%) per annum (the "Secured Promissory Note Margin") and (ii) the total amount of the Note negotiated and payable in cash monthly in arrears; provided however, that if the Default Rate is in effect, the Secured Promissory Note Margin shall be increased by an additional two percent (2.0%) per annum.

(e) Examination Fees. Borrower is required to pay (a) a fee of Five Thousand Dollars ($5,000.00) per day, per auditor, plus reasonable out-of-pocket expenses for each financial audit of Borrower performed by personnel employed by HB Foundation, and (b) the actual charges paid or incurred by HB Foundation if it elects to employ the services of one or more third persons to perform financial audits of Borrower or its subsidiaries, to establish electronic collateral reporting systems, to appraise the Collateral, or any portion thereof, or to assess Borrower's or its subsidiaries' business valuation.

**PREPAYMENT:**

Borrower may prepay principal on any portion of this Note which bears interest determined in relation to the Prime Rate at any time, in any amount and without penalty; provided however, that if the outstanding principal balance of such portion of this Note is less than said amount, the minimum prepayment amount shall be the entire outstanding principal balance thereof.

In consideration of HB Foundation providing this prepayment option to Borrower, or if any such portion of this Note shall become due and payable at any time prior to the last day of the Fixed Rate Term applicable thereto by acceleration or otherwise, Borrower shall pay to HB Foundation immediately upon demand a fee which is the sum of the discounted monthly differences for each month of prepayment through the month in which such Fixed Rate Term matures, calculated as follows for each such month:

Determine the amount of interest which would have accrued each month on the amount prepaid at the interest rate applicable to such amount had it remained outstanding until the last day of the Fixed Rate Term applicable.

**SECURITY:**

Contemporaneously with the execution of this Note, Borrower shall execute and deliver to HB Foundation the following as security for performance of its obligations under and pursuant to this Note and the loan by HB Foundation to Borrower (collectively the "Security Agreements"):

(a) Security Agreement, in form and substance, attached as Exhibit "A" to this Note.

(b) Stock Pledge Agreement, in form and substance, attached as Exhibit "B" to this Note.

(c) Corporate Guarantee – Conversion of Indebtedness, in form and substance as attached as Exhibit "C" to this Note.

**EVENTS OF DEFAULT:**

The occurrence of any of the following shall constitute an "Event of Default" under this Note:

(a) The failure to pay any principal, interest, fees or other charges when due hereunder or under any contract, instrument or document executed in connection with this Note.

(b) The payment by CACHET of any amount of principal and/or interest under any other promissory note or otherwise to HB Foundation, National Services Inc. and/or Al Blowers personally.

(c) The filing of a petition by or against Borrower, any guarantor of this Note or any general partner or joint venturer in Borrower which is a partnership or a joint venture (with each such guarantor, general partner and/or joint venturer referred to herein as a "Third-Party Obligor") under any provisions of the Bankruptcy Reform Act, Title 11 of the United States Code, as amended or recodified from time to time, or under any similar or other law relating to bankruptcy, insolvency, reorganization or other relief for debtors; the appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of Borrower or any Third Party Obligor; Borrower or any Third Party Obligor becomes insolvent, makes a general assignment for the benefit of creditors or is generally not paying its debts as they become due; or any attachment or like levy on any property of Borrower or any Third Party Obligor.

(c) The dissolution or liquidation of Borrower.

(d) Any default in the payment or performance of any obligation, or any defined event of default, under any provisions of any contract, instrument or document pursuant to which Borrower or any Third-Party Obligor has incurred any obligation for borrowed money, any purchase obligation, or any other liability of any kind to any person or entity, including the Holder.

(e) Any financial statement provided by Borrower or any Third-Party Obligor to HB Foundation proves to be incorrect, false or misleading in any material respect.

(f) Any sale or transfer of all or a substantial or material part of the assets of Borrower or any Third-Party Obligor other than in the ordinary course of its business.

(g) Any violation or breach of any provision of, or any defined event of default under, any addendum to this Note or any loan agreement, guaranty, security agreement, deed of trust, mortgage or other document executed in connection with or securing this Note.

HB Foundation agrees to provide Borrower with written notice of any default under this Note or any other agreement of document executed in connection with this Note and (i) five (5) days to cure any default that is a monetary default hereunder and/or thereunder, and (ii) twenty (20) days to cure any default that is a non-monetary default here under and/or thereunder. Such notice shall be provided to the following address, via email, facsimile, or overnight carrier, the delivery date of which will be considered on the date such notice is received by Borrower:

To Borrower: CACHET Financial Services
175 South Lake Avenue, Suite 200
Pasadena, CA 91101
Attention: Aberash Asfaw, President
Phone: (626) 578-9400
Fax: (626) 568-3938
Email: aberash@cachetbank.com

With a copy to: Law Office of Wendy L. Slavkin
Wendy Slavkin, Esq.
11707 Sunset Blvd., Suite 24
Los Angeles, CA 90049
Phone: 610-476-1959
Fax: 310-476-1939
E-mail: wendy@slavkinlaw.com

**FINANCIAL REPORTING**

Until payment in full of all obligations of Borrower hereunder, Borrower shall provide to HB Foundation all of the following, in form and detail satisfactory to HB Foundation:

(a) An audited financial statement of Borrower, prepared externally by qualified CPA firm, submitted each year for the prior year, but not more than four (4) months after the end of Borrower's fiscal accounting year end;

(b) Copies of Borrower's filed federal income tax returns for the prior year within fifteen (15) days after March 15 of each year;

(c) Not later than fifteen (15) calendar days after and as of the end of each month, copies of monthly financial statements for Borrower, in the form as required by HB Foundation; and

(d) From time to time such financial and other information as HB Foundation may reasonably request.

# LIQUIDITY COVENANT

Borrower shall maintain on a combined basis, unencumbered liquid assets (defined as cash, cash equivalents and/or publicly traded/quoted marketable securities acceptable to HB Foundation) with an aggregate face or market value not at any time less than one hundred twenty percent (120%) of the loan amount and accrued interest thereto.

**FINANCIAL AND OTHER COVENANTS**

Borrower must maintain the following covenants, such covenants to commence as of the date hereof. Borrower and HB Foundation agree to revisit the following covenants, on an annual basis, and to consider modifications thereto based upon enhancements in the financial condition, results of operations and cash flows of Borrower, or in the event that Borrower shall fail to meet industry acceptable ratio requirements.

**Interest Coverage Ratio:** Is calculated by dividing a company's earnings before interest, taxes, depreciation and amortization ("EBITDA") for a period by the company's interest expense for the same period (EBITDA/Interest Expense). Borrower will be required to maintain a ratio greater than or equal to _____. Dividends accrued and/or paid on preferred stock for income statement purposes are reflected below the net income line and, therefore, shall not be considered for purposes of the calculation.

**Cash Coverage (also known as Liquidity) Ratio:** Is computed by dividing a company's EBITDA by current liabilities (excluding funds held for clients) (EBITDA/ Liabilities). Expected greater than or equal to _____. Dividends accrued on preferred stock shall not be considered current liabilities.

**Current Ratio:** This ratio, which measures a company's liquidity, is computed by dividing current assets (excluding funds held for clients) by current liabilities (excluding funds held for clients) (current assets / current liabilities). Borrower is expected to maintain a minimum of _____. Current liabilities shall include the principal payments required for the twelve (12) months following the date of the balance sheet. Dividends accrued on preferred stock shall not be considered current liabilities.

**Debt Service Ratio:** Is calculated by dividing a company's EBITDA by the sum of interest expense and current portion of long-term debt (including current portion of capital lease obligations but not including current portion of subordinated debt or preferred stock liquidation preference). The ratio shall be greater than or equal to _____. Dividends accrued and/or paid on preferred stock for income statement purposes are reflected below the net income line and, therefore, shall not be considered for purposes of the calculation

**Minimum EBITDA:** Earnings before interest, taxes, depreciation and amortization (EBITDA) shall equal a minimum of _____ percent (_____%) of gross revenue.

**Payroll/Revenue Ratio:** This ratio measures the total cost of salaries, wages, employment taxes, employees' benefits, consulting, outsourcing, and other payroll related expenses to total revenue. This ratio shall

not exceed _____ percent (_____%) of revenue for the period ending _____, and shall be reduced by two percent (2%) each year thereafter until ratio reaches forty percent (40%). Forty percent (40%) shall be maintained through remainder of this Note.

**NEGATIVE PLEDGE:**

Borrower shall not permit the officers and/or shareholders of Borrower to mortgage, pledge, grant or permit to exist a security interest in, or lien upon, all or any portion of Borrower's assets now owned or hereafter acquired, except any of the foregoing in favor of HB Foundation or which is disclosed to HB Foundation in writing prior to the date hereof.

**NO WAIVER:**

No failure to exercise and no delay in exercising on the part of HB Foundation, of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. No waiver by HB Foundation of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by HB Foundation.

**WAIVER:**

Borrower hereby waives presentment, demand for payment, protest, notice of dishonor, notice of protest or nonpayment, notice of intent to accelerate, notice of acceleration of maturity and diligence in connection with the enforcement of this Note or the taking of any action to collect sums owing hereunder. Borrower hereby further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents. Borrower hereby further waives any rights pursuant to California Civil Code Sections 1479 and 2822 (and any amendments or successors thereto), to designate how payments will be applied, and acknowledges and agrees that Lender shall have the right in its sole discretion to determine the order and method of the application of payments on this Note or any other Loan Document.

**OTHER INDEBTEDNESS:**

Borrower shall not permit the officers and/or shareholders of Borrower to create, incur, assume or permit to exist any indebtedness or liabilities resulting from borrowing, loans or advances; whether secured or unsecured, matured or unmatured, liquidated or unliquidated, joint or several, except (a) any other liabilities existing as of, and disclosed to HB Foundation prior to, the date hereof, and (b) additional liabilities not to exceed Five Thousand Dollars ($5,000.00) in the aggregate.

**MISCELLANEOUS:**

(a) _Remedies_.  Upon the occurrence of any Event of Default and at any time thereafter, the Holder of this Note, at the Holder's option, may (i) declare all sums of principal under this Note, together with all accrued interest outstanding thereon and all other Secured Indebtedness, to be immediately due and payable without presentment, demand, notice of nonperformance, notice of protest, protest or notice of dishonor, all of which are expressly waived by each Borrower; and (ii) exercise any or all of its rights, powers or remedies under the Loan Documents or applicable law or available in equity; _provided_, _however_, that, if an Event of Default shall occur, the principal of and accrued interest on the loan and other Secured Indebtedness shall become immediately due and payable automatically and without any notice, declaration or other act on the part of HB Foundation; and, _provided further_, _however_,  the obligation, if any, of the Holder to extend any further credit hereunder shall immediately cease and terminate.  Borrower shall pay to the Holder immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all

allocated costs of the Holder's in-house counsel, if any), expended or incurred by the Holder in connection with the enforcement of the Holder's rights and/or the collection of any amounts which become due to the Holder under this Note, and the prosecution or defense of any action in any way related to this Note, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by HB Foundation or any other person) relating to Borrower or any other person or entity. The remedies of HB Foundation, as provided in this Note and the other Loan Documents, shall be cumulative and concurrent and may be pursued singly, successively or together, at the sole discretion of HB Foundation, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof.

In addition to the foregoing, upon the occurrence of any Event of Default, HB Foundation will be entitled to the benefits of the security provided by the Security Agreements and will have the right to enforce the covenants and agreements of each such Security Agreement set forth therein. The covenants, conditions and agreements contained in the Security Agreements are made part of this instrument.

(b) Obligations Joint and Several. Should more than one person or entity sign this Note as Borrower, the obligations of each such Borrower shall be joint and several.

(c) Governing Law. This Note shall be construed and enforced in accordance with the laws of the State of California. All actions in connection with, or pertaining to, this Note or its subject matter shall be commenced in the Superior Court of California, County of Los Angeles or, if a federal action is brought, the Los Angeles Courthouse of the Southern Division of the Central District of California.

(d) Attorneys' Fees. HB Foundation and Borrower each agree to bear his, her or its own attorneys' fees in regard to the preparation and negotiation of this Note and the other agreements in connection therewith. Notwithstanding the foregoing, if any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to actual attorneys' fees, costs (including expert witness fees), and necessary disbursements in addition to any relief to which he, she or it may be entitled.

(e) Use of Funds. Borrower hereby represents, warrants, covenants and agrees that all funds disbursed hereunder shall be used solely for business or commercial purposes and that no funds disbursed hereunder shall be used for personal, family or household purposes.

(f) Integration. This Note and the documents described herein constitute the entire understanding of Borrower and HB Foundation with respect to the matters set forth in this Note, and supersede all prior and contemporaneous discussions, agreements and representations, whether oral or written. This Note may only be modified in a writing signed by HB Foundation or the Holder hereof and the Borrower.

(g) Severability. If any term or provision of this Note is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date first written above.

**"BORROWER"**

By: _____
Aberash Asfaw, President
CACHET FINANCIAL SERVICES
Address:        175 S. Lake Avenue
                Suite 200
                Pasadena, CA 91191

**SECURITY AGREEMENT**

1. **GRANT OF SECURITY INTEREST.** For valuable consideration, the undersigned **CACHET FINANCIAL SERVICES.** a California corporation ("Debtor"), hereby grants and transfers to **HB FOUNDATION**, a Minnesota nonprofit public benefit corporation ("HB Foundation") a security interest in the following (hereinafter referred to herein collectively as the "Collateral"), all on the terms and conditions as more fully described in this security agreement (the "Security Agreement"):

   a) **Equipment.** A security interest in equipment - all goods, tools, machinery, furnishings, furniture and other equipment, now or at any time hereafter, and prior to the termination hereof, owned or acquired by Debtor, wherever located, whether in the possession of Debtor or any other person and whether located on Debtor's property or elsewhere, and all improvements, replacements, accessions and additions thereto and embedded software included therein (collectively called "Equipment Collateral"), together with whatever is receivable or received when any of the Equipment Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, (i) all accounts, contract rights, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles and other rights to payment of every kind now or at any time hereafter arising from any such sale, lease, collection, exchange or other disposition of any of the foregoing, (ii) all rights to payment, including returned premiums, with respect to any insurance relating to any of the foregoing , and (iii) all rights to payment with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Equipment Proceeds").

   b) **Rights to Payment and Inventory.** A security interest in rights to payment and Inventory - in all accounts, deposit accounts, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, health-care insurance receivable and other rights to payment (collectively called "Rights To Payment"), now existing or at any time hereafter, and prior to the termination thereof, arising (whether they arise from the sale, lease or other disposition of inventory or from performance of contracts for service, manufacture, construction, repair or otherwise or from any other source whatsoever), including all securities, guaranties, warranties, indemnity agreements, insurance policies, supporting obligations and other agreements pertaining to the same or the property described therein, and in all goods returned by or repossessed from Debtor's customers, together with a security interest in all inventory, goods held for sale or lease or to be furnished under contract for service, goods so leased or furnished, raw materials, component parts and embedded software, work in process or materials used or consumed in Debtor's business and all warehouse receipts, bills of lading and other documents evidencing goods owned or acquired by Debtor, and all goods covered thereby, now or at any time hereafter, and prior to the termination hereof, owned or acquired by debtor, wherever located, and all products thereof (collectively called "Inventory"), whether in the possession of Debtor, warehousemen, bailees or any other person, or in the process of delivery and whether located at Debtor's places of business or elsewhere (with all Rights to Payment and Inventory referred to herein collectively as the "Payment and Inventory Collateral"), together with whatever is receivable or received when any of the Payment and Inventory Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all Rights to Payment, including returned premiums, with respect to any insurance relating to any of the foregoing, and all Rights to Payment with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Payment and Inventory Proceeds").

   c) **Third Party Securities.** A security interest in securities of entities held by Debtor as an investment, including, but not limited to, all shares of stock in corporations, membership interests in limited liability companies, partnership interests in any general or limited partnerships, or other forms of ownership interests held by Debtor whether or not registered with the United States Securities and Exchange Commission or any foreign securities agency (collectively called "Securities Collateral"), and all rights to dividends, cash distributions, or other payments with respect to such Securities to which Debtor is entitled (collectively called "Distribution Rights"), now existing or at any time hereafter, and prior to the termination of this Security Agreement, arising, whether such Securities are in the possession of Debtor, a broker-dealer, investment advisor, or other third party, together with whatever is

receivable or received when any of the Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all Distribution Rights, and all Distribution Rights with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Securities Proceeds").

2. **OBLIGATIONS SECURED; CONTINUING AGREEMENT; REVOCATION; OBLIGATION UNDER OTHER AGREEMENTS.** This Security Agreement is a continuing agreement and all rights, powers and remedies hereunder shall apply to all past, present and future indebtedness of the Debtor to HB Foundation, including that arising under successive transactions which shall either continue the indebtedness, increase or decrease it, or from time to time create new indebtedness after all any prior indebtedness has been satisfied, and notwithstanding the death, incapacity, dissolution, liquidation or bankruptcy of the Debtor or any other event or proceeding affecting the Debtor. In addition to the foregoing, the obligations secured hereby are the payment and performance of: (a) all obligations of Debtor and rights of HB Foundation under this Security Agreement; and (b) all present and future obligations of Debtor to HB Foundation of other kinds. The word "indebtedness" is used herein in its most comprehensive sense and includes any and all advances debts, obligations and liabilities of Debtor, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Debtor may be liable individually or jointly, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.

3. **TERMINATION.** This Agreement will terminate upon the performance of all obligations of Debtor to HB Foundation, including without limitation, the payment of all indebtedness of Debtor to HB Foundation, and the termination of all commitments of HB Foundation to extend credit to Debtor, existing at the time HB Foundation receives written notice from Debtor of the termination of this Agreement.

4. **OBLIGATIONS OF HB Foundation.** HB Foundation has no obligation to make any loan hereunder. Any money received by HB Foundation in respect of the Equipment Collateral, Rights to Payment and Inventory Collateral, Third Party Securities Collateral and Funding Account Collateral (collectively the "Collateral"), and/or the Equipment Proceeds, Payment and Inventory Proceeds, and Third Party Securities Proceeds (collectively the "Proceeds") may be deposited, at HB Foundation's option, into a non-interest bearing account over which Debtor shall have no control, and the same shall, for all purposes, be deemed Collateral hereunder. In addition, HB Foundation shall have no duty to take any steps necessary to preserve the rights of Owner against prior parties, or to initiate any action to protect against the possibility of a decline in the market value of the Collateral or Proceeds. HB Foundation shall not be obligated to take any actions with respect to the Collateral or Proceeds requested by Debtor unless such request is made in writing and HB Foundation determines, in its sole and absolute discretion, that the requested action would not unreasonably jeopardize the value of the Collateral and Proceeds as security for the indebtedness.

5. **REPRESENTATIONS AND WARRANTIES.** Debtor represents and warrants to HB Foundation that: (a) Debtor's legal name is exactly as set forth on the first page of this Agreement, and all of Debtor's organizational documents or agreements delivered to HB Foundation are complete and accurate in every respect; (b) Debtor is the owner and has possession or control of the Collateral and Proceeds; (c) Debtor has the exclusive right to grant a security interest in the Collateral and Proceeds; (d) all Collateral and Proceeds are genuine, free from liens, adverse claims, setoffs, default, prepayment, defenses and conditions precedent of any kind or character, except the lien created hereby or as otherwise agreed to by HB Foundation, or heretofore disclosed by Debtor to HB Foundation in writing; (e) all statements contained herein are true and complete in all material respects; (f) no financing statement covering any of the Collateral or Proceeds, and naming any secured party other than HB Foundation, is on file in any public office; and

(g) Debtor is not in the business of selling goods of the kind included within the Collateral subject to this Agreement, and Debtor acknowledges that no sale or other disposition of any Collateral including without limitation, any Collateral which Debtor may deem to be surplus, has been or shall be consented to or acquiesced in by HB Foundation, except as specifically set forth in writing by HB Foundation.

6. **COVENANTS OF DEBTOR.**

   a) Debtor Agrees in general: (i) to pay Indebtedness secured hereby when due; (ii) to indemnify HB Foundation against all losses, claims, demands, liabilities and expenses of every kind caused by property subject hereto; (iii) to pay all costs and expenses, including reasonable attorneys' fees, incurred by HB Foundation in the perfection and preservation of the Collateral or HB Foundation's interest therein and/or the realization, enforcement and exercise of HB Foundation's rights, powers and remedies hereunder; (iv) to permit HB Foundation to exercise its powers; (v) to execute and deliver such documents as HB Foundation deems necessary to create, perfect and continue the security interests contemplated hereby; (vi) not to change its name, and as applicable, its chief executive office, its principle residence or the jurisdiction in which it is organized and/or registered without giving HB Foundation prior written notice thereof; (vii) not to change the places where Debtor keeps any Collateral or Debtor's records concerning the Collateral and Proceeds without giving HB Foundation prior written notice of the address to which Debtor is moving same; and (viii) to cooperate with HB Foundation in perfecting all security interests granted herein and in obtaining such agreements from third parties as HB Foundation deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights hereunder.

   b) Debtor agrees with regard to the Collateral and Proceeds, unless HB Foundation agrees otherwise in writing: (i) that HB Foundation is authorized to file financing statements in the name of Debtor to perfect HB Foundation's security interest in Collateral and Proceeds; (ii) to insure the Collateral with HB Foundation as loss payee in form, substance and amounts, under agreements, against risks and liabilities, and with insurance companies satisfactory to HB Foundation; (iii) to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control thereof, and not to use the Collateral for any unlawful purpose or in any way that would void any insurance required to be carried in connection therewith; (iv) not to permit any security interest in or lien on the Collateral or Proceeds, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of HB Foundation; (v) to pay when due all license fees, registration fees and other charges in connection with any Collateral; (vi) not to remove the Collateral from Debtor's premises unless the Collateral consists of mobile goods as defined in the California Uniform Commercial Code, in which case Debtor agrees not to remove or permit the removal of the Collateral from its state of domicile for a period in excess of 30 calendar days; (vii) not to sell, hypothecate or otherwise dispose of, nor permit the transfer by operation of law of, any of the Collateral or Proceeds or any interest therein; (viii) not to rent, lease or charter the Collateral; (ix) to permit HB Foundation to inspect the Collateral at any time; (x) to keep, in accordance with generally accepted accounting principles, complete and accurate records regarding all Collateral and Proceeds, and to permit HB Foundation to inspect the same and make copies thereof at any reasonable time; (xi) if requested by HB Foundation, to receive and use reasonable diligence to collect Proceeds, in trust and as the property of HB Foundation, and to immediately endorse as appropriate and deliver such Proceeds to HB Foundation daily in the exact form in which they are received together with a collection report in form satisfactory to HB Foundation; (xii) not to commingle Proceeds or collections thereunder with other property; (xiii) to give only normal allowances and credits and to advise HB Foundation thereof immediately in writing if they affect any Collateral or Proceeds in any material respect; (xiv) in the event HB Foundation elects to receive payments of Proceeds hereunder, to pay all expenses incurred by HB Foundation in connection therewith, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and expenses incidental thereto; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all Collateral and, as appropriate and applicable, to keep the Collateral in good and saleable condition and repair, to deal with the Collateral in accordance with the standards and practices adhered to generally by owners of like property, and to keep all Collateral and Proceeds free and clear of all defenses, rights of offset and counterclaims.

7. **POWERS OF HB Foundation.** Debtor appoints HB Foundation its true attorney-in-fact to perform any of the following powers, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by HB Foundation's officers and employees, or any of them, whether or not Debtor is in default: (a) to perform any obligation of Debtor hereunder in Debtor's name or otherwise; (b) to give notice to account debtors or others of HB Foundation's rights in the Collateral and Proceeds, to enforce or forebear from enforcing the

same and make extension or modification agreements with respect thereto;  (c) to release persons liable on Proceeds and to give receipts and acquittances and compromise disputes in connection therewith;  (d) to release or substitute security;  (e) to resort to security in any order; (f) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, termination statements, statements of assignment, applications for registration or like papers to perfect, preserve or release HB Foundation's interest in the Collateral and Proceeds;  (g) to receive, open and read mail addressed to Debtor;  (h) to take cash, instruments for the payment of money and other property to which HB Foundation is entitled;  (i) to verify facts concerning the Collateral and Proceeds by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name;  (j) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to proceeds;  (k) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by HB Foundation, at HB Foundation's sole option, toward repayment of the Indebtedness or replacement of the Collateral;  (l) to exercise all rights, powers and remedies which Debtor would have, but for this Agreement, with respect to all Collateral and Proceeds subject hereto;  (m) to enter into Debtor's premises in inspecting the Collateral;  and (n) to do all acts and things and execute all documents in the name of Debtor or otherwise, deemed by HB Foundation as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights hereunder.

8.  **DEBTOR'S WAIVERS.**

   a)  Debtor waives any right to require HB Foundation to:  (i) proceed against the Debtor of any other person; (ii) marshal assets or proceed against or exhaust any security held from the Debtor or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from the Debtor or any other person; (iv) take any action or pursue any other remedy in HB Foundation's power; or (v) make any presentment or demand for performance, or give any notice of nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by HB Foundation as security for or which constitute in whole or in part the indebtedness secured hereunder, or in connection with the creation of new or additional Indebtedness.

   b)  Debtor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of the Debtor of any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of the Debtor or any other person; (iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf of the Debtor which is a corporation, limited liability company, partnership or other type of entity, or any defect in the formation of such Debtor;  (iv) the application by the Debtor of the proceeds of any indebtedness for purposes other than the purposes represented by Debtor to, or intended or understood by, HB Foundation, or any shareholder of Debtor; (v) any act or omission by HB Foundation which directly or indirectly results in or aids the discharge of the Debtor or any portion of the indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of HB Foundation against the Debtor (vi) any impairment of the value of any interest in any security for the indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) any modification of the indebtedness, in any form whatsoever, including any modification made after revocation hereof to any indebtedness incurred prior to such revocation, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; or (viii) any requirement that HB Foundation give any notice of acceptance of this Security Agreement. Until all indebtedness shall have been paid in full, Debtor shall have no right of subrogation, and Debtor waives any right to enforce any remedy which HB Foundation now has or may hereafter have against the Debtor or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by HB Foundation.

9.  **PAYMENT OF PREMIUMS, TAXES, CHARGES, LIENS AND ASSESSMENTS.** Debtor agrees to pay, prior to delinquency, all insurance premiums, taxes, charges, liens and assessments against the Collateral and Proceeds, and upon the failure of Debtor to do so, HB Foundation at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same. Any such payments made by HB Foundation shall be obligations of Debtor to HB Foundation, due and payable immediately upon demand, together with interest at a rate determined in accordance with the provisions of Section 16 hereof, and shall be secured by the Collateral and Proceeds, subject to all terms and conditions of this Agreement.

10. **EVENTS OF DEFAULT.** The occurrence of any of the following shall constitute an "Event of Default" under this Security Agreement: (a) any default in the payment or performance of any obligation, or any defined event of default, under (i) any contract or instrument evidencing any Indebtedness, or (ii) any other agreement between Debtor and HB Foundation, including without limitation any loan agreement, relating to or executed in connection with any Indebtedness; (b) any representation or warranty made by Debtor herein shall prove to be incorrect, false or misleading in any material respect when made; (c) Debtor shall fail to observe or perform any obligation or agreement contained herein; (d) any impairment of the rights of HB Foundation in any Collateral or Proceeds or any attachment or like levy on any property of Debtor; and (e) HB Foundation, in good faith, believes any or all of the Collateral and/or Proceeds to be in danger of misuse, dissipation, commingling, loss, theft, damage or destruction, or otherwise in jeopardy or unsatisfactory in character or value.

11. **REMEDIES.** Upon the occurrence of any Event of Default, HB Foundation shall have the right to declare immediately due and payable all or any Indebtedness secured hereby and to terminate any commitments to make loans or otherwise extend credit to Debtor. HB Foundation shall have and may exercise without demand any and all other rights, powers, privileges and remedies granted to a secured party upon default under the California Uniform Commercial Code or otherwise provided by law, including without limitation, the right (a) to contact all persons obligated to Debtor on any Collateral or Proceeds and to instruct such persons to deliver all Collateral and/or Proceeds directly to HB Foundation, and (b) to sell, lease, license or otherwise dispose of any or all Collateral. All rights, powers, privileges and remedies of HB Foundation shall be cumulative. No delay, failure or discontinuance of HB Foundation in exercising any right, power, privilege or remedy hereunder shall affect or operate as a waiver of such right, power, privilege or remedy; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. Any waiver, permit, consent or approval of any kind by HB Foundation of any default hereunder, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing. It is agreed that public or private sales or other dispositions, for cash or on credit, to a wholesaler or retailer or investor, or user of property of the types subject to this Agreement, or public auctions, are all commercially reasonable since differences in the prices generally realized in the different kinds of dispositions are ordinarily offset by the differences in the costs and credit risks of such dispositions.

    While an Event of Default exists: (a) Debtor will deliver to HB Foundation from time to time, as requested by HB Foundation, current lists of all Collateral and Proceeds; (b) Debtor will not dispose of any Collateral or Proceeds except on terms approved by HB Foundation; (c) at HB Foundation's request, Debtor will assemble and deliver all Collateral and Proceeds, and books and records pertaining thereto, to HB Foundation at a reasonably convenient place designated by HB Foundation; (d) HB Foundation may, without notice to Debtor, enter onto Debtor's premises and take possession of the Collateral and (e) HB Foundation may take any action with respect to the Collateral contemplated by any control, custodial or other similar agreement then in effect among HB Foundation and owner. Debtor further agrees that HB Foundation shall have no obligation to process or prepare any Collateral for sale or other disposition. For any Collateral or Proceeds consisting of securities, HB Foundation shall be under no obligation to delay a disposition of any portion thereof for the period of time necessary to permit the issuer thereof to register such securities for public sale under any applicable state or federal law, even if the issuer thereof would agree to do so. Owner further agrees that HB Foundation shall have no obligation to process or prepare any Collateral for sale or other disposition.

12. **DISPOSITION OF COLLATERAL AND PROCEEDS; TRANSFER OF INDEBTEDNESS.** In disposing of Collateral hereunder, HB Foundation may disclaim all warranties of title, possession, quiet enjoyment and the like. Any proceeds

of any disposition of any Collateral or Proceeds, or any part thereof, may be applied by HB Foundation to the payment of expenses incurred by HB Foundation in connection with the foregoing, including reasonable attorney's fees, and the balance of such proceeds may be applied by HB Foundation toward the payment of the Indebtedness in such order of application as HB Foundation may from time to time elect. Upon the transfer of all or any part of the Indebtedness, HB Foundation may transfer all or any part of the Collateral or Proceeds and shall be fully discharged thereafter from all liability and responsibility with respect to any of the foregoing so transferred, and the transferee shall be vested with all rights and powers of HB Foundation hereunder with respect to any of the foregoing so transferred; but with respect to any Collateral or Proceeds not so transferred HB Foundation shall retain all rights, powers, privileges and remedies herein given.

13. **STATUTE OF LIMITATIONS.** Until all indebtedness shall have been paid in full and all commitments by HB Foundation to extend credit to Debtor have been terminated, the power of sale or other disposition and all other rights, powers, privileges and remedies granted to HB Foundation hereunder shall continue to exist and may be exercised by HB Foundation at any time and from time to time irrespective of the fact that the Indebtedness or any part thereof may have become barred by any statute of limitations, or that the personal liability of Debtor may have ceased, unless such liability shall have ceased due to the payment in full of all Indebtedness secured hereunder.

14. **MISCELLANEOUS.** When there is more than one Debtor named herein: (a) the word "Debtor" shall mean all or any one or more of them as the context requires; (b) the obligations of each Debtor hereunder are joint and several; and (c) until all Indebtedness shall have been paid in full, no Debtor shall have any right of subrogation or contribution, and each Debtor hereby waives any benefit of or right to participate in any of the Collateral or Proceeds or any other security now or hereafter held by HB Foundation. Debtor hereby waives any right to require HB Foundation to (i) proceed against Debtor or any other person, (ii) proceed against or exhaust any security from Debtor or any other person, (iii) perform any obligation of Debtor with respect to any Collateral or Proceeds, and (d) make any presentment or demand, or give any notice of nonpayment or nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any Collateral or Proceeds. Debtor further waives any right to direct the application of payments or security for any Indebtedness of Debtor or indebtedness of customers of Debtor.

15. **NOTICES.** All notices, requests and demands required under this Agreement must be in writing, addressed to HB Foundation at the address specified in any other loan documents entered into between Debtor and HB Foundation and to Debtor at the address of its chief executive office (or principal residence, if applicable) specified below or to such other address as any party may designate by written notice to each other party, and shall be deemed to have been given or made as follows: (a) if personally delivered, upon delivery; (b) if sent by mail, upon the earlier of the date of receipt or 3 days after deposit in the U.S. mail, first class and postage prepaid; and (c) if sent by telecopy, upon receipt.

16. **COSTS, EXPENSES AND ATTORNEY'S FEES.** Debtor shall pay to HB Foundation immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorney's fees (to include outside counsel fees and all allocated costs of HB Foundation's in-house counsel), expended or incurred by HB Foundation in exercising any right, power, privilege or remedy conferred by this Agreement or in the enforcement thereof, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by HB Foundation or any other person) relating to Debtor or in any way affecting any of the Collateral or HB Foundation's ability to exercise any of its rights or remedies with respect thereto. All of the foregoing shall be paid by Debtor with interest from the date of demand until paid in full at a rate per annum equal to the greater of ten percent (10%) or the CitiBank Prime Rate in effect from time to time.

17. **SUCCESSORS; ASSIGNS; AMENDMENT.** This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties, and may be amended or modified only in writing signed by HB Foundation and Debtor.

18. **AMENDMENT.** This Security Agreement may be amended or modified only in writing signed by HB Foundation and Debtor.

19. **APPLICATION OF SINGULAR AND PLURAL.** In all cases where there is but a single Debtor, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Debtor named herein, or when this Security Agreement is executed by more than one Debtor, the word "Debtors" shall mean all or any one or more of them as the context requires.

20. **SEVERABILITY OF PROVISIONS.** If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

21. **GOVERNING LAW; JURISDICTION.** This Agreement shall be construed and enforced in accordance with the laws of the State of California. All actions in connection with or pertaining to this Agreement or its subject matter shall be commenced in the Superior Court of California, County of Los Angeles. Debtor hereby (a) waives, to the fullest extent permitted by law, any objection or defense that the Debtor may now or hereafter have based on improper venue, lack of personal jurisdiction, inconvenience of forum or any similar matter in any action brought in such court; (b) agrees that final judgment in any action brought in the court shall be conclusive and binding upon Debtor and may be enforced in any other court to the jurisdiction of which Debtor is subject, by a suit upon such judgment; (c) consents to the service of process on Debtor in any action by the mailing of a copy thereof by registered or certified mail, postage prepaid, to Debtor at Debtor's address; and (d) agrees that service in accordance with this Section 18 shall in every respect be effective and binding on Debtor to the same extent as though served on Debtor in person by a person duly authorized to serve such process. Nothing in this Section 18 shall limit or restrict Secured Party's right to serve process or bring Agreement Actions in manners and in courts otherwise than as herein provided.

Debtor warrants the Debtor is an organization registered under the laws of the State of California.

Debtor warrants that its chief executive office (or principal residence, if applicable) is located at the following address:

175 South Lake Avenue, Suite 200, Pasadena, CA 91101.

Debtor warrants that the Collateral (except goods in transit) is located or domiciled at the following additional address: 175 South Lake Avenue, Suite 200, Pasadena, CA 91101 (if none, type "None".)

IN WITNESS WHEREOF, this Agreement has been duly executed as of October 22, 2019.

CACHET FINANCIAL SERVICES

By: _____
Aberash Asfaw
President

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Adrian Foushee  626-578-9400 | |
| **B. E-MAIL CONTACT AT FILER (optional)**<br>adrian@cachetbanq.com | |
| **C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**<br><br>┌ HB Foundation<br>  175 S Lake Avenue, Suite 200<br>  Pasadena, CA 91101 ┐ | |

| Filed in the Office of<br><br>*Barbara K. Cegavske*<br><br>Secretary of State<br>State Of Nevada | Initial Filing Number<br>**2019052703-4**<br>Filed On<br>**November 6, 2019 10:00 AM**<br>Number of Pages<br>**8** |
|---|---|

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME<br>**Cachet Financial Services** | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS<br>**175 S Lake Avenue, Suite 200** | CITY<br>**Pasadena** | STATE **CA** / POSTAL CODE **91101** | COUNTRY<br>**USA** |

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME<br>**HB Foundation** | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS<br>**175 S Lake Avenue, Suite 200** | CITY<br>**Pasadena** | STATE **CA** / POSTAL CODE **91101** | COUNTRY<br>**USA** |

**4. COLLATERAL:** This financing statement covers the following collateral:

**See attached document**

| 5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|
| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: <br>☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | 6b. Check <u>only</u> if applicable and check <u>only</u> one box:<br>☐ Agricultural Lien  ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer | ☐ Bailee/Bailor  ☐ Licensee/Licensor |
| 8. OPTIONAL FILER REFERENCE DATA: | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

**SECURITY AGREEMENT**

1. **GRANT OF SECURITY INTEREST.** For valuable consideration, the undersigned **CACHET FINANCIAL SERVICES.** a California corporation ("Debtor"), hereby grants and transfers to **HB FOUNDATION**, a Minnesota nonprofit public benefit corporation ("HB Foundation") a security interest in the following (hereinafter referred to herein collectively as the "Collateral"), all on the terms and conditions as more fully described in this security agreement (the "Security Agreement"):

   a) **Equipment.** A security interest in equipment - all goods, tools, machinery, furnishings, furniture and other equipment, now or at any time hereafter, and prior to the termination hereof, owned or acquired by Debtor, wherever located, whether in the possession of Debtor or any other person and whether located on Debtor's property or elsewhere, and all improvements, replacements, accessions and additions thereto and embedded software included therein (collectively called "Equipment Collateral"), together with whatever is receivable or received when any of the Equipment Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, (i) all accounts, contract rights, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles and other rights to payment of every kind now or at any time hereafter arising from any such sale, lease, collection, exchange or other disposition of any of the foregoing, (ii) all rights to payment, including returned premiums, with respect to any insurance relating to any of the foregoing , and (iii) all rights to payment with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Equipment Proceeds").

   b) **Rights to Payment and Inventory.** A security interest in rights to payment and Inventory - in all accounts, deposit accounts, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, health-care insurance receivable and other rights to payment (collectively called "Rights To Payment"), now existing or at any time hereafter, and prior to the termination thereof, arising (whether they arise from the sale, lease or other disposition of inventory or from performance of contracts for service, manufacture, construction, repair or otherwise or from any other source whatsoever), including all securities, guaranties, warranties, indemnity agreements, insurance policies, supporting obligations and other agreements pertaining to the same or the property described therein, and in all goods returned by or repossessed from Debtor's customers, together with a security interest in all Inventory, goods held for sale or lease or to be furnished under contract for service, goods so leased or furnished, raw materials, component parts and embedded software, work in process or materials used or consumed in Debtor's business and all warehouse receipts, bills of lading and other documents evidencing goods owned or acquired by Debtor, and all goods covered thereby, now or at any time hereafter, and prior to the termination hereof, owned or acquired by debtor, wherever located, and all products thereof (collectively called "Inventory"), whether in the possession of Debtor, warehousemen, bailees or any other person, or in the process of delivery and whether located at Debtor's places of business or elsewhere (with all Rights to Payment and Inventory referred to herein collectively as the "Payment and Inventory Collateral"), together with whatever is receivable or received when any of the Payment and Inventory Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all Rights to Payment, including returned premiums, with respect to any insurance relating to any of the foregoing, and all Rights to Payment with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Payment and Inventory Proceeds").

   c) **Third Party Securities.** A security interest in securities of entities held by Debtor as an investment, including, but not limited to, all shares of stock in corporations, membership interests in limited liability companies, partnership interests in any general or limited partnerships, or other forms of ownership interests held by Debtor whether or not registered with the United States Securities and Exchange Commission or any foreign securities agency (collectively called "Securities Collateral"), and all rights to dividends, cash distributions, or other payments with respect to such Securities to which Debtor is entitled (collectively called "Distribution Rights"), now existing or at any time hereafter, and prior to the termination of this Security Agreement, arising, whether such Securities are in the possession of Debtor, a broker-dealer, investment advisor, or other third party, together with whatever is

receivable or received when any of the Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all Distribution Rights, and all Distribution Rights with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Securities Proceeds").

2. **OBLIGATIONS SECURED; CONTINUING AGREEMENT; REVOCATION; OBLIGATION UNDER OTHER AGREEMENTS.** This Security Agreement is a continuing agreement and all rights, powers and remedies hereunder shall apply to all past, present and future indebtedness of the Debtor to HB Foundation, including that arising under successive transactions which shall either continue the indebtedness, increase or decrease it, or from time to time create new indebtedness after all any prior indebtedness has been satisfied, and notwithstanding the death, incapacity, dissolution, liquidation or bankruptcy of the Debtor or any other event or proceeding affecting the Debtor. In addition to the foregoing, the obligations secured hereby are the payment and performance of: (a) all obligations of Debtor and rights of HB Foundation under this Security Agreement; and (b) all present and future obligations of Debtor to HB Foundation of other kinds. The word "indebtedness" is used herein in its most comprehensive sense and includes any and all advances debts, obligations and liabilities of Debtor, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Debtor may be liable individually or jointly, or whether recovery upon such indebtedness may be or hereafter becomes unenforceable.

3. **TERMINATION.** This Agreement will terminate upon the performance of all obligations of Debtor to HB Foundation, including without limitation, the payment of all indebtedness of Debtor to HB Foundation, and the termination of all commitments of HB Foundation to extend credit to Debtor, existing at the time HB Foundation receives written notice from Debtor of the termination of this Agreement.

4. **OBLIGATIONS OF HB Foundation.** HB Foundation has no obligation to make any loan hereunder. Any money received by HB Foundation in respect of the Equipment Collateral, Rights to Payment and Inventory Collateral, Third Party Securities Collateral and Funding Account Collateral (collectively the "Collateral"), and/or the Equipment Proceeds, Payment and Inventory Proceeds, and Third Party Securities Proceeds (collectively the "Proceeds") may be deposited, at HB Foundation's option, into a non-interest bearing account over which Debtor shall have no control, and the same shall, for all purposes, be deemed Collateral hereunder. In addition, HB Foundation shall have no duty to take any steps necessary to preserve the rights of Owner against prior parties, or to initiate any action to protect against the possibility of a decline in the market value of the Collateral or Proceeds. HB Foundation shall not be obligated to take any actions with respect to the Collateral or Proceeds requested by Debtor unless such request is made in writing and HB Foundation determines, in its sole and absolute discretion, that the requested action would not unreasonably jeopardize the value of the Collateral and Proceeds as security for the indebtedness.

5. **REPRESENTATIONS AND WARRANTIES.** Debtor represents and warrants to HB Foundation that: (a) Debtor's legal name is exactly as set forth on the first page of this Agreement, and all of Debtor's organizational documents or agreements delivered to HB Foundation are complete and accurate in every respect;  (b) Debtor is the owner and has possession or control of the Collateral and Proceeds; (c) Debtor has the exclusive right to grant a security interest in the Collateral and Proceeds; (d) all Collateral and Proceeds are genuine, free from liens, adverse claims, setoffs, default, prepayment, defenses and conditions precedent of any kind or character, except the lien created hereby or as otherwise agreed to by HB Foundation, or heretofore disclosed by Debtor to HB Foundation in writing;  (e) all statements contained herein are true and complete in all material respects;  (f) no financing statement covering any of the Collateral or Proceeds, and naming any secured party other than HB Foundation, is on file in any public office; and

(g) Debtor is not in the business of selling goods of the kind included within the Collateral subject to this Agreement, and Debtor acknowledges that no sale or other disposition of any Collateral including without limitation, any Collateral which Debtor may deem to be surplus, has been or shall be consented to or acquiesced in by HB Foundation, except as specifically set forth in writing by HB Foundation.

6.  **COVENANTS OF DEBTOR.**

a)  Debtor Agrees in general: (i) to pay Indebtedness secured hereby when due; (ii) to indemnify HB Foundation against all losses, claims, demands, liabilities and expenses of every kind caused by property subject hereto; (iii) to pay all costs and expenses, including reasonable attorneys' fees, incurred by HB Foundation in the perfection and preservation of the Collateral or HB Foundation's interest therein and/or the realization, enforcement and exercise of HB Foundation's rights, powers and remedies hereunder; (iv) to permit HB Foundation to exercise its powers; (v) to execute and deliver such documents as HB Foundation deems necessary to create, perfect and continue the security interests contemplated hereby; (vi) not to change its name, and as applicable, its chief executive office, its principle residence or the jurisdiction in which it is organized and/or registered without giving HB Foundation prior written notice thereof; (vii) not to change the places where Debtor keeps any Collateral or Debtor's records concerning the Collateral and Proceeds without giving HB Foundation prior written notice of the address to which Debtor is moving same; and (viii) to cooperate with HB Foundation in perfecting all security interests granted herein and in obtaining such agreements from third parties as HB Foundation deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights hereunder.

b)  Debtor agrees with regard to the Collateral and Proceeds, unless HB Foundation agrees otherwise in writing: (i) that HB Foundation is authorized to file financing statements in the name of Debtor to perfect HB Foundation's security interest in Collateral and Proceeds; (ii) to insure the Collateral with HB Foundation as loss payee in form, substance and amounts, under agreements, against risks and liabilities, and with insurance companies satisfactory to HB Foundation; (iii) to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control thereof, and not to use the Collateral for any unlawful purpose or in any way that would void any insurance required to be carried in connection therewith; (iv) not to permit any security interest in or lien on the Collateral or Proceeds, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of HB Foundation; (v) to pay when due all license fees, registration fees and other charges in connection with any Collateral; (vi) not to remove the Collateral from Debtor's premises unless the Collateral consists of mobile goods as defined in the California Uniform Commercial Code, in which case Debtor agrees not to remove or permit the removal of the Collateral from its state of domicile for a period in excess of 30 calendar days; (vii) not to sell, hypothecate or otherwise dispose of, nor permit the transfer by operation of law of, any of the Collateral or Proceeds or any interest therein; (viii) not to rent, lease or charter the Collateral; (ix) to permit HB Foundation to inspect the Collateral at any time; (x) to keep, in accordance with generally accepted accounting principles, complete and accurate records regarding all Collateral and Proceeds, and to permit HB Foundation to inspect the same and make copies thereof at any reasonable time; (xi) if requested by HB Foundation, to receive and use reasonable diligence to collect Proceeds, in trust and as the property of HB Foundation, and to immediately endorse as appropriate and deliver such Proceeds to HB Foundation daily in the exact form in which they are received together with a collection report in form satisfactory to HB Foundation; (xii) not to commingle Proceeds or collections thereunder with other property; (xiii) to give only normal allowances and credits and to advise HB Foundation thereof immediately in writing if they affect any Collateral or Proceeds in any material respect; (xiv) in the event HB Foundation elects to receive payments of Proceeds hereunder, to pay all expenses incurred by HB Foundation in connection therewith, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and expenses incidental thereto; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all Collateral and, as appropriate and applicable, to keep the Collateral in good and saleable condition and repair, to deal with the Collateral in accordance with the standards and practices adhered to generally by owners of like property, and to keep all Collateral and Proceeds free and clear of all defenses, rights of offset and counterclaims.

7.  **POWERS OF HB Foundation.** Debtor appoints HB Foundation its true attorney-in-fact to perform any of the following powers, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by HB Foundation's officers and employees, or any of them, whether or not Debtor is in default: (a) to perform any obligation of Debtor hereunder in Debtor's name or otherwise; (b) to give notice to account debtors or others of HB Foundation's rights in the Collateral and Proceeds, to enforce or forebear from enforcing the

same and make extension or modification agreements with respect thereto;  (c) to release persons liable on Proceeds and to give receipts and acquittances and compromise disputes in connection therewith;  (d) to release or substitute security;  (e) to resort to security in any order;  (f) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, termination statements, statements of assignment, applications for registration or like papers to perfect, preserve or release HB Foundation's interest in the Collateral and Proceeds;  (g) to receive, open and read mail addressed to Debtor;  (h) to take cash, instruments for the payment of money and other property to which HB Foundation is entitled;  (i) to verify facts concerning the Collateral and Proceeds by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name;  (j) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to proceeds;  (k) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by HB Foundation, at HB Foundation's sole option, toward repayment of the Indebtedness or replacement of the Collateral;  (l) to exercise all rights, powers and remedies which Debtor would have, but for this Agreement, with respect to all Collateral and Proceeds subject hereto;  (m) to enter into Debtor's premises in inspecting the Collateral;  and (n) to do all acts and things and execute all documents in the name of Debtor or otherwise, deemed by HB Foundation as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights hereunder.

8.  **DEBTOR'S WAIVERS.**

   a)  Debtor waives any right to require HB Foundation to:  (i) proceed against the Debtor of any other person; (ii) marshal assets or proceed against or exhaust any security held from the Debtor or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from the Debtor or any other person; (iv) take any action or pursue any other remedy in HB Foundation's power: or (v) make any presentment or demand for performance, or give any notice of nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by HB Foundation as security for or which constitute in whole or in part the indebtedness secured hereunder, or in connection with the creation of new or additional Indebtedness.

   b)  Debtor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of the Debtor of any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of the Debtor or any other person; (iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf of the Debtor which is a corporation, limited liability company, partnership or other type of entity, or any defect in the formation of such Debtor;  (iv)  the application by the Debtor of the proceeds of any indebtedness for purposes other than the purposes represented by Debtor to, or intended or understood by, HB Foundation, or any shareholder of Debtor; (v) any act or omission by HB Foundation which directly or indirectly results in or aids the discharge of the Debtor or any portion of the indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of HB Foundation against the Debtor (vi) any impairment of the value of any interest in any security for the indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) any modification of the indebtedness, in any form whatsoever, including any modification made after revocation hereof to any indebtedness incurred prior to such revocation, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; or (viii) any requirement that HB Foundation give any notice of acceptance of this Security Agreement. Until all indebtedness shall have been paid in full, Debtor shall have no right of subrogation, and Debtor waives any right to enforce any remedy which HB Foundation now has or may hereafter have against the Debtor or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by HB Foundation.

9. **PAYMENT OF PREMIUMS, TAXES, CHARGES, LIENS AND ASSESSMENTS.** Debtor agrees to pay, prior to delinquency, all insurance premiums, taxes, charges, liens and assessments against the Collateral and Proceeds, and upon the failure of Debtor to do so, HB Foundation at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same. Any such payments made by HB Foundation shall be obligations of Debtor to HB Foundation, due and payable immediately upon demand, together with interest at a rate determined in accordance with the provisions of Section 16 hereof, and shall be secured by the Collateral and Proceeds, subject to all terms and conditions of this Agreement.

10. **EVENTS OF DEFAULT.** The occurrence of any of the following shall constitute an "Event of Default" under this Security Agreement: (a) any default in the payment or performance of any obligation, or any defined event of default, under (i) any contract or instrument evidencing any Indebtedness, or (ii) any other agreement between Debtor and HB Foundation, including without limitation any loan agreement, relating to or executed in connection with any Indebtedness; (b) any representation or warranty made by Debtor herein shall prove to be incorrect, false or misleading in any material respect when made; (c) Debtor shall fail to observe or perform any obligation or agreement contained herein; (d) any impairment of the rights of HB Foundation in any Collateral or Proceeds or any attachment or like levy on any property of Debtor; and (e) HB Foundation, in good faith, believes any or all of the Collateral and/or Proceeds to be in danger of misuse, dissipation, commingling, loss, theft, damage or destruction, or otherwise in jeopardy or unsatisfactory in character or value.

11. **REMEDIES.** Upon the occurrence of any Event of Default, HB Foundation shall have the right to declare immediately due and payable all or any Indebtedness secured hereby and to terminate any commitments to make loans or otherwise extend credit to Debtor. HB Foundation shall have and may exercise without demand any and all other rights, powers, privileges and remedies granted to a secured party upon default under the California Uniform Commercial Code or otherwise provided by law, including without limitation, the right (a) to contact all persons obligated to Debtor on any Collateral or Proceeds and to instruct such persons to deliver all Collateral and/or Proceeds directly to HB Foundation, and (b) to sell, lease, license or otherwise dispose of any or all Collateral. All rights, powers, privileges and remedies of HB Foundation shall be cumulative. No delay, failure or discontinuance of HB Foundation in exercising any right, power, privilege or remedy hereunder shall affect or operate as a waiver of such right, power, privilege or remedy; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. Any waiver, permit, consent or approval of any kind by HB Foundation of any default hereunder, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing. It is agreed that public or private sales or other dispositions, for cash or on credit, to a wholesaler or retailer or investor, or user of property of the types subject to this Agreement, or public auctions, are all commercially reasonable since differences in the prices generally realized in the different kinds of dispositions are ordinarily offset by the differences in the costs and credit risks of such dispositions.

While an Event of Default exists: (a) Debtor will deliver to HB Foundation from time to time, as requested by HB Foundation, current lists of all Collateral and Proceeds; (b) Debtor will not dispose of any Collateral or Proceeds except on terms approved by HB Foundation; (c) at HB Foundation's request, Debtor will assemble and deliver all Collateral and Proceeds, and books and records pertaining thereto, to HB Foundation at a reasonably convenient place designated by HB Foundation; (d) HB Foundation may, without notice to Debtor, enter onto Debtor's premises and take possession of the Collateral and (e) HB Foundation may take any action with respect to the Collateral contemplated by any control, custodial or other similar agreement then in effect among HB Foundation and owner. Debtor further agrees that HB Foundation shall have no obligation to process or prepare any Collateral for sale or other disposition. For any Collateral or Proceeds consisting of securities, HB Foundation shall be under no obligation to delay a disposition of any portion thereof for the period of time necessary to permit the issuer thereof to register such securities for public sale under any applicable state or federal law, even if the issuer thereof would agree to do so. Owner further agrees that HB Foundation shall have no obligation to process or prepare any Collateral for sale or other disposition.

12. **DISPOSITION OF COLLATERAL AND PROCEEDS; TRANSFER OF INDEBTEDNESS.** In disposing of Collateral hereunder, HB Foundation may disclaim all warranties of title, possession, quiet enjoyment and the like. Any proceeds

of any disposition of any Collateral or Proceeds, or any part thereof, may be applied by HB Foundation to the payment of expenses incurred by HB Foundation in connection with the foregoing, including reasonable attorney's fees, and the balance of such proceeds may be applied by HB Foundation toward the payment of the Indebtedness in such order of application as HB Foundation may from time to time elect. Upon the transfer of all or any part of the Indebtedness, HB Foundation may transfer all or any part of the Collateral or Proceeds and shall be fully discharged thereafter from all liability and responsibility with respect to any of the foregoing so transferred, and the transferee shall be vested with all rights and powers of HB Foundation hereunder with respect to any of the foregoing so transferred; but with respect to any Collateral or Proceeds not so transferred HB Foundation shall retain all rights, powers, privileges and remedies herein given.

13. **STATUTE OF LIMITATIONS.** Until all indebtedness shall have been paid in full and all commitments by HB Foundation to extend credit to Debtor have been terminated, the power of sale or other disposition and all other rights, powers, privileges and remedies granted to HB Foundation hereunder shall continue to exist and may be exercised by HB Foundation at any time and from time to time irrespective of the fact that the Indebtedness or any part thereof may have become barred by any statute of limitations, or that the personal liability of Debtor may have ceased, unless such liability shall have ceased due to the payment in full of all Indebtedness secured hereunder.

14. **MISCELLANEOUS.** When there is more than one Debtor named herein: (a) the word "Debtor" shall mean all or any one or more of them as the context requires; (b) the obligations of each Debtor hereunder are joint and several; and (c) until all Indebtedness shall have been paid in full, no Debtor shall have any right of subrogation or contribution, and each Debtor hereby waives any benefit of or right to participate in any of the Collateral or Proceeds or any other security now or hereafter held by HB Foundation. Debtor hereby waives any right to require HB Foundation to (i) proceed against Debtor or any other person, (ii) proceed against or exhaust any security from Debtor or any other person, (iii) perform any obligation of Debtor with respect to any Collateral or Proceeds, and (d) make any presentment or demand, or give any notice of nonpayment or nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any Collateral or Proceeds. Debtor further waives any right to direct the application of payments or security for any Indebtedness of Debtor or indebtedness of customers of Debtor.

15. **NOTICES.** All notices, requests and demands required under this Agreement must be in writing, addressed to HB Foundation at the address specified in any other loan documents entered into between Debtor and HB Foundation and to Debtor at the address of its chief executive office (or principal residence, if applicable) specified below or to such other address as any party may designate by written notice to each other party, and shall be deemed to have been given or made as follows: (a) if personally delivered, upon delivery; (b) if sent by mail, upon the earlier of the date of receipt or 3 days after deposit in the U.S. mail, first class and postage prepaid; and (c) if sent by telecopy, upon receipt.

16. **COSTS, EXPENSES AND ATTORNEY'S FEES.** Debtor shall pay to HB Foundation immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorney's fees (to include outside counsel fees and all allocated costs of HB Foundation's in-house counsel), expended or incurred by HB Foundation in exercising any right, power, privilege or remedy conferred by this Agreement or in the enforcement thereof, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by HB Foundation or any other person) relating to Debtor or in any way affecting any of the Collateral or HB Foundation's ability to exercise any of its rights or remedies with respect thereto. All of the foregoing shall be paid by Debtor with interest from the date of demand until paid in full at a rate per annum equal to the greater of ten percent (10%) or the CitiBank Prime Rate in effect from time to time.

17. **SUCCESSORS; ASSIGNS; AMENDMENT.** This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties, and may be amended or modified only in writing signed by HB Foundation and Debtor.

18. **AMENDMENT.** This Security Agreement may be amended or modified only in writing signed by HB Foundation and Debtor.

19. **APPLICATION OF SINGULAR AND PLURAL.** In all cases where there is but a single Debtor, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Debtor named herein, or when this Security Agreement is executed by more than one Debtor, the word "Debtors" shall mean all or any one or more of them as the context requires.

20. **SEVERABILITY OF PROVISIONS.** If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

21. **GOVERNING LAW; JURISDICTION.** This Agreement shall be construed and enforced in accordance with the laws of the State of California. All actions in connection with or pertaining to this Agreement or its subject matter shall be commenced in the Superior Court of California, County of Los Angeles. Debtor hereby (a) waives, to the fullest extent permitted by law, any objection or defense that the Debtor may now or hereafter have based on improper venue, lack of personal jurisdiction, inconvenience of forum or any similar matter in any action brought in such court; (b) agrees that final judgment in any action brought in the court shall be conclusive and binding upon Debtor and may be enforced in any other court to the jurisdiction of which Debtor is subject, by a suit upon such judgment; (c) consents to the service of process on Debtor in any action by the mailing of a copy thereof by registered or certified mail, postage prepaid, to Debtor at Debtor's address; and (d) agrees that service in accordance with this Section 18 shall in every respect be effective and binding on Debtor to the same extent as though served on Debtor in person by a person duly authorized to serve such process. Nothing in this Section 18 shall limit or restrict Secured Party's right to serve process or bring Agreement Actions in manners and in courts otherwise than as herein provided.

Debtor warrants the Debtor is an organization registered under the laws of the State of California.

Debtor warrants that its chief executive office (or principal residence, if applicable) is located at the following address:

175 South Lake Avenue, Suite 200, Pasadena, CA 91101.

Debtor warrants that the Collateral (except goods in transit) is located or domiciled at the following additional address: 175 South Lake Avenue, Suite 200, Pasadena, CA 91101 (if none, type "None".)

IN WITNESS WHEREOF, this Agreement has been duly executed as of October 22, 2019.

CACHET FINANCIAL SERVICES

By: _____
Aberash Asfaw
President

## SECURED PROMISSORY NOTE

$6,050,000.00

Pasadena, California
*October 22, 2019*

FOR VALUE RECEIVED, the undersigned CACHET FINANCIAL SERVICES, a California corporation ("Borrower") having its principal office located at 175 Lake Avenue, Suite 200, Pasadena, California 91101, hereby promises to pay to the order of NATIONAL SERVICES, Inc., a Nevada corporation ("National Services" or "Holder", depending on the context), at its principal office located at 175 S. Lake Avenue, Suite 200, Pasadena, CA 91101, or at such other place as the Holder hereof may designate, in lawful money of the United States of America and in immediately available funds, the principal sum of Six Million Fifty Thousand Dollars ($6,050,000.00) (the "Loan Amount") at National Services's office, or so much thereof as may be advanced and be outstanding, with interest thereon, to be computed on each advance from the date of disbursement as set forth herein.

### DEFINITIONS:

As used herein, the following terms shall have the meanings set forth after each, and any other term defined in this Note shall have the meaning set forth at the place defined:

(a) "Business Day" means any day except a Saturday, Sunday or any other day on which commercial banks in California are authorized or required by law to close.

(b) "Loan Documents" means, cumulatively, the Security Agreements, as defined hereinbelow, together with this Note and all other documents to or of which CACHET is a party or beneficiary now or hereafter evidencing, securing, guarantying, modifying or otherwise relating to the secured indebtedness evidenced hereby.

(d) "Note" means this Secured Promissory Note.

(f) "Prime Rate" means at any time the rate of interest most recently announced by Citibank as Prime Rate, with the understanding that the Prime Rate as published by Citibank is National Services's basic rate and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto.

(g) "Secured Indebtedness" means the Loan Amount, accrued interest thereon and all other amounts due and payable under this Note and the Loan Documents.

(h) "Term" means the period commencing on the execution and delivery of this Note and ending October 21, 2020.

### BORROWING AND REPAYMENT:

(a) <u>Borrowing and Repayment</u>.  Borrower may from time to time during the Term of this Note borrow, partially or wholly repay its outstanding borrowings, subject to all of the limitations, terms and conditions of this Note, and of any document executed in connection with or governing this Note; provided however, that the total outstanding borrowings under this Note shall not at any time exceed the Maximum Revolver Amount.  The unpaid principal balance of this obligation at any time shall be the total amounts advanced hereunder by the Holder hereof less the amount of principal payments made hereon by or for any Borrower, which balance may be endorsed hereon from time to time by the Holder.  The outstanding principal balance of this Note, together with any accrued interest shall be due and payable in full on October 21, 2020.

(b) <u>Application of Payments</u>.  Each payment made on this Note shall be credited first, to any interest then due and second, to the outstanding principal balance hereof.

### INTEREST RATES AND FEES:

(a) <u>Interest on Borrowings</u>.  The outstanding principal balance of this Note shall bear interest (computed on the basis of a three hundred sixty (360) day year, actual days elapsed) at a fluctuating rate per annum Five percent (5.0%) above the Prime Rate in effect from time to time, or in effect on the first day of the applicable Fixed Rate

Term. When interest is determined in relation to the Prime Rate, each change in the rate of interest hereunder shall become effective on the date each Prime Rate change is announced. Said interest shall accrue from and after (i) September 11, 2019 with respect to the principal sum of Two Million Dollars ($2,000,000), (ii) September 13, 2019 with respect to the principal sum of One Million Dollars ($1,000,000)and (iii) September 14, 2019 with respect to the principal sum of Three Million Fifty Thousand Dollars ($3,050,000).

(b) <u>Payment of Principal and Interest</u>. Principal and Interest payments on the outstanding principal balance of this Note are due no later than October 21, 2020.

(c) <u>Default Interest on Borrowings</u>. From and after the maturity date of this Note, or such earlier date as all principal owing hereunder becomes due and payable by acceleration or otherwise, the outstanding principal balance of this Note shall bear interest until paid in full at an increased rate per annum (computed on the basis of a three hundred sixty (360)-day year, actual days elapsed) equal to two percent (2.0%) above the rate of interest from time to time applicable to this Note.

(d) <u>Secured Promissory Note Fee</u>. An amount equal to the product of (i) two percent (2.0%) per annum (the "Secured Promissory Note Margin") and (ii) the total amount of the Note negotiated and payable in cash monthly in arrears; <u>provided however</u>, that if the Default Rate is in effect, the Secured Promissory Note Margin shall be increased by an additional two percent (2.0%) per annum.

(e) <u>Examination Fees</u>. Borrower is required to pay (a) a fee of Five Thousand Dollars ($5,000.00) per day, per auditor, plus reasonable out-of-pocket expenses for each financial audit of Borrower performed by personnel employed by National Services, and (b) the actual charges paid or incurred by National Services if it elects to employ the services of one or more third persons to perform financial audits of Borrower or its subsidiaries, to establish electronic collateral reporting systems, to appraise the Collateral, or any portion thereof, or to assess Borrower's or its subsidiaries' business valuation.

**PREPAYMENT:**

Borrower may prepay principal on any portion of this Note which bears interest determined in relation to the Prime Rate at any time, in any amount and without penalty; provided however, that if the outstanding principal balance of such portion of this Note is less than said amount, the minimum prepayment amount shall be the entire outstanding principal balance thereof.

In consideration of National Services providing this prepayment option to Borrower, or if any such portion of this Note shall become due and payable at any time prior to the last day of the Fixed Rate Term applicable thereto by acceleration or otherwise, Borrower shall pay to National Services immediately upon demand a fee which is the sum of the discounted monthly differences for each month of prepayment through the month in which such Fixed Rate Term matures, calculated as follows for each such month:

Determine the amount of interest which would have accrued each month on the amount prepaid at the interest rate applicable to such amount had it remained outstanding until the last day of the Fixed Rate Term applicable.

**SECURITY:**

Contemporaneously with the execution of this Note, Borrower shall execute and deliver to National Services the following as security for performance of its obligations under and pursuant to this Note and the loan by National Services to Borrower (collectively the "Security Agreements"):

(a) Security Agreement, in form and substance, attached as Exhibit "A" to this Note.

(b) Stock Pledge Agreement, in form and substance, attached as Exhibit "B" to this Note.

(c) Corporate Guarantee – Conversion of Indebtedness, in form and substance as attached as Exhibit "C" to this Note.

**EVENTS OF DEFAULT:**

The occurrence of any of the following shall constitute an "Event of Default" under this Note:

(a) The failure to pay any principal, interest, fees or other charges when due hereunder or under any contract, instrument or document executed in connection with this Note.

(b) The payment by CACHET of any amount of principal and/or interest under any other promissory note or otherwise to National Services, National Services Inc. and/or Al Blowers personally.

(c) The filing of a petition by or against Borrower, any guarantor of this Note or any general partner or joint venturer in Borrower which is a partnership or a joint venture (with each such guarantor, general partner and/or joint venturer referred to herein as a "Third-Party Obligor") under any provisions of the Bankruptcy Reform Act, Title 11 of the United States Code, as amended or recodified from time to time, or under any similar or other law relating to bankruptcy, insolvency, reorganization or other relief for debtors; the appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of Borrower or any Third Party Obligor; Borrower or any Third Party Obligor becomes insolvent, makes a general assignment for the benefit of creditors or is generally not paying its debts as they become due; or any attachment or like levy on any property of Borrower or any Third Party Obligor.

(c) The dissolution or liquidation of Borrower.

(d) Any default in the payment or performance of any obligation, or any defined event of default, under any provisions of any contract, instrument or document pursuant to which Borrower or any Third-Party Obligor has incurred any obligation for borrowed money, any purchase obligation, or any other liability of any kind to any person or entity, including the Holder.

(e) Any financial statement provided by Borrower or any Third-Party Obligor to National Services proves to be incorrect, false or misleading in any material respect.

(f) Any sale or transfer of all or a substantial or material part of the assets of Borrower or any Third-Party Obligor other than in the ordinary course of its business.

(g) Any violation or breach of any provision of, or any defined event of default under, any addendum to this Note or any loan agreement, guaranty, security agreement, deed of trust, mortgage or other document executed in connection with or securing this Note.

National Services agrees to provide Borrower with written notice of any default under this Note or any other agreement of document executed in connection with this Note and (i) five (5) days to cure any default that is a monetary default hereunder and/or thereunder, and (ii) twenty (20) days to cure any default that is a non-monetary default here under and/or thereunder. Such notice shall be provided to the following address, via email, facsimile, or overnight carrier, the delivery date of which will be considered on the date such notice is received by Borrower:

To Borrower:               CACHET Financial Services
175 South Lake Avenue, Suite 200
Pasadena, CA 91101
Attention: Aberash Asfaw, President
Phone: (626) 578-9400
Fax: (626) 568-3938
Email: aberash@cachetbank.com


With a copy to:          Law Office of Wendy L. Slavkin
Wendy Slavkin, Esq.
11707 Sunset Blvd., Suite 24
Los Angeles, CA 90049
Phone: 610-476-1959
Fax: 310-476-1939
E-mail: wendy@slavkinlaw.com

## FINANCIAL REPORTING

Until payment in full of all obligations of Borrower hereunder, Borrower shall provide to National Services all of the following, in form and detail satisfactory to National Services:

(a) An audited financial statement of Borrower, prepared externally by qualified CPA firm, submitted each year for the prior year, but not more than four (4) months after the end of Borrower's fiscal accounting year end;

(b) Copies of Borrower's filed federal income tax returns for the prior year within fifteen (15) days after March 15 of each year;

(c) Not later than fifteen (15) calendar days after and as of the end of each month, copies of monthly financial statements for Borrower, in the form as required by National Services; and

(d) From time to time such financial and other information as National Services may reasonably request.

## LIQUIDITY COVENANT:

Borrower shall maintain on a combined basis, unencumbered liquid assets (defined as cash, cash equivalents and/or publicly traded/quoted marketable securities acceptable to HB Foundation) with an aggregate face or market value not at any time less than one hundred twenty percent (120%) of the loan amount and accrued interest thereto.

## FINANCIAL AND OTHER COVENANTS:

Borrower must maintain the following covenants, such covenants to commence as of the date hereof. Borrower and National Services agree to revisit the following covenants, on an annual basis, and to consider modifications thereto based upon enhancements in the financial condition, results of operations and cash flows of Borrower, or in the event that Borrower shall fail to meet industry acceptable ratio requirements.

**Interest Coverage Ratio:** Is calculated by dividing a company's earnings before interest, taxes, depreciation and amortization ("EBITDA") for a period by the company's interest expense for the same period (EBITDA/Interest Expense). Borrower will be required to maintain a ratio greater than or equal to _____. Dividends accrued and/or paid on preferred stock for income statement purposes are reflected below the net income line and, therefore, shall not be considered for purposes of the calculation.

**Cash Coverage (also known as Liquidity) Ratio**: Is computed by dividing a company's EBITDA by current liabilities (excluding funds held for clients) (EBITDA/ Liabilities). Expected greater than or equal to _____. Dividends accrued on preferred stock shall not be considered current liabilities.

**Current Ratio**: This ratio, which measures a company's liquidity, is computed by dividing current assets (excluding funds held for clients) by current liabilities (excluding funds held for clients) (current assets / current liabilities). Borrower is expected to maintain a minimum of _____. Current liabilities shall include the principal payments required for the twelve (12) months following the date of the balance sheet. Dividends accrued on preferred stock shall not be considered current liabilities.

**Debt Service Ratio**: Is calculated by dividing a company's EBITDA by the sum of interest expense and current portion of long-term debt (including current portion of capital lease obligations but not including current portion of subordinated debt or preferred stock liquidation preference). The ratio shall be greater than or equal to _____. Dividends accrued and/or paid on preferred stock for income statement purposes are reflected below the net income line and, therefore, shall not be considered for purposes of the calculation

**Minimum EBITDA:** Earnings before interest, taxes, depreciation and amortization (EBITDA) shall equal a minimum of _____ percent (_____%) of gross revenue.

**Payroll/Revenue Ratio:** This ratio measures the total cost of salaries, wages, employment taxes, employees' benefits, consulting, outsourcing, and other payroll related expenses to total revenue. This ratio shall

not exceed _____ percent (_____%) of revenue for the period ending _____, and shall be reduced by two percent (2%) each year thereafter until ratio reaches forty percent (40%). Forty percent (40%) shall be maintained through remainder of this Note.

## NEGATIVE PLEDGE:

Borrower shall not permit the officers and/or shareholders of Borrower to mortgage, pledge, grant or permit to exist a security interest in, or lien upon, all or any portion of Borrower's assets now owned or hereafter acquired, except any of the foregoing in favor of National Services or which is disclosed to National Services in writing prior to the date hereof.

## NO WAIVER:

No failure to exercise and no delay in exercising on the part of National Services, of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. No waiver by National Services of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by National Services.

## WAIVER:

Borrower hereby waives presentment, demand for payment, protest, notice of dishonor, notice of protest or nonpayment, notice of intent to accelerate, notice of acceleration of maturity and diligence in connection with the enforcement of this Note or the taking of any action to collect sums owing hereunder. Borrower hereby further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents. Borrower hereby further waives any rights pursuant to California Civil Code Sections 1479 and 2822 (and any amendments or successors thereto), to designate how payments will be applied, and acknowledges and agrees that Lender shall have the right in its sole discretion to determine the order and method of the application of payments on this Note or any other Loan Document.

## OTHER INDEBTEDNESS:

Borrower shall not permit the officers and/or shareholders of Borrower to create, incur, assume or permit to exist any indebtedness or liabilities resulting from borrowing, loans or advances; whether secured or unsecured, matured or unmatured, liquidated or unliquidated, joint or several, except (a) any other liabilities existing as of, and disclosed to National Services prior to, the date hereof, and (b) additional liabilities not to exceed Five Thousand Dollars ($5,000.00) in the aggregate.

## MISCELLANEOUS:

(a) Remedies.  Upon the occurrence of any Event of Default and at any time thereafter, the Holder of this Note, at the Holder's option, may (i) declare all sums of principal under this Note, together with all accrued interest outstanding thereon and all other Secured Indebtedness, to be immediately due and payable without presentment, demand, notice of nonperformance, notice of protest, protest or notice of dishonor, all of which are expressly waived by each Borrower; and (ii) exercise any or all of its rights, powers or remedies under the Loan Documents or applicable law or available in equity; provided, however, that, if an Event of Default shall occur, the principal of and accrued interest on the loan and other Secured Indebtedness shall become immediately due and payable automatically and without any notice, declaration or other act on the part of National Services; and, provided further, however,  the obligation, if any, of the Holder to extend any further credit hereunder shall immediately cease and terminate.  Borrower shall pay to the Holder immediately upon demand the full amount of all payments,

advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all allocated costs of the Holder's in-house counsel, if any), expended or incurred by the Holder in connection with the enforcement of the Holder's rights and/or the collection of any amounts which become due to the Holder under this Note, and the prosecution or defense of any action in any way related to this Note, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by National Services or any other person) relating to Borrower or any other person or entity. The remedies of National Services, as provided in this Note and the other Loan Documents, shall be cumulative and concurrent and may be pursued singly, successively or together, at the sole discretion of National Services, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof.

In addition to the foregoing, upon the occurrence of any Event of Default, National Services will be entitled to the benefits of the security provided by the Security Agreements and will have the right to enforce the covenants and agreements of each such Security Agreement set forth therein. The covenants, conditions and agreements contained in the Security Agreements are made part of this instrument.

(b) Obligations Joint and Several. Should more than one person or entity sign this Note as Borrower, the obligations of each such Borrower shall be joint and several.

(c) Governing Law. This Note shall be construed and enforced in accordance with the laws of the State of California. All actions in connection with, or pertaining to, this Note or its subject matter shall be commenced in the Superior Court of California, County of Los Angeles or, if a federal action is brought, the Los Angeles Courthouse of the Southern Division of the Central District of California.

(d) Attorneys' Fees. National Services and Borrower each agree to bear his, her or its own attorneys' fees in regard to the preparation and negotiation of this Note and the other agreements in connection therewith. Notwithstanding the foregoing, if any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to actual attorneys' fees, costs (including expert witness fees), and necessary disbursements in addition to any relief to which he, she or it may be entitled.

(e) Use of Funds. Borrower hereby represents, warrants, covenants and agrees that all funds disbursed hereunder shall be used solely for business or commercial purposes and that no funds disbursed hereunder shall be used for personal, family or household purposes.

(f) Integration. This Note and the documents described herein constitute the entire understanding of Borrower and National Services with respect to the matters set forth in this Note, and supersede all prior and contemporaneous discussions, agreements and representations, whether oral or written. This Note may only be modified in a writing signed by National Services or the Holder hereof and the Borrower.

(g) Severability. If any term or provision of this Note is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date first written above.

**"BORROWER"**


By: _____
Aberash Asfaw, President
CACHET FINANCIAL SERVICES
Address:        175 S. Lake Avenue
                Suite 200
                Pasadena, CA 91191

**SECURITY AGREEMENT**

1. **GRANT OF SECURITY INTEREST**. For valuable consideration, the undersigned **CACHET FINANCIAL SERVICES.** a California corporation ("Debtor"), hereby grants and transfers to **NATIONAL SERVICES, INC.,** a Nevada corporation ("National Services") a security interest in the following (hereinafter referred to herein collectively as the "Collateral"), all on the terms and conditions as more fully described in this security agreement (the "Security Agreement"):

   a) **Equipment.** A security interest in equipment - all goods, tools, machinery, furnishings, furniture and other equipment, now or at any time hereafter, and prior to the termination hereof, owned or acquired by Debtor, wherever located, whether in the possession of Debtor or any other person and whether located on Debtor's property or elsewhere, and all improvements, replacements, accessions and additions thereto and embedded software included therein (collectively called "Equipment Collateral"), together with whatever is receivable or received when any of the Equipment Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, (i) all accounts, contract rights, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles and other rights to payment of every kind now or at any time hereafter arising from any such sale, lease, collection, exchange or other disposition of any of the foregoing, (ii) all rights to payment, including returned premiums, with respect to any insurance relating to any of the foregoing , and (iii) all rights to payment with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Equipment Proceeds").

   b) **Rights to Payment and Inventory.** A security interest in rights to payment and Inventory - in all accounts, deposit accounts, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, health-care insurance receivable and other rights to payment (collectively called "Rights To Payment"), now existing or at any time hereafter, and prior to the termination thereof, arising (whether they arise from the sale, lease or other disposition of inventory or from performance of contracts for service, manufacture, construction, repair or otherwise or from any other source whatsoever), including all securities, guaranties, warranties, indemnity agreements, insurance policies, supporting obligations and other agreements pertaining to the same or the property described therein, and in all goods returned by or repossessed from Debtor's customers, together with a security interest in all inventory, goods held for sale or lease or to be furnished under contract for service, goods so leased or furnished, raw materials, component parts and embedded software, work in process or materials used or consumed in Debtor's business and all warehouse receipts, bills of lading and other documents evidencing goods owned or acquired by Debtor, and all goods covered thereby, now or at any time hereafter, and prior to the termination hereof, owned or acquired by debtor, wherever located, and all products thereof (collectively called "Inventory"), whether in the possession of Debtor, warehousemen, bailees or any other person, or in the process of delivery and whether located at Debtor's places of business or elsewhere (with all Rights to Payment and Inventory referred to herein collectively as the "Payment and Inventory Collateral"), together with whatever is receivable or received when any of the Payment and Inventory Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all Rights to Payment, including returned premiums, with respect to any insurance relating to any of the foregoing, and all Rights to Payment with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Payment and Inventory Proceeds").

   c) **Third Party Securities.** A security interest in securities of entities held by Debtor as an investment, including, but not limited to, all shares of stock in corporations, membership interests in limited liability companies, partnership interests in any general or limited partnerships, or other forms of ownership interests held by Debtor whether or not registered with the United States Securities and Exchange Commission or any foreign securities agency (collectively called "Securities Collateral"), and all rights to dividends, cash distributions, or other payments with respect to such Securities to which Debtor is entitled (collectively called "Distribution Rights"), now existing or at any time hereafter, and prior to the termination of this Security Agreement, arising, whether such Securities are in the possession of Debtor, a broker-dealer, investment advisor, or other third party, together with whatever is

receivable or received when any of the Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all Distribution Rights, and all Distribution Rights with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Securities Proceeds").

2. **OBLIGATIONS SECURED; CONTINUING AGREEMENT; REVOCATION; OBLIGATION UNDER OTHER AGREEMENTS.** This Security Agreement is a continuing agreement and all rights, powers and remedies hereunder shall apply to all past, present and future indebtedness of the Debtor to National Services, including that arising under successive transactions which shall either continue the indebtedness, increase or decrease it, or from time to time create new indebtedness after all any prior indebtedness has been satisfied, and notwithstanding the death, incapacity, dissolution, liquidation or bankruptcy of the Debtor or any other event or proceeding affecting the Debtor. In addition to the foregoing, the obligations secured hereby are the payment and performance of: (a) all obligations of Debtor and rights of National Services under this Security Agreement; and (b) all present and future obligations of Debtor to National Services of other kinds. The word "indebtedness" is used herein in its most comprehensive sense and includes any and all advances debts, obligations and liabilities of Debtor, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Debtor may be liable individually or jointly, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.

3. **TERMINATION.** This Agreement will terminate upon the performance of all obligations of Debtor to National Services, including without limitation, the payment of all indebtedness of Debtor to National Services, and the termination of all commitments of National Services to extend credit to Debtor, existing at the time National Services receives written notice from Debtor of the termination of this Agreement.

4. **OBLIGATIONS OF National Services.** National Services has no obligation to make any loan hereunder. Any money received by National Services in respect of the Equipment Collateral, Rights to Payment and Inventory Collateral, Third Party Securities Collateral and Funding Account Collateral (collectively the "Collateral"), and/or the Equipment Proceeds, Payment and Inventory Proceeds, and Third Party Securities Proceeds (collectively the "Proceeds") may be deposited, at National Services's option, into a non-interest bearing account over which Debtor shall have no control, and the same shall, for all purposes, be deemed Collateral hereunder. In addition, National Services shall have no duty to take any steps necessary to preserve the rights of Owner against prior parties, or to initiate any action to protect against the possibility of a decline in the market value of the Collateral or Proceeds. National Services shall not be obligated to take any actions with respect to the Collateral or Proceeds requested by Debtor unless such request is made in writing and National Services determines, in its sole and absolute discretion, that the requested action would not unreasonably jeopardize the value of the Collateral and Proceeds as security for the indebtedness.

5. **REPRESENTATIONS AND WARRANTIES.** Debtor represents and warrants to National Services that: (a) Debtor's legal name is exactly as set forth on the first page of this Agreement, and all of Debtor's organizational documents or agreements delivered to National Services are complete and accurate in every respect; (b) Debtor is the owner and has possession or control of the Collateral and Proceeds; (c) Debtor has the exclusive right to grant a security interest in the Collateral and Proceeds; (d) all Collateral and Proceeds are genuine, free from liens, adverse claims, setoffs, default, prepayment, defenses and conditions precedent of any kind or character, except the lien created hereby or as otherwise agreed to by National Services, or heretofore disclosed by Debtor to National Services in writing; (e) all statements contained herein are true and complete in all material respects; (f) no financing statement covering any of the Collateral or Proceeds, and naming any secured party other than National Services, is on file in any public office; and

(g) Debtor is not in the business of selling goods of the kind included within the Collateral subject to this Agreement, and Debtor acknowledges that no sale or other disposition of any Collateral including without limitation, any Collateral which Debtor may deem to be surplus, has been or shall be consented to or acquiesced in by National Services, except as specifically set forth in writing by National Services.

6. **COVENANTS OF DEBTOR.**

a) Debtor Agrees in general: (i) to pay Indebtedness secured hereby when due; (ii) to indemnify National Services against all losses, claims, demands, liabilities and expenses of every kind caused by property subject hereto; (iii) to pay all costs and expenses, including reasonable attorneys' fees, incurred by National Services in the perfection and preservation of the Collateral or National Services's interest therein and/or the realization, enforcement and exercise of National Services's rights, powers and remedies hereunder; (iv) to permit National Services to exercise its powers; (v) to execute and deliver such documents as National Services deems necessary to create, perfect and continue the security interests contemplated hereby; (vi) not to change its name, and as applicable, its chief executive office, its principle residence or the jurisdiction in which it is organized and/or registered without giving National Services prior written notice thereof; (vii) not to change the places where Debtor keeps any Collateral or Debtor's records concerning the Collateral and Proceeds without giving National Services prior written notice of the address to which Debtor is moving same; and (viii) to cooperate with National Services in perfecting all security interests granted herein and in obtaining such agreements from third parties as National Services deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights hereunder.

b) Debtor agrees with regard to the Collateral and Proceeds, unless National Services agrees otherwise in writing: (i) that National Services is authorized to file financing statements in the name of Debtor to perfect National Services's security interest in Collateral and Proceeds; (ii) to insure the Collateral with National Services as loss payee in form, substance and amounts, under agreements, against risks and liabilities, and with insurance companies satisfactory to National Services; (iii) to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control thereof, and not to use the Collateral for any unlawful purpose or in any way that would void any insurance required to be carried in connection therewith; (iv) not to permit any security interest in or lien on the Collateral or Proceeds, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of National Services; (v) to pay when due all license fees, registration fees and other charges in connection with any Collateral; (vi) not to remove the Collateral from Debtor's premises unless the Collateral consists of mobile goods as defined in the California Uniform Commercial Code, in which case Debtor agrees not to remove or permit the removal of the Collateral from its state of domicile for a period in excess of 30 calendar days; (vii) not to sell, hypothecate or otherwise dispose of, nor permit the transfer by operation of law of, any of the Collateral or Proceeds or any interest therein; (viii) not to rent, lease or charter the Collateral; (ix) to permit National Services to inspect the Collateral at any time; (x) to keep, in accordance with generally accepted accounting principles, complete and accurate records regarding all Collateral and Proceeds, and to permit National Services to inspect the same and make copies thereof at any reasonable time; (xi) if requested by National Services, to receive and use reasonable diligence to collect Proceeds, in trust and as the property of National Services, and to immediately endorse as appropriate and deliver such Proceeds to National Services daily in the exact form in which they are received together with a collection report in form satisfactory to National Services; (xii) not to commingle Proceeds or collections thereunder with other property; (xiii) to give only normal allowances and credits and to advise National Services thereof immediately in writing if they affect any Collateral or Proceeds in any material respect; (xiv) in the event National Services elects to receive payments of Proceeds hereunder, to pay all expenses incurred by National Services in connection therewith, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and expenses incidental thereto; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all Collateral and, as appropriate and applicable, to keep the Collateral in good and saleable condition and repair, to deal with the Collateral in accordance with the standards and practices adhered to generally by owners of like property, and to keep all Collateral and Proceeds free and clear of all defenses, rights of offset and counterclaims.

7. **POWERS OF National Services.** Debtor appoints National Services its true attorney-in-fact to perform any of the following powers, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by National Services's officers and employees, or any of them, whether or not Debtor is in default: (a) to perform any obligation of Debtor hereunder in Debtor's name or otherwise; (b) to give notice to account debtors or others of National Services's rights in the Collateral and Proceeds, to enforce or forebear from enforcing the same and make extension or modification agreements with respect thereto; (c) to release persons liable on

Proceeds and to give receipts and acquittances and compromise disputes in connection therewith; (d) to release or substitute security; (e) to resort to security in any order; (f) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, termination statements, statements of assignment, applications for registration or like papers to perfect, preserve or release National Services's interest in the Collateral and Proceeds; (g) to receive, open and read mail addressed to Debtor; (h) to take cash, instruments for the payment of money and other property to which National Services is entitled; (i) to verify facts concerning the Collateral and Proceeds by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (j) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to proceeds; (k) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by National Services, at National Services's sole option, toward repayment of the Indebtedness or replacement of the Collateral; (l) to exercise all rights, powers and remedies which Debtor would have, but for this Agreement, with respect to all Collateral and Proceeds subject hereto; (m) to enter into Debtor's premises in inspecting the Collateral; and (n) to do all acts and things and execute all documents in the name of Debtor or otherwise, deemed by National Services as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights hereunder.

## 8. DEBTOR'S WAIVERS.

a) Debtor waives any right to require National Services to: (i) proceed against the Debtor of any other person; (ii) marshal assets or proceed against or exhaust any security held from the Debtor or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from the Debtor or any other person; (iv) take any action or pursue any other remedy in National Services's power: or (v) make any presentment or demand for performance, or give any notice of nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by National Services as security for or which constitute in whole or in part the indebtedness secured hereunder, or in connection with the creation of new or additional Indebtedness.

b) Debtor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of the Debtor of any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of the Debtor or any other person; (iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf of the Debtor which is a corporation, limited liability company, partnership or other type of entity, or any defect in the formation of such Debtor; (iv) the application by the Debtor of the proceeds of any indebtedness for purposes other than the purposes represented by Debtor to, or intended or understood by, National Services, or any shareholder of Debtor; (v) any act or omission by National Services which directly or indirectly results in or aids the discharge of the Debtor or any portion of the indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of National Services against the Debtor (vi) any impairment of the value of any interest in any security for the indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) any modification of the indebtedness, in any form whatsoever, including any modification made after revocation hereof to any indebtedness incurred prior to such revocation, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; or (viii) any requirement that National Services give any notice of acceptance of this Security Agreement. Until all indebtedness shall have been paid in full, Debtor shall have no right of subrogation, and Debtor waives any right to enforce any remedy which National Services now has or may hereafter have against the Debtor or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by National Services.

9. **PAYMENT OF PREMIUMS, TAXES, CHARGES, LIENS AND ASSESSMENTS.** Debtor agrees to pay, prior to delinquency, all insurance premiums, taxes, charges, liens and assessments against the Collateral and Proceeds, and upon the failure of Debtor to do so, National Services at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same. Any such payments made by National Services shall be obligations of Debtor to National Services, due and payable immediately upon demand, together with interest at a rate determined in accordance with the provisions of Section 16 hereof, and shall be secured by the Collateral and Proceeds, subject to all terms and conditions of this Agreement.

10. **EVENTS OF DEFAULT.** The occurrence of any of the following shall constitute an "Event of Default" under this Security Agreement:  (a) any default in the payment or performance of any obligation, or any defined event of default, under (i) any contract or instrument evidencing any Indebtedness, or (ii) any other agreement between Debtor and National Services, including without limitation any loan agreement, relating to or executed in connection with any Indebtedness;  (b) any representation or warranty made by Debtor herein shall prove to be incorrect, false or misleading in any material respect when made; (c) Debtor shall fail to observe or perform any obligation or agreement contained herein;  (d) any impairment of the rights of National Services in any Collateral or Proceeds or any attachment or like levy on any property of Debtor; and (e) National Services, in good faith, believes any or all of the Collateral and/or Proceeds to be in danger of misuse, dissipation, commingling, loss, theft, damage or destruction, or otherwise in jeopardy or unsatisfactory in character or value.

11. **REMEDIES.** Upon the occurrence of any Event of Default, National Services shall have the right to declare immediately due and payable all or any Indebtedness secured hereby and to terminate any commitments to make loans or otherwise extend credit to Debtor.  National Services shall have and may exercise without demand any and all other rights, powers, privileges and remedies granted to a secured party upon default under the California Uniform Commercial Code or otherwise provided by law, including without limitation, the right (a) to contact all persons obligated to Debtor on any Collateral or Proceeds and to instruct such persons to deliver all Collateral and/or Proceeds directly to National Services, and (b) to sell, lease, license or otherwise dispose of any or all Collateral.  All rights, powers, privileges and remedies of National Services shall be cumulative.  No delay, failure or discontinuance of National Services in exercising any right, power, privilege or remedy hereunder shall affect or operate as a waiver of such right, power, privilege or remedy; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power, privilege or remedy.  Any waiver, permit, consent or approval of any kind by National Services of any default hereunder, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.  It is agreed that public or private sales or other dispositions, for cash or on credit, to a wholesaler or retailer or investor, or user of property of the types subject to this Agreement, or public auctions, are all commercially reasonable since differences in the prices generally realized in the different kinds of dispositions are ordinarily offset by the differences in the costs and credit risks of such dispositions.

While an Event of Default exists: (a) Debtor will deliver to National Services from time to time, as requested by National Services, current lists of all Collateral and Proceeds;  (b) Debtor will not dispose of any Collateral or Proceeds except on terms approved by National Services;  (c) at National Services's request, Debtor will assemble and deliver all Collateral and Proceeds, and books and records pertaining thereto, to National Services at a reasonably convenient place designated by National Services; (d) National Services may, without notice to Debtor, enter onto Debtor's premises and take possession of the Collateral and (e) National Services may take any action with respect to the Collateral contemplated by any control, custodial or other similar agreement then in effect among National Services and owner.  Debtor further agrees that National Services shall have no obligation to process or prepare any Collateral for sale or other disposition.  For any Collateral or Proceeds consisting of securities, National Services shall be under no obligation to delay a disposition of any portion thereof for the period of time necessary to permit the issuer thereof to register such securities for public sale under any applicable state or federal law, even if the issuer thereof would agree to do so.  Owner further agrees that National Services shall have no obligation to process or prepare any Collateral for sale or other disposition.

12. **DISPOSITION OF COLLATERAL AND PROCEEDS; TRANSFER OF INDEBTEDNESS.** In disposing of Collateral hereunder, National Services may disclaim all warranties of title, possession, quiet enjoyment and the like. Any

proceeds of any disposition of any Collateral or Proceeds, or any part thereof, may be applied by National Services to the payment of expenses incurred by National Services in connection with the foregoing, including reasonable attorney's fees, and the balance of such proceeds may be applied by National Services toward the payment of the Indebtedness in such order of application as National Services may from time to time elect. Upon the transfer of all or any part of the Indebtedness, National Services may transfer all or any part of the Collateral or Proceeds and shall be fully discharged thereafter from all liability and responsibility with respect to any of the foregoing so transferred, and the transferee shall be vested with all rights and powers of National Services hereunder with respect to any of the foregoing so transferred; but with respect to any Collateral or Proceeds not so transferred National Services shall retain all rights, powers, privileges and remedies herein given.

13. **STATUTE OF LIMITATIONS.** Until all indebtedness shall have been paid in full and all commitments by National Services to extend credit to Debtor have been terminated, the power of sale or other disposition and all other rights, powers, privileges and remedies granted to National Services hereunder shall continue to exist and may be exercised by National Services at any time and from time to time irrespective of the fact that the Indebtedness or any part thereof may have become barred by any statute of limitations, or that the personal liability of Debtor may have ceased, unless such liability shall have ceased due to the payment in full of all Indebtedness secured hereunder.

14. **MISCELLANEOUS.** When there is more than one Debtor named herein: (a) the word "Debtor" shall mean all or any one or more of them as the context requires; (b) the obligations of each Debtor hereunder are joint and several; and (c) until all Indebtedness shall have been paid in full, no Debtor shall have any right of subrogation or contribution, and each Debtor hereby waives any benefit of or right to participate in any of the Collateral or Proceeds or any other security now or hereafter held by National Services. Debtor hereby waives any right to require National Services to (i) proceed against Debtor or any other person, (ii) proceed against or exhaust any security from Debtor or any other person, (iii) perform any obligation of Debtor with respect to any Collateral or Proceeds, and (d) make any presentment or demand, or give any notice of nonpayment or nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any Collateral or Proceeds. Debtor further waives any right to direct the application of payments or security for any Indebtedness of Debtor or indebtedness of customers of Debtor.

15. **NOTICES.** All notices, requests and demands required under this Agreement must be in writing, addressed to National Services at the address specified in any other loan documents entered into between Debtor and National Services and to Debtor at the address of its chief executive office (or principal residence, if applicable) specified below or to such other address as any party may designate by written notice to each other party, and shall be deemed to have been given or made as follows: (a) if personally delivered, upon delivery; (b) if sent by mail, upon the earlier of the date of receipt or 3 days after deposit in the U.S. mail, first class and postage prepaid; and (c) if sent by telecopy, upon receipt.

16. **COSTS, EXPENSES AND ATTORNEY'S FEES.** Debtor shall pay to National Services immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorney's fees (to include outside counsel fees and all allocated costs of National Services's in-house counsel), expended or incurred by National Services in exercising any right, power, privilege or remedy conferred by this Agreement or in the enforcement thereof, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by National Services or any other person) relating to Debtor or in any way affecting any of the Collateral or National Services's ability to exercise any of its rights or remedies with respect thereto. All of the foregoing shall be paid by Debtor with interest from the date of demand until paid in full at a rate per annum equal to the greater of ten percent (10%) or the CitiBank Prime Rate in effect from time to time.

17. **SUCCESSORS; ASSIGNS; AMENDMENT.** This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties, and may be amended or modified only in writing signed by National Services and Debtor.

18. **AMENDMENT.** This Security Agreement may be amended or modified only in writing signed by National Services and Debtor.

19. **APPLICATION OF SINGULAR AND PLURAL.** In all cases where there is but a single Debtor, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Debtor named herein, or when this Security Agreement is executed by more than one Debtor, the word "Debtors" shall mean all or any one or more of them as the context requires.

20. **SEVERABILITY OF PROVISIONS.** If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

21. **GOVERNING LAW; JURISDICTION.** This Agreement shall be construed and enforced in accordance with the laws of the State of California. All actions in connection with or pertaining to this Agreement or its subject matter shall be commenced in the Superior Court of California, County of Los Angeles. Debtor hereby (a) waives, to the fullest extent permitted by law, any objection or defense that the Debtor may now or hereafter have based on improper venue, lack of personal jurisdiction, inconvenience of forum or any similar matter in any action brought in such court; (b) agrees that final judgment in any action brought in the court shall be conclusive and binding upon Debtor and may be enforced in any other court to the jurisdiction of which Debtor is subject, by a suit upon such judgment; (c) consents to the service of process on Debtor in any action by the mailing of a copy thereof by registered or certified mail, postage prepaid, to Debtor at Debtor's address; and (d) agrees that service in accordance with this Section 18 shall in every respect be effective and binding on Debtor to the same extent as though served on Debtor in person by a person duly authorized to serve such process. Nothing in this Section 18 shall limit or restrict Secured Party's right to serve process or bring Agreement Actions in manners and in courts otherwise than as herein provided.

Debtor warrants the Debtor is an organization registered under the laws of the State of California.

Debtor warrants that its chief executive office (or principal residence, if applicable) is located at the following address:

175 South Lake Avenue, Suite 200, Pasadena, CA 91101.

Debtor warrants that the Collateral (except goods in transit) is located or domiciled at the following additional address: 175 South Lake Avenue, Suite 200, Pasadena, CA 91101 (if none, type "None".)

IN WITNESS WHEREOF, this Agreement has been duly executed as of October 22, 2019.

CACHET FINANCIAL SERVICES


By: _____
Aberash Asfaw
President

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>**Adrian Foushee  626-578-9400** | Filed in the Office of<br><br>*Barbara K. Cegavske*<br><br>Secretary of State<br>State Of Nevada |
| B. E-MAIL CONTACT AT FILER (optional)<br>**adrian@cachetbanq.com** | Initial Filing Number<br>**2019052714-0**<br>Filed On<br>**November 6, 2019 10:00 AM**<br>Number of Pages<br>**8** |

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

> **National Services, Inc.**
> **175 S Lake Avenue, Suite 200**
> **Pasadena, CA 91101**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME<br>**Cachet Financial Services** | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS<br>**175 S Lake Avenue, Suite 200** | CITY<br>**Pasadena** | STATE POSTAL CODE<br>**CA**  **91101** | COUNTRY<br>**USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME<br>**National Services, Inc.** | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS<br>**175 S Lake Avenue, Suite 200** | CITY<br>**Pasadena** | STATE POSTAL CODE<br>**CA**  **91101** | COUNTRY<br>**USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**See attached document**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:  
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:  
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

**SECURITY AGREEMENT**

1. **GRANT OF SECURITY INTEREST.** For valuable consideration, the undersigned **CACHET FINANCIAL SERVICES.** a California corporation ("Debtor"), hereby grants and transfers to **NATIONAL SERVICES, INC.,** a Nevada corporation ("National Services") a security interest in the following (hereinafter referred to herein collectively as the "Collateral"), all on the terms and conditions as more fully described in this security agreement (the "Security Agreement"):

   a) **Equipment.** A security interest in equipment - all goods, tools, machinery, furnishings, furniture and other equipment, now or at any time hereafter, and prior to the termination hereof, owned or acquired by Debtor, wherever located, whether in the possession of Debtor or any other person and whether located on Debtor's property or elsewhere, and all improvements, replacements, accessions and additions thereto and embedded software included therein (collectively called "Equipment Collateral"), together with whatever is receivable or received when any of the Equipment Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, (i) all accounts, contract rights, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles and other rights to payment of every kind now or at any time hereafter arising from any such sale, lease, collection, exchange or other disposition of any of the foregoing, (ii) all rights to payment, including returned premiums, with respect to any insurance relating to any of the foregoing , and (iii) all rights to payment with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Equipment Proceeds").

   b) **Rights to Payment and Inventory.** A security interest in rights to payment and Inventory - in all accounts, deposit accounts, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, health-care insurance receivable and other rights to payment (collectively called "Rights To Payment"), now existing or at any time hereafter, and prior to the termination thereof, arising (whether they arise from the sale, lease or other disposition of inventory or from performance of contracts for service, manufacture, construction, repair or otherwise or from any other source whatsoever), including all securities, guaranties, warranties, indemnity agreements, insurance policies, supporting obligations and other agreements pertaining to the same or the property described therein, and in all goods returned by or repossessed from Debtor's customers, together with a security interest in all inventory, goods held for sale or lease or to be furnished under contract for service, goods so leased or furnished, raw materials, component parts and embedded software, work in process or materials used or consumed in Debtor's business and all warehouse receipts, bills of lading and other documents evidencing goods owned or acquired by Debtor, and all goods covered thereby, now or at any time hereafter, and prior to the termination hereof, owned or acquired by debtor, wherever located, and all products thereof (collectively called "Inventory"), whether in the possession of Debtor, warehousemen, bailees or any other person, or in the process of delivery and whether located at Debtor's places of business or elsewhere (with all Rights to Payment and Inventory referred to herein collectively as the "Payment and Inventory Collateral"), together with whatever is receivable or received when any of the Payment and Inventory Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all Rights to Payment, including returned premiums, with respect to any insurance relating to any of the foregoing, and all Rights to Payment with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Payment and Inventory Proceeds").

   c) **Third Party Securities.** A security interest in securities of entities held by Debtor as an investment, including, but not limited to, all shares of stock in corporations, membership interests in limited liability companies, partnership interests in any general or limited partnerships, or other forms of ownership interests held by Debtor whether or not registered with the United States Securities and Exchange Commission or any foreign securities agency (collectively called "Securities Collateral"), and all rights to dividends, cash distributions, or other payments with respect to such Securities to which Debtor is entitled (collectively called "Distribution Rights"), now existing or at any time hereafter, and prior to the termination of this Security Agreement, arising, whether such Securities are in the possession of Debtor, a broker-dealer, investment advisor, or other third party, together with whatever is

receivable or received when any of the Collateral or proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all Distribution Rights, and all Distribution Rights with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "Securities Proceeds").

2. **OBLIGATIONS SECURED; CONTINUING AGREEMENT; REVOCATION; OBLIGATION UNDER OTHER AGREEMENTS.** This Security Agreement is a continuing agreement and all rights, powers and remedies hereunder shall apply to all past, present and future indebtedness of the Debtor to National Services, including that arising under successive transactions which shall either continue the indebtedness, increase or decrease it, or from time to time create new indebtedness after all any prior indebtedness has been satisfied, and notwithstanding the death, incapacity, dissolution, liquidation or bankruptcy of the Debtor or any other event or proceeding affecting the Debtor. In addition to the foregoing, the obligations secured hereby are the payment and performance of: (a) all obligations of Debtor and rights of National Services under this Security Agreement; and (b) all present and future obligations of Debtor to National Services of other kinds. The word "indebtedness" is used herein in its most comprehensive sense and includes any and all advances debts, obligations and liabilities of Debtor, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Debtor may be liable individually or jointly, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.

3. **TERMINATION.** This Agreement will terminate upon the performance of all obligations of Debtor to National Services, including without limitation, the payment of all indebtedness of Debtor to National Services, and the termination of all commitments of National Services to extend credit to Debtor, existing at the time National Services receives written notice from Debtor of the termination of this Agreement.

4. **OBLIGATIONS OF National Services.** National Services has no obligation to make any loan hereunder. Any money received by National Services in respect of the Equipment Collateral, Rights to Payment and Inventory Collateral, Third Party Securities Collateral and Funding Account Collateral (collectively the "Collateral"), and/or the Equipment Proceeds, Payment and Inventory Proceeds, and Third Party Securities Proceeds (collectively the "Proceeds") may be deposited, at National Services's option, into a non-interest bearing account over which Debtor shall have no control, and the same shall, for all purposes, be deemed Collateral hereunder. In addition, National Services shall have no duty to take any steps necessary to preserve the rights of Owner against prior parties, or to initiate any action to protect against the possibility of a decline in the market value of the Collateral or Proceeds. National Services shall not be obligated to take any actions with respect to the Collateral or Proceeds requested by Debtor unless such request is made in writing and National Services determines, in its sole and absolute discretion, that the requested action would not unreasonably jeopardize the value of the Collateral and Proceeds as security for the Indebtedness.

5. **REPRESENTATIONS AND WARRANTIES.** Debtor represents and warrants to National Services that: (a) Debtor's legal name is exactly as set forth on the first page of this Agreement, and all of Debtor's organizational documents or agreements delivered to National Services are complete and accurate in every respect; (b) Debtor is the owner and has possession or control of the Collateral and Proceeds; (c) Debtor has the exclusive right to grant a security interest in the Collateral and Proceeds; (d) all Collateral and Proceeds are genuine, free from liens, adverse claims, setoffs, default, prepayment, defenses and conditions precedent of any kind or character, except the lien created hereby or as otherwise agreed to by National Services, or heretofore disclosed by Debtor to National Services in writing; (e) all statements contained herein are true and complete in all material respects; (f) no financing statement covering any of the Collateral or Proceeds, and naming any secured party other than National Services, is on file in any public office; and
(g) Debtor is not in the business of selling goods of the kind included within the Collateral subject to this Agreement, and Debtor acknowledges that no sale or other disposition of any Collateral including without limitation, any Collateral which Debtor may deem to be surplus, has been or shall be consented to or acquiesced in by National Services, except as specifically set forth in writing by National Services.

6. **COVENANTS OF DEBTOR.**

a) Debtor Agrees in general: (i) to pay Indebtedness secured hereby when due; (ii) to indemnify National Services against all losses, claims, demands, liabilities and expenses of every kind caused by property subject hereto; (iii) to pay all costs and expenses, including reasonable attorneys' fees, incurred by National Services in the perfection and preservation of the Collateral or National Services's interest therein and/or the realization, enforcement and exercise of National Services's rights, powers and remedies hereunder; (iv) to permit National Services to exercise its powers; (v) to execute and deliver such documents as National Services deems necessary to create, perfect and continue the security interests contemplated hereby; (vi) not to change its name, and as applicable, its chief executive office, its principle residence or the jurisdiction in which it is organized and/or registered without giving National Services prior written notice thereof; (vii) not to change the places where Debtor keeps any Collateral or Debtor's records concerning the Collateral and Proceeds without giving National Services prior written notice of the address to which Debtor is moving same; and (viii) to cooperate with National Services in perfecting all security interests granted herein and in obtaining such agreements from third parties as National Services deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights hereunder.

b) Debtor agrees with regard to the Collateral and Proceeds, unless National Services agrees otherwise in writing: (i) that National Services is authorized to file financing statements in the name of Debtor to perfect National Services's security interest in Collateral and Proceeds; (ii) to insure the Collateral with National Services as loss payee in form, substance and amounts, under agreements, against risks and liabilities, and with insurance companies satisfactory to National Services; (iii) to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control thereof, and not to use the Collateral for any unlawful purpose or in any way that would void any insurance required to be carried in connection therewith; (iv) not to permit any security interest in or lien on the Collateral or Proceeds, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of National Services; (v) to pay when due all license fees, registration fees and other charges in connection with any Collateral; (vi) not to remove the Collateral from Debtor's premises unless the Collateral consists of mobile goods as defined in the California Uniform Commercial Code, in which case Debtor agrees not to remove or permit the removal of the Collateral from its state of domicile for a period in excess of 30 calendar days; (vii) not to sell, hypothecate or otherwise dispose of, nor permit the transfer by operation of law of, any of the Collateral or Proceeds or any interest therein; (viii) not to rent, lease or charter the Collateral; (ix) to permit National Services to inspect the Collateral at any time; (x) to keep, in accordance with generally accepted accounting principles, complete and accurate records regarding all Collateral and Proceeds, and to permit National Services to inspect the same and make copies thereof at any reasonable time; (xi) if requested by National Services, to receive and use reasonable diligence to collect Proceeds, in trust and as the property of National Services, and to immediately endorse as appropriate and deliver such Proceeds to National Services daily in the exact form in which they are received together with a collection report in form satisfactory to National Services; (xii) not to commingle Proceeds or collections thereunder with other property; (xiii) to give only normal allowances and credits and to advise National Services thereof immediately in writing if they affect any Collateral or Proceeds in any material respect; (xiv) in the event National Services elects to receive payments of Proceeds hereunder, to pay all expenses incurred by National Services in connection therewith, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and expenses incidental thereto; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all Collateral and, as appropriate and applicable, to keep the Collateral in good and saleable condition and repair, to deal with the Collateral in accordance with the standards and practices adhered to generally by owners of like property, and to keep all Collateral and Proceeds free and clear of all defenses, rights of offset and counterclaims.

7. **POWERS OF National Services.** Debtor appoints National Services its true attorney-in-fact to perform any of the following powers, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by National Services's officers and employees, or any of them, whether or not Debtor is in default: (a) to perform any obligation of Debtor hereunder in Debtor's name or otherwise; (b) to give notice to account debtors or others of National Services's rights in the Collateral and Proceeds, to enforce or forebear from enforcing the same and make extension or modification agreements with respect thereto; (c) to release persons liable on

Proceeds and to give receipts and acquittances and compromise disputes in connection therewith; (d) to release or substitute security; (e) to resort to security in any order; (f) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, termination statements, statements of assignment, applications for registration or like papers to perfect, preserve or release National Services's interest in the Collateral and Proceeds; (g) to receive, open and read mail addressed to Debtor; (h) to take cash, instruments for the payment of money and other property to which National Services is entitled; (i) to verify facts concerning the Collateral and Proceeds by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (j) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to proceeds; (k) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by National Services, at National Services's sole option, toward repayment of the Indebtedness or replacement of the Collateral; (l) to exercise all rights, powers and remedies which Debtor would have, but for this Agreement, with respect to all Collateral and Proceeds subject hereto; (m) to enter into Debtor's premises in inspecting the Collateral; and (n) to do all acts and things and execute all documents in the name of Debtor or otherwise, deemed by National Services as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights hereunder.

8.  **DEBTOR'S WAIVERS.**

    a)  Debtor waives any right to require National Services to:  (i) proceed against the Debtor of any other person; (ii) marshal assets or proceed against or exhaust any security held from the Debtor or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from the Debtor or any other person; (iv) take any action or pursue any other remedy in National Services's power: or (v) make any presentment or demand for performance, or give any notice of nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by National Services as security for or which constitute in whole or in part the indebtedness secured hereunder, or in connection with the creation of new or additional Indebtedness.

    b)  Debtor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of the Debtor of any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of the Debtor or any other person; (iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf of the Debtor which is a corporation, limited liability company, partnership or other type of entity, or any defect in the formation of such Debtor;  (iv)  the application by the Debtor of the proceeds of any indebtedness for purposes other than the purposes represented by Debtor to, or intended or understood by, National Services, or any shareholder of Debtor; (v) any act or omission by National Services which directly or indirectly results in or aids the discharge of the Debtor or any portion of the indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of National Services against the Debtor (vi) any impairment of the value of any interest in any security for the indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) any modification of the indebtedness, in any form whatsoever, including any modification made after revocation hereof to any indebtedness incurred prior to such revocation, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; or (viii) any requirement that National Services give any notice of acceptance of this Security Agreement. Until all indebtedness shall have been paid in full, Debtor shall have no right of subrogation, and Debtor waives any right to enforce any remedy which National Services now has or may hereafter have against the Debtor or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by National Services.

9. **PAYMENT OF PREMIUMS, TAXES, CHARGES, LIENS AND ASSESSMENTS.** Debtor agrees to pay, prior to delinquency, all insurance premiums, taxes, charges, liens and assessments against the Collateral and Proceeds, and upon the failure of Debtor to do so, National Services at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same. Any such payments made by National Services shall be obligations of Debtor to National Services, due and payable immediately upon demand, together with interest at a rate determined in accordance with the provisions of Section 16 hereof, and shall be secured by the Collateral and Proceeds, subject to all terms and conditions of this Agreement.

10. **EVENTS OF DEFAULT.** The occurrence of any of the following shall constitute an "Event of Default" under this Security Agreement: (a) any default in the payment or performance of any obligation, or any defined event of default, under (i) any contract or instrument evidencing any Indebtedness, or (ii) any other agreement between Debtor and National Services, including without limitation any loan agreement, relating to or executed in connection with any Indebtedness; (b) any representation or warranty made by Debtor herein shall prove to be incorrect, false or misleading in any material respect when made; (c) Debtor shall fail to observe or perform any obligation or agreement contained herein; (d) any impairment of the rights of National Services in any Collateral or Proceeds or any attachment or like levy on any property of Debtor; and (e) National Services, in good faith, believes any or all of the Collateral and/or Proceeds to be in danger of misuse, dissipation, commingling, loss, theft, damage or destruction, or otherwise in jeopardy or unsatisfactory in character or value.

11. **REMEDIES.** Upon the occurrence of any Event of Default, National Services shall have the right to declare immediately due and payable all or any Indebtedness secured hereby and to terminate any commitments to make loans or otherwise extend credit to Debtor. National Services shall have and may exercise without demand any and all other rights, powers, privileges and remedies granted to a secured party upon default under the California Uniform Commercial Code or otherwise provided by law, including without limitation, the right (a) to contact all persons obligated to Debtor on any Collateral or Proceeds and to instruct such persons to deliver all Collateral and/or Proceeds directly to National Services, and (b) to sell, lease, license or otherwise dispose of any or all Collateral. All rights, powers, privileges and remedies of National Services shall be cumulative. No delay, failure or discontinuance of National Services in exercising any right, power, privilege or remedy hereunder shall affect or operate as a waiver of such right, power, privilege or remedy; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. Any waiver, permit, consent or approval of any kind by National Services of any default hereunder, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing. It is agreed that public or private sales or other dispositions, for cash or on credit, to a wholesaler or retailer or investor, or user of property of the types subject to this Agreement, or public auctions, are all commercially reasonable since differences in the prices generally realized in the different kinds of dispositions are ordinarily offset by the differences in the costs and credit risks of such dispositions.

While an Event of Default exists: (a) Debtor will deliver to National Services from time to time, as requested by National Services, current lists of all Collateral and Proceeds; (b) Debtor will not dispose of any Collateral or Proceeds except on terms approved by National Services; (c) at National Services's request, Debtor will assemble and deliver all Collateral and Proceeds, and books and records pertaining thereto, to National Services at a reasonably convenient place designated by National Services; (d) National Services may, without notice to Debtor, enter onto Debtor's premises and take possession of the Collateral and (e) National Services may take any action with respect to the Collateral contemplated by any control, custodial or other similar agreement then in effect among National Services and owner. Debtor further agrees that National Services shall have no obligation to process or prepare any Collateral for sale or other disposition. For any Collateral or Proceeds consisting of securities, National Services shall be under no obligation to delay a disposition of any portion thereof for the period of time necessary to permit the issuer thereof to register such securities for public sale under any applicable state or federal law, even if the issuer thereof would agree to do so. Owner further agrees that National Services shall have no obligation to process or prepare any Collateral for sale or other disposition.

12. **DISPOSITION OF COLLATERAL AND PROCEEDS; TRANSFER OF INDEBTEDNESS.** In disposing of Collateral hereunder, National Services may disclaim all warranties of title, possession, quiet enjoyment and the like. Any

proceeds of any disposition of any Collateral or Proceeds, or any part thereof, may be applied by National Services to the payment of expenses incurred by National Services in connection with the foregoing, including reasonable attorney's fees, and the balance of such proceeds may be applied by National Services toward the payment of the Indebtedness in such order of application as National Services may from time to time elect. Upon the transfer of all or any part of the Indebtedness, National Services may transfer all or any part of the Collateral or Proceeds and shall be fully discharged thereafter from all liability and responsibility with respect to any of the foregoing so transferred, and the transferee shall be vested with all rights and powers of National Services hereunder with respect to any of the foregoing so transferred; but with respect to any Collateral or Proceeds not so transferred National Services shall retain all rights, powers, privileges and remedies herein given.

13. **STATUTE OF LIMITATIONS.**  Until all indebtedness shall have been paid in full and all commitments by National Services to extend credit to Debtor have been terminated, the power of sale or other disposition and all other rights, powers, privileges and remedies granted to National Services hereunder shall continue to exist and may be exercised by National Services at any time and from time to time irrespective of the fact that the Indebtedness or any part thereof may have become barred by any statute of limitations, or that the personal liability of Debtor may have ceased, unless such liability shall have ceased due to the payment in full of all Indebtedness secured hereunder.

14. **MISCELLANEOUS.**  When there is more than one Debtor named herein: (a) the word "Debtor" shall mean all or any one or more of them as the context requires; (b) the obligations of each Debtor hereunder are joint and several; and (c) until all Indebtedness shall have been paid in full, no Debtor shall have any right of subrogation or contribution, and each Debtor hereby waives any benefit of or right to participate in any of the Collateral or Proceeds or any other security now or hereafter held by National Services. Debtor hereby waives any right to require National Services to (i) proceed against Debtor or any other person, (ii) proceed against or exhaust any security from Debtor or any other person, (iii) perform any obligation of Debtor with respect to any Collateral or Proceeds, and (d) make any presentment or demand, or give any notice of nonpayment or nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any Collateral or Proceeds. Debtor further waives any right to direct the application of payments or security for any Indebtedness of Debtor or indebtedness of customers of Debtor.

15. **NOTICES.**  All notices, requests and demands required under this Agreement must be in writing, addressed to National Services at the address specified in any other loan documents entered into between Debtor and National Services and to Debtor at the address of its chief executive office (or principal residence, if applicable) specified below or to such other address as any party may designate by written notice to each other party, and shall be deemed to have been given or made as follows: (a) if personally delivered, upon delivery; (b) if sent by mail, upon the earlier of the date of receipt or 3 days after deposit in the U.S. mail, first class and postage prepaid; and (c) if sent by telecopy, upon receipt.

16. **COSTS, EXPENSES AND ATTORNEY'S FEES.**  Debtor shall pay to National Services immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorney's fees (to include outside counsel fees and all allocated costs of National Services's in-house counsel), expended or incurred by National Services in exercising any right, power, privilege or remedy conferred by this Agreement or in the enforcement thereof, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by National Services or any other person) relating to Debtor or in any way affecting any of the Collateral or National Services's ability to exercise any of its rights or remedies with respect thereto. All of the foregoing shall be paid by Debtor with interest from the date of demand until paid in full at a rate per annum equal to the greater of ten percent (10%) or the CitiBank Prime Rate in effect from time to time.

17. **SUCCESSORS; ASSIGNS; AMENDMENT.**  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties, and may be amended or modified only in writing signed by National Services and Debtor.

18. **AMENDMENT.** This Security Agreement may be amended or modified only in writing signed by National Services and Debtor.

19. **APPLICATION OF SINGULAR AND PLURAL.** In all cases where there is but a single Debtor, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Debtor named herein, or when this Security Agreement is executed by more than one Debtor, the word "Debtors" shall mean all or any one or more of them as the context requires.

20. **SEVERABILITY OF PROVISIONS.** If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

21. **GOVERNING LAW; JURISDICTION.** This Agreement shall be construed and enforced in accordance with the laws of the State of California. All actions in connection with or pertaining to this Agreement or its subject matter shall be commenced in the Superior Court of California, County of Los Angeles. Debtor hereby (a) waives, to the fullest extent permitted by law, any objection or defense that the Debtor may now or hereafter have based on improper venue, lack of personal jurisdiction, inconvenience of forum or any similar matter in any action brought in such court; (b) agrees that final judgment in any action brought in the court shall be conclusive and binding upon Debtor and may be enforced in any other court to the jurisdiction of which Debtor is subject, by a suit upon such judgment; (c) consents to the service of process on Debtor in any action by the mailing of a copy thereof by registered or certified mail, postage prepaid, to Debtor at Debtor's address; and (d) agrees that service in accordance with this Section 18 shall in every respect be effective and binding on Debtor to the same extent as though served on Debtor in person by a person duly authorized to serve such process. Nothing in this Section 18 shall limit or restrict Secured Party's right to serve process or bring Agreement Actions in manners and in courts otherwise than as herein provided.

Debtor warrants the Debtor is an organization registered under the laws of the State of California.

Debtor warrants that its chief executive office (or principal residence, if applicable) is located at the following address:

175 South Lake Avenue, Suite 200, Pasadena, CA 91101.

Debtor warrants that the Collateral (except goods in transit) is located or domiciled at the following additional address: 175 South Lake Avenue, Suite 200, Pasadena, CA 91101 (if none, type "None".)

IN WITNESS WHEREOF, this Agreement has been duly executed as of October 22, 2019.

CACHET FINANCIAL SERVICES

By: _____
Aberash Asfaw
President