# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                          :
CACHET FINANCIAL SERVICES,
                                                          :
                              Plaintiff,                       Civil Action No. 19-CV-1181
                                                          :
              -against-
                                                          :
MYPAYROLLHR, LLC; MICHAEL MANN;
VALUEWISE CORPORATION; ROSS PERSONNEL          :
CONSULTANTS INC.; SOUTHWESTERN
PAYROLL SERVICES INC.; ESSQUE, INC. (D/B/A     :
HEUTMAKER BUSINESS ADVISORS); AND DOES
1-10,                                                     :

                              Defendants.                 :
-------------------------------------------------------------------X

## DECLARATION OF ABERASH ASFAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; MOTION FOR AN ORDER OF ATTACHMENT; AND MOTION FOR EXPEDITED DISCOVERY

        I, Aberash Asfaw, make this declaration pursuant to 28 U.S.C. § 1746.  I hereby state as

follows:

        1.      I am the President of Cachet Financial Services ("Cachet"), the plaintiff in this

action, with offices in Pasadena, California.  The facts set forth in this declaration are personally

known to me and, if called as a witness, I could and would testify thereto.

        A.      **Cachet is a Third-Party ACH Service Provider**

        2.      Cachet is a national financial services company focused on processing ACH

transactions and providing related services for the payroll industry.  Used correctly, Cachet's ACH

system provides the electronic mechanism through which funds from employers' bank accounts

are withdrawn and then ultimately deposited into the bank accounts of the employers' employees.

Payroll processors – which are referred to as "remarketers" – contract with Cachet to process tens-

of-billions of dollars annually in ACH transactions for tens-of-thousands of employers and millions of employees.

3.      Cachet's patented ACH transaction process works as follows: A payroll processor, such as Defendant MyPayrollHR, LLC ("MyPayrollHR"), sends a digital specification batch file to Cachet's automated system, which includes, among other things, the (i) bank and account information of each of the payroll processor's employer-clients; (ii) amount of deposits to be made by each of the payroll processor's employer-clients into Cachet's settlement account at Cachet's bank; and (iii) the amounts to be directly deposited from Cachet's settlement account to each of the payroll processor's employer-clients' employees.  The batch file also includes the bank information for Cachet's settlement account (albeit through the use of a fictitious account number to protect Cachet), so that funds from the payroll processor's employer-clients transfer directly from their accounts to Cachet's settlement account.

4.      Once Cachet's system receives the batch file from the payroll processor, and the file is "balanced" (that is, the amounts to be withdrawn from the client-employers equals the amounts to be deposited into the employees' accounts), Cachet's system **automatically** initiates the transfer of funds from the employer-clients' accounts to Cachet's settlement account, as delineated in the specifications batch file, on the "settlement date" indicated in the file.  Cachet's system then **automatically** disburses funds from its settlement account into the bank accounts of the employees, as provided in the specifications by the payroll processor, on the "settlement date" indicated in the file.

5.      Banks have up to two banking days to reject an ACH transaction.

### B.      Cachet Had an 11-Year Contractual Relationship With MyPayrollHR

6.      MyPayrollHR is an employer-outsource payroll processing company that contracts with employers to manage the employers' payroll.  MyPayrollHR is one of Cachet's clients (or "remarketers").

7.      The business relationship between Cachet and MyPayrollHR, which began approximately eleven years ago, is governed by two written agreements – the Rules, Regulations, and Binding Policies (the "Rules"), and the Cachet Terms and Conditions (the "Terms," and with the Rules, the "Agreement") – the most recent versions of which were executed by MyPayrollHR on May 1, 2019.  A true and correct copy of the Rules is attached hereto as **Exhibit A,** and a true and correct copy of the Terms is attached hereto as **Exhibit B**.

8.      Pursuant to the Agreement, MyPayrollHR agreed, among other things:

   a.      To use Cachet's ACH settlement and processing services only for payroll-related transactions, and not to use Cachet's services for non-payroll-related transactions, such as company-to-company transfers (Ex. B (Terms) at Introduction Para., §§ 1B, 2B, 7F);

   b.      Not to use Cachet's ACH settlement and processing services in a way that violates the laws of the United States (Ex. A (Rules) § 1D);

   c.      Not to allow unauthorized access to Cachet's ACH settlement and processing services (*id.* § 5B; Ex. B (Terms) § 1A);

   d.      To provide accurate information in Cachet's specifications batch files (Ex. A (Rules) § 4E); and

   e.      To pay Cachet for all credit entries directed by MyPayrollHR that were made by Cachet on MyPayrollHR's behalf (*id.* § 8A).

9.      The Agreement further provides that "[t]o secure the payment and performance of [MyPayrollHR]'s obligations set forth herein, [MyPayrollHR] grants C[achet] a security interest in the funds collected by [MyPayrollHR] into the Settlement Account, as collateral for the obligations contained in this . . . Agreement[.]"  *Id.* § 4F.

### C.      Mann and MyPayrollHR Stole More Than $26 Million From Cachet

10.      In or about late-August and/or early-September 2019, unbeknownst to Cachet at the time, MyPayrollHR and Defendant Michael Mann ("Mann"), MyPayrollHR's CEO, manipulated Cachet's specifications batch files to cause in excess of $26 million to be routed to MyPayrollHR and several other entities owned or controlled by Mann, which have been named as Defendants in this case (or soon will be once Cachet learns their true legal names).  This occurred by way of two separate sets of transactions and two different means of theft – one for more than $19 million and another for more than $7 million.

#### *(1)      The $19 Million Theft:*

11.      In the first set of transactions, Mann and MyPayrollHR used Cachet's settlement account for non-payroll purposes to steal $19 million (the "$19 million") directly from Cachet. They did this by manipulating Cachet's specifications to make it appear as if $19 million was being transferred from various entities to Cachet's settlement account, and that the same amount was then being transferred from Cachet's settlement account to various other entities.

12.      Attached hereto as **Exhibit C** is a true and correct copy of a redacted version of the download file that Cachet's system received electronically from MyPayrollHR's system. Generally speaking, each line of data is a coded instruction – to either withdraw or deposit funds from or to an account.  The contents of the first two batches of data are set forth in detail below:

a.     The first batch of data, which has been bracketed, has been labeled with an "A" next to the circled word "Collection."  It contains seven instructions, which are denominated "1" to "7."

b.     The name of the company for whom the instructions are being provided is below the circled word "Collection." In this example, the instructions are being provided for ValueWise Corporation ("ValueWise"), the parent company to MyPayrollHR.  (I know that ValueWise is the parent company to MyPayrollHR based on my dealings with MypayrollHR.)

c.     There is a string of numbers below the word "ValueWise" in that same column, some of which have been redacted.  Within the string of numbers are three different sets of codes.  The first three digits is code which indicates whether the transaction is a withdrawal or deposit.  The code "627" means withdrawal, and the code "622" means checking account deposit. (The code "632" means savings account deposit.)  The next nine digits is a bank routing number, which can be found at publically available websites, such as http://www.routingnumber.com/ or the American Bankers Association website at https://www.aba.com/about-us/routing-number.  For example, in the instruction label "1," after the withdrawal code "627," is the routing number "221371372," which is the routing number for Pioneer Bank ("Pioneer"), located in Albany, New York.

d.     The next code within the string of numbers (which has been redacted from Exhibit C) is the bank account number from which funds are to be withdrawn (code "627") or deposited (code "622"), as the case may be.  The account number for each of the instructions labeled "1" to "6" is the same.

e.     The second column in Exhibit C – next to the string of numbers containing the withdrawal/deposit instruction and bank account information – is a ten digit number.  That ten

5

digit number is the amount of money (without commas or decimal points) that is to be withdrawn or deposited from or to the account number indicated in the first column.  So, for example, for the instruction labeled "1," the amount to be withdrawn ("627") from the (redacted) account number at Pioneer (routing number 221371372) is "0077844887," which equates to $778,448.87.  The third column contains the generic name of the account, which is typically a company d/b/a or shorthand name.

        f.      The first six instructions in the "Collection" batch labeled "A" are withdrawals totaling $4,387,510.57:

| Instruction No. | Amount in Coded Format | Amount in Dollar Format |
|---|---|---|
| 1. | 0077844887 | $778,448.87 |
| 2. | 0075811482 | $758,114.82 |
| 3. | 0073284013 | $732,840.13 |
| 4. | 0071126793 | $711,267.93 |
| 5. | 0075198449 | $751,984.49 |
| 6. | 0065485433 | $654,854.33 |
| **TOTAL** | | **$4,387,510.57** |

        g.      The instruction in the line item labeled with a "7" indicates to deposit (code "622") into Cachet's settlement account (the routing number and account number have been redacted) the same amount that was withdrawn pursuant to the first six instructions – *i.e.,* "0438751057" or $4,387,510.57.  In the other words, the batch of instructions balances (*i.e.,* the sum of the debits/withdrawals equals the credit/deposit).  In the upper-right-hand corner of the batch file is the date on which these instructions were to execute – namely, "190830," or August 30, 2019, which has been underlined.  This is called the "settlement date."

h.   To summarize this collection example "A":  The first set of instructions instructed Cachet's system to automatically withdraw/debit $4,387,510.57 on August 30, 2019, from an account at Pioneer and then deposit/credit the exact same amount in Cachet's settlement account.

i.   The second batch of instructions – which is bracketed with a "B" next to the circled word "Disburement" [sic] – indicates how the $4,387,510.87 is to be disbursed from the Cachet settlement account on September 3, 2019 (*i.e.*, "190903" in the upper-right-corner of batch "B").   The amount to be withdrawn (code "627") from the Cachet settlement account (see line item "20") is the same amount that was to be deposited (see line item "7").

j.   The line item instructions labeled "8" to "19" indicate that the $4,387,51.87 was to be spread out over 12 different deposits (code "622"), in two different accounts (the account numbers are redacted) at Bank of America ("BofA") (routing number 021000322).  The names of the two accounts, as seen in the third column, are "Heutmaker" and "ValueWise Corporation." As stated above, ValueWise is the parent of MyPayrollHR.  I am informed and believe that Heutmaker refers to Heutmaker Business Advisors, which is 70% owned by ValueWise.

13.   I have summarized all of the data from the download file (Exhibit C) – *i.e.,* the specifications provided by Mann and MyPayrollHR – in an Excel spreadsheet in a more user-friendly format (stripped of codes), not only for the example set of transactions discussed above (comprising $4,387,510.87), but for all of the transactions making up the total $19,199,175.74 (the "$19 million").  That summary is attached hereto as **Exhibit D**.

14.   As indicated in the summary (Exhibit D), and as seen in the specifications/download file (Exhibit C), the entire $19 million that was to be credited to Cachet's settlement account was to come from various accounts at Pioneer (*i.e.*, routing number

021000322), called "Primacy-Pioneer," "Optix-Pioneer," "Apogee-Pioneer," "Ross Consultants,"
and "OptumInsight," and are referred to in this declaration as the "Mann Originating Accounts."

15. Cachet's ACH system **automatically** executed the instructions indicated in the
specifications provided by MyPayrollHR and Mann (*i.e.,* Exhibit C). Specifically, on Friday,
August 30, 2019, the various accounts at Pioneer making up the $19 million – *i.e.,* the Mann
Originating Accounts – were debited, and the $19 million was credited to Cachet's settlement
account (the "Collection Transactions"). On Friday, August 30, 2019 and Tuesday, September 3,
2019, as instructed in the specifications prepared by MyPayrollHR and Mann, Cachet's settlement
account was **automatically** debited and the various accounts indicated in the specifications were
**automatically** credited. Significantly, Monday, September 2, 2019, was Labor Day, a bank
holiday, which did not count toward the two banking days that Pioneer had to reject the Collection
Transactions.

16. As indicated in Exhibit C, and summarized in Exhibit D, the $19 million was
deposited as follows (the "Disbursement Transactions"):

| Entity/Account Name | Amount | Bank |
|---|---|---|
| Heutmaker | $7,713,026.23 | BofA |
| ValueWise Corporation | $7,661,261.57 | BofA |
| Weitz & Associates | $669,746.99 | Wells Fargo |
| Weitz and Associates | $655,006.76 | Pioneer |
| Cloud Inc. | $660,045.85 | Pioneer |
| Millennium Funding | $415,973.00 | Key Bank |
| P2B Inc. | $849,357.19 | Wells Fargo |
| FPG BofI | $574,758.15 | Bank of Internet |
| **TOTAL** | **$19,199,175.74** | |

The accounts called "Heutmaker," "ValueWise Corporation," "Weitz and Associates," "Weitz & Associates," "Cloud Inc.," "Millennium Funding," "P2B Inc.," and "FPG BofI" are referred to collectively in this declaration as the "Mann Receiving Accounts," since these accounts received the $19 million as a result of the Disbursement Transactions.

17.     Then, on September 4, 2019, after Cachet's settlement account had already been debited (and the Mann Receiving Accounts credited) for the Disbursement Transactions, Pioneer rejected the Collection Transactions purportedly within its two-day window, because, according to the returns issued by Pioneer, the Mann Originating Accounts were frozen.

18.     Having received notice of Pioneer's rejection of the Collection Transactions for the frozen accounts, Cachet immediately sought to reverse the Disbursement Transactions and thereby claw back the $19 million that went to the Mann Receiving Accounts.  However, Cachet learned that each of the Mann Receiving Accounts had purportedly been frozen by the relevant "receiving" banks (*i.e.,* Pioneer, BofA, Wells Fargo, Key Bank, and Bank of Internet).  As such, Cachet could not reverse the Disbursement Transactions.  (In an ACH transaction, the receiving bank is known as the "RDFI," or receiving depository financial institution, which is the final destination of a transaction.)

19.     Thus, because the Mann Originating Accounts were frozen, no funds were actually transferred to Cachet's settlement account.  As such, to effectuate the Disbursement Transactions, $19 million of *Cachet's funds* were transferred from Cachet's settlement account to the Mann Receiving Accounts.

20.     This is an example of ACH kiting, which is just like classic check kiting, in that the perpetrator takes advantage of the "float" time for transactions to "clear" a bank.

<b><i>(2)      The $7 Million Theft:</i></b>

21.      In the second set of transactions, Mann and MyPayrollHR diverted from MyPayrollHR's employer-clients more than $7 million (the exact amount is $7,219,341.34), which was supposed to be transferred to Cachet to be used for payroll for the employees of MyPayrollHR's employer-clients.   Specifically, Mann and MyPayrollHR altered account information in the Cachet ACH specifications so that the $7 million, which belonged to MyPayrollHR's employer-clients, was diverted from their accounts and deposited in a bank account controlled by MyPayrollHR and Mann at Pioneer (the "MPHR Account"), instead of being deposited in Cachet's settlement account, as required by the Agreement.

22.      Attached hereto as **Exhibit E** is a true and correct copy of a redacted version of two sample pages from the download file that Cachet's system received electronically from MyPayrollHR's system related to the $7 million of payroll.   The entire download file for the transactions making up the $7 million is over 550 pages and includes dozens of employer names and thousands of employee names and account numbers.

23.      The format of the download file for the transactions making up the $7 million is the same as the format for the download file for the $19 million.   The following is an example of how MyPayrollHR and Mann manipulated the specifications (*i.e.,* the download file) to divert the $7 million to MyPayrollHR's account at Pioneer:

a.      The first batch of bracketed data has been labeled with an "A," which contains two instructions, labeled "1" and "2."   The redacted name of the MyPayrollHR client-employer for whom the instructions are being provided is immediately to the right of the "A."   The client-employer's redacted EIN is in the next column.   The next column to the right indicates that

10

the transaction is for "payroll" purposes, and the next number on that same row is the "settlement date" for instructions "1" and "2," or August 29, 2019.

b. Instruction "1" is the withdrawal ("627") of $24,543.41 from the employer's bank account (the routing and account numbers have been redacted).

c. Instruction "2" contains the manipulated instructions created by MyPayrollHR and Mann. The deposit instruction ("622") should be to Cachet's settlement account. However, the account in instruction "2" is an account controlled by MyPayrollHR at Pioneer (routing number 221371372).

d. To summarize "A": The first set of instructions instructed Cachet's system to automatically withdraw/debit ("627") $24,543.41 on August 29, 2019, from an employer account and then deposit/credit ("622") the exact same amount in MyPayrollHR's account at Pioneer.

e. The second batch of instructions – which is bracketed with a "B" – indicates how the $24,543.41 is to be disbursed from the MyPayrollHR's account on August 30, 2019 (*i.e.,* "190830" in the upper-right-corner of batch "B").

f. The line item instructions labeled "3" to "24" indicate that the $24,543.41 was to be deposited ("622") in 22 different accounts (the routing and account numbers have been redacted) for 16 different employees (the name of whom in the last column have been redacted). Instruction "25" indicates that the $24,543.41 was to be withdrawn from ("627") MyPayrollHR's account at Pioneer (routing number 221371372).

24. Pursuant to the ACH specifications created by MyPayrollHR and Mann, the employees' accounts were credited via direct deposits for the $7 million. However, Pioneer then

froze the MPHR Account, which means that the $7 million of credits to the employees' accounts were funded by *Cachet* instead of MyPayrollHR.

25.     It is my understanding that Pioneer is still in possession of the $7 million.

**D.     Cachet Attempted to Communicate With MyPayrollHR and Mann**

26.     On September 3, 2019, Hanan Succar, Cachet's Director of Operations, called MyPayrollHR and spoke with a MyPayrollHR representative, and was informed that Mr. Mann was at Pioneer attempting to have Pioneer release funds to Cachet.  On the same day, David Taub, Cachet's Director of Sales, spoke with Robert Higley, MyPayrollHR's Chief Financial Officer, and was advised that Pioneer would release the funds shortly.  However, I spoke with Frank Sarratori, Pioneer's Executive Vice President, Chief Administrative Officer, and General Counsel, and John Renkie, also of Pioneer, who refused to provide any information on the frozen account, and advised that Mann was to blame for the situation.

27.     On September 4, 2019, Al Blowers and I called MyPayrollHR and this time spoke with Mr. Mann, who said that he would call me back "in a few minutes."  Mr. Mann never called either of us back.

28.     MyPayrollHR thereafter advised its employer-clients that it had ceased operations effective immediately.  Attached hereto as **Exhibit F** is a true and correct copy of the message posted on MyPayrollHR's website beginning on or about September 5, 2019.

29.     The next time I learned anything about Mann is when I read an article (a true and correct of which is attached hereto as **Exhibit G**) about his arrest and arraignment in federal court on charges of bank fraud.

30.     The $19 million and the $7 million remain outstanding.  I and my staff have attempted to contact the various banks to discuss the accounts for the various Mann Entities.

However, the banks, citing banking regulations, will not provide *any* information regarding the accounts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Pasadena, California
       October 8, 2019

_____
       Aberash Asfaw

# EXHIBIT A

**RULES, REGULATIONS, BINDING POLICIES:** Subject to the following rules, regulations and binding policies, Cachet shall provide REMARKETER with such Automated Clearing House ("ACH") settlement and processing services and other data processing services as REMARKETER may request from time to time (the "Services"). All references to "REMARKETER" shall refer to REMARKETER and its affiliates that are receiving the services pursuant hereto. Certain other services such as Payroll Tax Reconciliation, On Analysis Services and other payroll related services are available only for as long as REMARKETERS are meeting Cachet's eligibility requirements and require execution of additional forms (e.g. Power of Attorney, Authorization to Debit, Payroll Tax Reconciliation). Direct Deposit and other depositing services shall be provided to REMARKETER in accordance with the following rules, regulations and binding policies.

**1. RECITALS:**

A. Agreement with each Originator. REMARKETER shall enter into a binding agreement with each Originator that is SEC code specific that binds the Originator to the NACHA Rules.

B. ACH Processing Authorization. REMARKETER authorizes CACHET to process Entries on behalf of an Originator to Receiver's account and CACHET agrees to process such Entries in accordance with the terms of this Agreement.

C. NACHA Rules. REMARKETER shall comply with, and be bound by, the NACHA Rules, as are in effect from time to time. REMARKETER acknowledges that it has access to a copy of the NACHA Rules, it has received a copy of the NACHA Rules, or it has the capability to purchase a copy of the NACHA Rules if it so desires. For Entries of which REMARKETER is not the Originator, REMARKETER represents and warrants that the Originator has agreed to assume the responsibilities of an Originator under the NACHA Rules. In the event the REMARKETER or its Originator violates any of the applicable NACHA Rules and NACHA imposes a fine or other cost on CACHET because of REMARKETER's violation, CACHET may charge the fine/cost to the REMARKETER.

D. Compliance with Applicable Law. REMARKETER shall not Transmit ACH transactions that violate the laws of the United States and shall perform its obligations under this Agreement in accordance with all applicable laws and regulations. REMARKETER may Transmit the ACH entries as required in the Installation/setup documentation provided by CACHET and in compliance with the formatting and other requirements set forth in the NACHA Rules, this Agreement, and any other documentation provided to REMARKETER by CACHET (i.e. Cachet transmission specifications).

E. COMPLIANCE WITH CACHET SPECIFICATION (S). Remarketer shall cause payroll software vendor to provide data per CACHET's specifications. REMARKETER shall bind software vendor to these specifications or shall grant CACHET a Power of Attorney should payroll software vendor refuse or fail to provide, with or without cause, CACHET's specifications. REMARKETER warrants and agrees to conform and obligate Remarketer and its affiliates to all banking laws, regulations and rules, both federal, state of California and any other local government administrations. REMARKETER warrants and agrees to be bound by and apply all collection rules of any nature or kind to CACHET's collection requirements. California banking case law, regarding CACHET ACH collections shall apply.

**2. PROVISIONS APPLICABLE TO CERTAIN ENTRIES:**

A. PPD Warranties (Direct Deposit/Credit Entries). REMARKETER warrants to CACHET that REMARKETER makes the warranties and assumes the liabilities of CACHET under the PPD rules, including ensuring the Originator in performing the following functions:

B. Authorization. Require Originator obtains authorization for PPD credit Entries in accordance with the NACHA Rules and United States law and retain the original, copy, or a readily and accurately reproducible Record of the authorization for a period of two years from the termination or revocation of the authorization. Upon CACHET's written request, REMARKETER shall provide CACHET copy, or other accurate Record of the Receiver's authorization for the requested PPD credit Entry within five days of its receipt of such request.

C. CCD (Corporate Credit or Debit). REMARKETER warrants to CACHET that REMARKETER makes the warranties and assumes the liabilities of CACHET under the CCD/CTX rules, including ensuring the Originator:

D. Wholesale Credit. For a credit Entry subject to Article 4A of the Uniform Commercial Code, (a) such Entry may be Transmitted through ACH; (b) credit given by the RDFI to the Receiver for the Entry is provisional until the RDFI has received a final settlement through a Federal Reserve Bank or otherwise has received payment as provided for in Section 4A-403(a) of Article 4A of the Uniform Commercial Code; and (c) if the RDFI does not receive such payment for the Entry, the RDFI is entitled to a refund from the Receiver in the amount of the credit to the Receiver's account, and Originator will not be considered to have paid the amount of the credit Entry to the Receiver.

E. Prenotification. REMARKETER shall send prenotifications six Banking Days prior to initiating the first PPD and/or CCD Entry to a Receiver's account. Such notice shall be provided to CACHET in the format and on the medium provided in the NACHA Rules. Should REMARKETER receive notice that any such prenotification has been rejected by an RDFI or the FRB, Entries shall not be initiated. Should REMARKETER receive a Notification of Change from an RDFI, such Entries shall not be initiated unless the required changes have been made.

F. CTX (Corporate Trade Exchange Entries). CTX is a CCD Entry accompanied by more than one addenda record and up to a maximum of 9,999 records. They have the same applicable NACHA rules as a CCD Entry and are governed by Article 4A of the Uniform Commercial Code, as well as the provisions of this Agreement applicable to CCD Entries.

G. Tax Payment Credit Entry. REMARKETER warrants to CACHET that REMARKETER makes the warranties and assumes the liabilities of CACHET under the Tax Payment Credit Entry rules, including ensuring the Originator:

H. Compliance. Transmits Tax Payment Credit Entries to CACHET in compliance with the formatting and other requirements set forth in this Agreement.

I. CCD Format. Warrants that it will use the CCD format with a TXP Addenda Record as required.

**3. CACHET REPORTING REQUIREMENTS:**

A. CACHET Reporting. CACHET will provide NACHA all information collected from REMARKETER or other sources about REMARKETER and Originator as required by NACHA Rules or as deemed appropriate by CACHET. In addition, CACHET may provide information for the terminated originator database maintained by Fidelity Information Systems, as deemed appropriate by CACHET.

B. Identification of Originators. REMARKETER shall provide CACHET with any information required by NACHA, banking laws (State and Federal), or as CACHET reasonably deems necessary to identify each Originator for which the REMARKETER transmits Entries. Such information will be provided to CACHET upon request by CACHET, within five days of the receipt of the request. REMARKETER shall notify CACHET of any new Originators prior to initiating Entries.

**4. REMARKETER'S GENERAL WARRANTIES:**

A. REMARKETER. REMARKETER warrants that: (a) it shall perform all of the duties, including but not limited to, the duty to identify Originators; (b) it shall assume all of the responsibilities, including, but not limited to, the responsibilities of ODFIs and Originators; (c) it shall make all of the warranties, including, but not limited to, the warranties of ODFIs and the warranty that Originators have agreed to assume the responsibilities of Originators under the NACHA Rules; (d) it shall make all of the representations and it shall assume all of the liabilities, including, but not limited to, liability for indemnification for failure of an Originator to perform its obligations as an Originator; of a REMARKETER in accordance with the NACHA Rules.

B. Authorization. REMARKETER warrants that each Entry has been properly authorized by the Receiver in accordance with the NACHA Rules and that such authorization is operative at the time of Transmittal or crediting by CACHET.

C. No Knowledge of Termination. REMARKETER warrants that it does not have actual knowledge of the revocation of the Receiver's authorization or the termination of the agreement between the RDFI and the Receiver concerning the Entry.

D. Entry Compliance. REMARKETER warrants that each Entry complies with the NACHA Rules, including the use of the proper SEC Code, and the terms of this Agreement.

E. Accurate Information. REMARKETER warrants that each Entry contains the Receiver's correct account number and all other information necessary to enable the RDFI to comply with its requirements under the NACHA Rules, except for information within the purview of the RDFI's relationship with the Receiver. REMARKETER further warrants that all information Transmitted with an Entry is related to the payment represented by such Entry.

F. Offset and Security Interest. To secure the payment and performance of REMARKETER's obligations set forth herein, REMARKETER grants CACHET a security interest in the funds collected by REMARKETER into the Settlement Account, as collateral for the obligations contained in this Remarketer Agreement, and any other agreement REMARKETER has signed with CACHET.

G. Timeliness. REMARKETER warrants that each entry is timely.

H. Debit Entries. REMARKETER warrants that each debit Entry is (i) for an amount that will be due and owing to Originator from Receiver on the Settlement Date; (ii) for a sum specified by the Receiver to be paid to the Originator; or (iii) to correct a previous credit Entry that was an Erroneous Entry.

I. Transmission. REMARKETER warrants that all ACH information for an Entry that is Transmitted via an Unsecured Electronic Network, at all times from the point of data entry and through the Transmission of such ACH information, is encrypted or Transmitted via a secure session, in either case using a commercially reasonable technology that provides a level of security that, at a minimum, is equivalent to 128-bit RC4 encryption technology. Such ACH information includes any Entry, routing number, account number, PIN or other identification system.

J. Supervision and Safeguards. REMARKETER warrants that no individual will be allowed to initiate transfers in the absence of proper supervision and safeguards.

**5. SECURITY PROCEDURES:**

A. Security Procedure Compliance. CACHET and REMARKETER shall comply with the security procedure requirements set forth in and as specified in implementation documentation. REMARKETER acknowledges that the purpose of such security

procedures is to verify authenticity and not to detect an error in the Transmission or content of an Entry. No security procedures have been agreed upon between CACHET and REMARKETER for the detection of such errors.

B. Unauthorized Access. REMARKETER is strictly responsible for establishing and maintaining commercially reasonable security measures to safeguard against unauthorized Transmissions and network infections. Further, REMARKETER shall take reasonable steps to maintain the confidentiality of security procedures and any passwords, codes, security devices, and related instructions provided by CACHET in connection with the security procedures detailed in and as specified in implementation documentation. If REMARKETER suspects that any such information or instructions are accessed by unauthorized persons, REMARKETER shall notify CACHET immediately. The occurrence of unauthorized access will not affect any transfers made in good faith by CACHET prior to receipt of sufficient notification and within a reasonable time period to prevent unauthorized transfers. REMARKETER shall limit utilization of access codes and other identification information facilitating the origination and Transmission of Entries to those individuals, or their designees, specifically authorized to disburse funds on behalf of REMARKETER. REMARKETER shall safeguard the confidentiality of all identification numbers or codes, other codes, passwords, and other identification information and procedures each time an employee of REMARKETER, who has been entrusted with such information, resigns, is terminated, or is reassigned.

C. Deemed Effectiveness. If an Entry (or a request for cancellation or amendment of an Entry) received by CACHET purports to have been Transmitted or authorized by REMARKETER, it will be deemed effective as REMARKETER's Entry (or request) and REMARKETER shall be obligated to pay CACHET the amount of such Entry even though the Entry (or request) was not authorized by REMARKETER, provided CACHET acted in compliance with the security procedures set forth in this Agreement.

**6. PROCESSING, TRANSMITTAL AND SETTLEMENT:**

A. Processing Requirements. Except as otherwise provided, CACHET shall (i) process Entries received from REMARKETER that conform with the File specifications set forth in the NACHA Rules, this Agreement, or any other specifications provided by CACHET to REMARKETER; (ii) Transmit such Entries as an ODFI to the FRB; and (iii) settle Entries as provided in the NACHA Rules.

B. Transmission Deadlines. CACHET shall Transmit Entries to the FRB one Business Day prior to the Settlement Date shown in such Entries, provided (i) such Entries are received by CACHET's cut-off on a Business Day, and (ii) the FRB is open for business on such Business Day. For purposes of this Agreement, Entries shall be deemed received by CACHET when the Transmission is completed as provided in and as specified in implementation documentation.

C. Failure to Meet Requirements. If any of the requirements of Paragraph B above are not met, CACHET shall use reasonable efforts to Transmit such Entries to the FRB by the next deposit deadline on which the FRB is open for business.

D. Confirmation. CACHET makes available the information, indicating the number of transactions and dollar amounts of Transmissions, prior to processing in order for REMARKETER to confirm the accuracy of the File Transmitted by REMARKETER.

E. Error in Processing. In the event that CACHET commits an error in connection with the processing or Transmission of an Entry, REMARKETER's sole remedy against CACHET shall be to request CACHET to correct the error with reasonable promptness.

F. Excused Transmission. CACHET shall be excused from failing to Transmit or a delay in Transmitting an Entry if such Transmittal would result in CACHET's having exceeded any limitation upon its intra-day net funds position established pursuant to Federal Reserve guidelines or if CACHET reasonably believes it would violate any provision of any risk control program of the Federal Reserve or any rule or regulation of any other U.S. governmental regulatory authority.

G. CACHET's Failure to Affect Entry. CACHET shall have no liability for not affecting an Entry if: (a) CACHET receives actual notice or has reason to believe that REMARKETER has filed or commenced a petition or proceeding for relief under any bankruptcy or similar law; (b) the ownership of funds involving an Entry or the authorized representative's authority to Transmit an Entry is in question; (c) CACHET suspects a breach of the security procedures; (d) CACHET suspects that the Settlement Account, has been used for illegal or fraudulent purposes; (e) CACHET suspects that the Entry violates the Rules; or (f) CACHET reasonably believes that an Entry is prohibited by federal law or regulation or this Agreement.

**7. PROCESSING OF ENTRIES:**

A. On-Us Entries. Except as provided in Paragraph B below, in the case of an Entry received for credit or debit to an account maintained with CACHET ("On-Us Entry"), CACHET shall credit or debit the Receiver's account in the amount of such Entry on the Settlement Date contained in such Entry, provided the requirements set forth in Paragraph 6B above are met. If the requirements are not met, CACHET shall use reasonable efforts to credit or debit the Receiver's account on the next Business Day following such Settlement Date.

B. Rejection of Entries. CACHET shall reject any File or Entry that does not comply with the requirements of this Agreement or the NACHA Rules, that uses an Improper SEC Code, that would cause REMARKETER to exceed the Maximum Daily Dollar Limit, or if CACHET suspects fraud or illegal or improper activity. CACHET shall have the right to reject an On-Us Entry for any reason for which an Entry may be returned under this Agreement or the NACHA Rules. CACHET shall notify REMARKETER by an automated system response of such rejection no later than the Business Day such Entry would otherwise have been Transmitted by CACHET to CACHET's sponsor bank, or in the case of an On-Us Entry, its Settlement Date. CACHET shall have no liability to REMARKETER by reason of the rejection of any Entry or the fact that such notice is not given at an earlier time than that provided for in this Agreement. In the event that any Entries are rejected by the FRB for any reason, it shall be the responsibility of REMARKETER to re-make such Entries. Notwithstanding the foregoing, should the File be rejected due to an error caused by CACHET, CACHET shall be responsible for re-making the File. In such a case, REMARKETER shall supply sufficient information to allow CACHET to re-create the applicable Entries for up to five Business Days after midnight of the Settlement Date.

C. Cancellation or Amendment by REMARKETER. REMARKETER may cancel or amend any Entry after its receipt by CACHET prior to processing for Transmission to the FRB. REMARKETER shall reimburse CACHET for any expenses, losses, or damages CACHET may incur in effecting or attempting to affect the cancellation or amendment of an Entry.

D. Notice of Return Entries. CACHET shall notify REMARKETER via Cachet's system of the receipt of a Return Entry from the FRB immediately upon receipt of such receipt and shall credit or charge such Entry to an account maintained at CACHET. REMARKETER shall provide collected funds to indemnify CACHET if any debit is returned after CACHET has permitted REMARKETER to withdraw collected funds from the Settlement Account. CACHET shall not be obligated to re-present a Return Entry.

E. Notifications of Change. CACHET shall notify REMARKETER of all Notifications of Change received by CACHET related to Entries Transmitted by REMARKETER immediately upon receipt of such Notifications of Change. REMARKETER shall ensure that changes requested by Notifications of Change are made by, or on behalf of the Originator, within five Banking Days of REMARKETER's receipt of the information or prior to initiating another Entry to the Receiver's account, whichever is later.

F. Re-initiation of Entries. REMARKETER may not reinitiate Entries except as prescribed by the NACHA Rules.

G. Reversing Entries. REMARKETER shall notify the Receiver that a Reversing Entry has been Transmitted to the Receiver's account no later than the Settlement Date of the Reversing Entry. This notification may be made by REMARKETER's method of choice.

**8. PAYMENT OF REMARKETER FOR ENTRIES; PAYMENT BY CACHET FOR ENTRIES:**

A. Cachet Credit Entry. REMARKETER shall pay CACHET the amount of each credit Entry, including On-Us Entries, Transmitted by CACHET pursuant to this Agreement on the Settlement Date of such Entry.

B. Cachet Debit Entry. REMARKETER shall immediately pay CACHET the amount of each debit Entry returned by an RDFI pursuant to this Agreement.

C. Remarketer Debit Entry. CACHET shall pay REMARKETER the amount of each debit Entry, including On-Us Entries, Transmitted by CACHET pursuant to this Agreement on the Settlement Date of such Entry.

D. Credit Entry Return. CACHET shall promptly pay Originator the amount of each credit Entry returned by an RDFI pursuant to this Agreement.

**9. AUTHORIZATIONS:**

REMARKETER shall obtain, or shall ensure each Originator obtains, from all applicable Persons an authorization, as required by the NACHA Rules, for effecting transactions with respect to the applicable account. REMARKETER shall maintain, or shall ensure each Originator maintains, a copy of such authorization for the period set forth in the NACHA Rules after termination or revocation of such authorization, and, in the case of an authorization for the initiation of a Single Entry, for the period required after initiating such Entry, and shall, upon request by CACHET, promptly furnish such original or such copy of any such authorization to CACHET. If such authorization is revoked, REMARKETER shall update Originator's data files as may be necessary to prevent the Transmission of subsequent Entries with respect to Originator's account. REMARKETER shall be liable for processing any files after Originator has revoked the authorization.

**10. GENERAL ITEMS:**

A. Inconsistency of Name and Account Number. REMARKETER acknowledges and agrees that, if an Entry describes the Receiver inconsistently by name and account number, payment of the Entry Transmitted to the RDFI may be made by the RDFI on the basis of the account number even if the account number is different from the named Receiver, and that REMARKETER's obligation to pay the amount of the Entry to CACHET is not excused in such circumstances.

B. Data Retention. REMARKETER shall retain data on file adequate to permit remaking of Entries for three banking Days following the date of their Transmittal to CACHET and shall provide such data to CACHET upon its request.

C. Third-Party Service Providers. Should REMARKETER require entering into a contract with any Third-Party Processor for the processing of Entries on its behalf, REMARKETER is required to notify CACHET in writing immediately. REMARKETER must receive CACHET's written approval to proceed with discussions with any Third-Party processer.

D. Inclusion in Terms and Conditions. The above Rules, Regulations and Binding Policies shall be incorporated in and become part and parcel of the Cachet Terms and Conditions.

Signed : *Robert P Higley*    5/1/19

Robert P Higley, President
My Payroll HR

EXHIBIT B

Case 1:19-cv-01181-EJS-SCFH Document 77-7 Filed 02/24/20 Page 19 of 149
Case 1:19-cv-01181-JJS-CFH Document 74-7 Filed 10/08/19 Page 96 of 101

1063

Cachet Terms + Conditions
5-1-19

**CACHET TERMS AND CONDITIONS: Subject** to the following terms and conditions, CACHET shall provide REMARKETER Automated Clearing House ("ACH") processing and other data processing services as REMARKETER may request from time to time (the "Services"). All references herein to REMARKETER shall refer to REMARKETER and its affiliates that are receiving the Services pursuant hereto. Certain Services such as Payroll Tax Pay and File Reconciliation Services, Official Bank Checks ("OBC") Reconciliation Services or other payroll related services are available only for so long as REMARKETER meets CACHET's eligibility requirements and require execution of additional forms (e.g., Power of Attorney, bank OBC Agreement, Direct Deposit Services shall be provided to REMARKETER in accordance with the operating rules of the National Automated Clearing House Association ("NACHA").

**1. THE SERVICES.**

A. **Performance Standard.** REMARKETER will use the Services in accordance with the instructions and reasonable policies established by CACHET from time to time. REMARKETER will use the Services only for the internal business purposes of the REMARKETER. REMARKETER will not provide, directly or indirectly, any of the Services or any portion thereof to any party other than the REMARKETER.

B. **Accuracy of REMARKETER Information. Review of Data.** All services provided hereunder will be based upon information provided to CACHET by REMARKETER (including proof of all required payroll related data). Upon receipt from CACHET, whether electronically or otherwise, REMARKETER will promptly review all data records and other reports prepared by CACHET for validity and accuracy according to REMARKETER's records.

**2. RECITALS.**

A. REMARKETER wishes to transmit credit and debit Entries to accounts maintained with CACHET and other financial institutions by means of the Automated Clearing House ("ACH") operated by the Federal Reserve Bank ("FRB") pursuant to the terms of this Agreement and the NACHA Operating Rules and Guidelines ("NACHA Rules"). CACHET is willing to act as a Third-Party Sender with respect to such Entries ("ACH Processing Services" or "Services"). The Rules, Regulations and Binding Policies (part of Application form) are incorporated herein and may be modified from time to time or as required by law.

B. **Cachet Specifications.** Remarketer shall cause payroll software vendor to provide data per CACHET's specifications. Remarketer shall lend software vendor to these specifications at their specifications. CACHET or REMARKETER should payroll software vendor refuse or fail to provide, with or without cause, CACHET's specifications. REMARKETER warrants and agrees to conform and obligate Remarketer and its affiliates to all banking laws, regulations and rules both federal, state of California and any other local government and institutions. REMARKETER warrants and agrees to be bound by and apply all collection rules of any nature or kind to CACHET collection requirements. California banking case law, regarding CACHET ACH collections shall apply.

C. Unless otherwise defined or conventionally capitalized, capitalized terms shall have the meanings ascribed in the NACHA Rules. The term "Entry" shall have the meaning provided in the NACHA Rules and shall also mean the data received from REMARKETER from which CACHET prepares an Entry.

D. Therefore, CACHET and REMARKETER, intending to be legally bound, agree to the terms and conditions set forth in this Agreement as of the date of the last signature hereto (the "Effective Date").

**3. PRICING, BILLING & FUNDING.**

A. **Settlement Account.** REMARKETER shall open and maintain with CACHET at least two accounts, 1) A Reserve Account, and 2) a "Settlement Account" for which deposits made under this Agreement will be made. REMARKETER shall maintain a minimum balance at the Settlement Account as specified in installation documentation. All deposits are provisional and subject to final adjustments. This Agreement and the Settlement Account shall be subject to CACHET's terms and conditions as specified in installation documentation and as required by law pertaining to the Settlement Accounts. CACHET shall, automatically debit the Settlement Account for transactions or obligations under this Agreement. In the event REMARKETER fails to maintain sufficient funds in the Settlement Account to cover Entries or obligations to be performed pursuant to this Agreement, CACHET may (i) debit any account that REMARKETER maintains with CACHET, or (ii) set-off against any other amount CACHET owes to REMARKETER.

C. **Termination Upon Default.** Failure of REMARKETER to comply with any material term or condition of this Agreement, REMARKETER's breach of the NACHA Rules, or REMARKETER's violation of any applicable federal or state regulation shall constitute default. Upon default, CACHET may terminate this Agreement in a manner that permits CACHET to comply with the NACHA Rules. Termination is effective immediately upon written notice of such termination to REMARKETER. The right to suspend the Services under Paragraph 5(C) below and/or terminate this Agreement is in addition to any other rights and remedies provided under this Agreement or otherwise under law.

D. **Termination of the Employer.** CACHET reserves the right to immediately terminate or suspend any Employer, processed by the REMARKETER, for breach of any of the NACHA Rules in a manner that permits CACHET to comply with the NACHA Rules or if CACHET suspects the Employer's practices do not conform to CACHET's or banking policies or procedures.

E. **Additional Rights.** In addition to the rights set forth in Paragraph 5 (C) above, if REMARKETER defaults under this Agreement, CACHET may, at its option, suspend Services. Unless this Agreement is terminated pursuant to Paragraph 5 (C) above, upon REMARKETER curing the default, CACHET shall resume any suspended Services.

F. **Effect of Termination.** No termination of this Agreement shall relieve REMARKETER from any obligation to pay CACHET any amount that has accrued or becomes payable at or prior to the date of termination. No suspension of Services shall relieve REMARKETER from any obligation to pay CACHET any amounts due under this Agreement. REMARKETER shall not be entitled to any refund of any amounts paid to CACHET as a result of a termination based on REMARKETER's default. No suspension of Services or termination of this Agreement shall affect any of CACHET's rights or REMARKETER's obligations with respect to Entries transmitted prior to such suspension or termination. Notwithstanding the termination of this Agreement, REMARKETER shall continue to comply with the NACHA Rules with respect to the Entries transmitted pursuant to this Agreement, including, but not limited to, REMARKETER's obligation to retain the original, copy, or a readily and accurately reproducible Record of the applicable authorization, or Eligible Source Document for a period of two years from the termination or revocation of the authorization or the Settlement Date, as applicable.

**6. COOPERATION IN LOSS RECOVERY EFFORTS.**

A. In the event of any damages for which CACHET or REMARKETER may be liable to each other or to any third party pursuant to the Services provided under this Agreement, CACHET and REMARKETER will undertake reasonable efforts to cooperate with each other, as permitted by applicable law, in any loss recovery efforts and in connection with any actions that the relevant party may be obligated to defend or to elect to pursue against any third party. REMARKETER agrees to, represents and warrants that the Employer has agreed to undertake reasonable efforts to cooperate with remarketer, as permitted by applicable law, in performing loss recovery efforts.

B. **Notices and Instructions.** CACHET shall be entitled to rely on any written notice or other written communication believed by it in good faith to be genuine and to have been signed by an authorized representative.

**7. GENERAL.**

A. **Account Opening Documentation and Disclosure Agreement.** CACHET's standard disclosure agreement and account opening documentation requirements are incorporated herein by reference.

B. **Collection Costs.** In the event of default by Employer and/or REMARKETER, REMARKETER shall be responsible for all costs of collection arising out of this default, including, without limitation, court costs and attorney's fees.

C. **Right of Offset.** CACHET shall have the right, but not the obligation, to set-off any amounts due and owing under this Agreement from any account REMARKETER maintains with CACHET.

D. **Audit.** CACHET has the right to audit REMARKETER's and Employer's compliance with NACHA Rules, United States law, this Agreement, and CACHET policies. Upon request of CACHET, REMARKETER shall promptly provide to CACHET information pertaining to REMARKETER's or Employer's financial condition. CACHET reserves the right to put a credit report at any time to evaluate REMARKETER's or Employer's ongoing financial condition.

E. **Cumulative Rights.** All of CACHET's rights and remedies under this Agreement shall be cumulative and not exclusive, and the election of one right or remedy by CACHET shall not affect or limit any other right or remedy available to CACHET.

2063

**B.    Payment; Funding.**  REMARKETER shall pay CACHET for services rendered at the mutually agreed upon rates. CACHET shall have the right to change this price list upon written notice. REMARKETER shall make its bank account number available to CACHET. CACHET shall automatically debit REMARKETER bank account for all fees and charges as may be incurred. REMARKETER agrees to reimburse CACHET for any and all expenses CACHET may incur, including interest and attorney fees in taking any action to collect amounts due CACHET. CACHET shall deposit funds in REMARKETER's settlement account(s) for Client deposits. REMARKETER fees, and other settlements authorized by Client to be made to REMARKETER within forty-eight (48) hours following receipt of collected deposits from Client. Credit earnings or interest earnings on funds deposited by REMARKETER or Client hereunder pending settlement to payee on respective settlement dates, will be for the sole benefit of CACHET. REMARKETER grants CACHET a security interest in the funds collected to the extent necessary to maintain all such information in strict confidence and shall not disclose Remarketer Agreement, and any other agreement REMARKETER has agreed with CACHET. REMARKETER understands and acknowledges that CACHET is not a bank but that CACHET has requested and received regulatory permission to process EFT transactions through the FRB. REMARKETER additionally understands that the FRB requires banks and financial institutions to maintain a ten (10) percent reserve on funds. To guarantee the EFT transactions processed, CACHET shall waive the ten (10) percent reserve account required of Remarketer; however, Remarketer shall establish an NSF Reserve Account with CACHET in order to make funds available in the event of an NSF.

**C.    Warranty Disclaimer.**  EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, CACHET MAKES NO WARRANTY, EXPRESS OR IMPLIED, REGARDING ANY MATTER WHATSOEVER. CACHET SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF TITLE, ACCURACY OF DATA, NONINFRINGEMENT, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, AND ANY IMPLIED WARRANTY ARISING FROM A COURSE OF DEALING OR PERFORMANCE OR FROM USAGE OF TRADE.

## 4.    COMPREHENSIVE INDEMNIFICATION:

**A.**  REMARKETER shall indemnify and hold CACHET harmless from any claims, demands, losses, liabilities, and expenses, including attorney's fees and costs, that result directly or indirectly from (a) the breach of any warranty made to CACHET under this Agreement and the NACHA Rules; (b) the debiting or crediting of an Entry to a Receiver's account in accordance with the terms of the Entry, including any claims, demands, losses, liabilities, or expenses, including attorney's fees and costs, that result either directly or indirectly from the Return of one or more Items or Entries of the Receiver due to insufficient funds caused by a debit Entry; (c) REMARKETER's breach of this Agreement; (d) REMARKETER's acts or omissions (including, without limitation, the amount, accuracy, timeliness of transmittal, or due authorization of any Entry received from REMARKETER) or those of any other person, including a third party, for whom or which REMARKETER's acts or omissions (including, without limitation, the return of an item or Entry by such Receiver or RDFI); (e) REMARKETER's failure to report any breach of a security procedure; (f) REMARKETER's use of the Services except to the extent such claims arise from CACHET's gross negligence or willful misconduct; (g) claims for fraud or alteration related to any Item transferred or presented for payment; (h) any errors, omissions, or delays caused by erroneous, untimely, or incomplete deliveries or transmissions of REMARKETER on any agent of REMARKETER; and (i) any errors, omissions, or delays that are the result in whole or in part of any unauthorized act at REMARKETER's place of business.

**B.    Indemnification for Regulation Issues.**  REMARKETER shall indemnify and hold CACHET harmless from any claims, demands, losses, liabilities, and expenses, including attorney's fees and costs, based on REMARKETER's failure to comply with any provision of the NACHA Rules that results either directly or indirectly, in the violation by CACHET of the Federal Electronic Fund Transfer Act of Federal Reserve Board Regulation E.

**C.    Limitation of Liability.**  The total liability of CACHET for all claims, whether in contract, tort, or otherwise, arising out of, connected with, or resulting from the Services or any other services under this Agreement shall not exceed the amounts paid by REMARKETER under this Agreement during the three months immediately preceding the claim.

**D.    Liability for Fines.**  REMARKETER shall be responsible for all fines levied against CACHET by NACHA for any violations of the NACHA Rules arising from REMARKETER's acts or omissions.

**E.    Exclusion of Liability.**  CACHET SHALL NOT BE LIABLE FOR ANY DAMAGES ARISING OUT OF OR CAUSED IN WHOLE OR IN PART, BY ANY ERRORS OR OMISSIONS IN ANY DATA, CONTENT, OR OTHER INFORMATION PROVIDED

**F.    Confidential and Proprietary Rights.**  REMARKETER and CACHET agree to hold all items of this Agreement as confidential and shall not divulge any aspect of this Agreement to any outside party. REMARKETER and CACHET agree to maintain all Employee's payroll and payroll tax data, and each other's respective software processing techniques, methods and procedures as proprietary, which shall be kept in strictest confidence. CACHET agrees to maintain confidentiality of Employer information (i.e., names and addresses) and shall only use Employer information in the processing of EFT services. REMARKETER acknowledges that CACHET has applied for patents (patent pending) as of the date of this Agreement on the CACHET methods and procedures of processing EFT transactions and other financial activity for REMARKETER. REMARKETER acknowledges and agrees that it shall have access to and full knowledge of CACHET methods, procedures, pricing, agreements, forms, operations, work methods and other confidential data. REMARKETER agrees that it shall maintain all such information in strict confidence and shall not include this confidential information in any manner or release to any other entity without the prior written authorization of CACHET executive management. Should this confidential information be harmful and be inseparable damage to CACHET, financial or otherwise, REMARKETER shall assume full responsibility for such damage as may be caused by such unauthorized release of confidential information to include costs, losses, attorney fees, and other financial damages as may occur.

**G.    Assignment.**  Neither party may assign or otherwise transfer this Agreement or any rights or obligations under this Agreement to any third party without the prior written consent of the other party, except that this Agreement may be transferred to a successor in all or substantially all of the assets and business of the transferring party. Consent shall not be unreasonably withheld. Subject to the restriction on transfer set forth in this Paragraph, this Agreement shall be binding upon and inure to the benefit of the parties' successors and assigns.

**H.    Excused Performance.**  Neither party shall be liable for any delay in or failure of performance (excluding failure to make payments required by this Agreement) resulting from any cause or condition beyond its reasonable control, whether foreseeable or not.

**I.    Waiver.**  The failure of either party to act upon any right, remedy, or breach of this Agreement shall not constitute a waiver of that or any other right, remedy, or breach. No waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party.

**J.    Notices.**  Except as otherwise expressly provided herein, CACHET shall not be required to act upon any notice or instruction received from REMARKETER or any other person, or to provide any notice or advice to REMARKETER or any other person with respect to any matter. Unless provided otherwise in this Agreement, any notice required or permitted under this Agreement shall be personally delivered or sent by e-mail, telefax, courier, express or overnight delivery service, or by certified mail, postage prepaid, return receipt requested, to the address set forth below, or to such other address as shall be advised by any party to the other in writing. Notices shall be effective as of the date of receipt.

## DISPUTE RESOLUTION.

**A.**  Any claim or controversy arising out of or relating to this Agreement, including any anticipatory breach or disagreement as to interpretation of this Agreement, that is not resolved by the parties themselves or through mediation, shall be settled by binding arbitration in Los Angeles, California and administered in accordance with the American Arbitration Association's Commercial Arbitration Rules, including its Optional Rules for Emergency Measures of Protection. The arbitrator(s) shall decide all discovery issues. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Neither party nor the arbitrator(s) may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. All fees and expenses of the arbitration shall be borne by the party in default. However, each party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentation of proofs, except that the prevailing party shall be entitled to an award of reasonable attorney's fees.

**B.    Provisions Severable.**  The provisions of this Agreement are severable. If any provision is held to be invalid, unenforceable or void, the remaining provisions shall not be so affected.

**C.    Interpretation.**  The language of this Agreement shall be construed as a whole, according to its fair meaning, and not strictly for or against any of the Parties. This Agreement shall be interpreted in accordance with its terms and not strictly for or against any of the Parties hereto, irrespective of which Party may have drafted or requested changes to its language, and no Party hereto shall urge otherwise.

3063

Terms & Conditions:

THROUGH THE SERVICES OR BY DELAYS IN OR INTERRUPTIONS OF ACCESS TO THE SERVICES. IN NO EVENT SHALL CACHET BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOST PROFITS, LOST REVENUE, OR LOST SAVINGS, INCURRED BY REMARKETER OR ANY THIRD PARTY, EVEN IF CACHET HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

F.     Survival. The indemnification obligations and the limitations of liability under this Agreement shall survive termination of this Agreement.

**5.    TERM / TERMINATION:**

A.     Term. The term of this agreement shall be in effect for a period of five (5) years from the date executed. This Agreement shall automatically continue to renew for additional two (2) year terms upon the lapse of each term, unless otherwise specified in writing by either party, at least one hundred eighty (180) days prior to the expiration of each term.

B.     Termination for Adverse Status. CACHET may terminate this Agreement immediately, if REMARKETER ceases to carry on operations as contemplated by this Agreement, makes an assignment for the benefit of creditors, is adjudged bankrupt or insolvent, has a receiver appointed over its assets, or becomes subject to any similar action in consequence of debt.

D.     Amendments. CACHET may from time to time amend the terms and conditions of this Agreement, including but not limited to, cut-off times, exposure limits any Business Day, and any parts of the Schedules hereto. Such amendments shall become effective upon receipt of notice by REMARKETER or such later date as may be stated in. CACHET's notice to REMARKETER. To the extent any amendments to the NACHA Rules create a conflict between the terms of this Agreement and the NACHA Rules, the NACHA Rules as applicable, shall govern.

E.     Governing Law/Venue. In the event of any action or proceeding initiated by REMARKETER arising out of or relating to this Agreement, REMARKETER hereby irrevocably submits to the exclusive jurisdiction of the federal or state courts of California County of Los Angeles and irrevocably agrees to that all claims in respect of such action or proceedings shall be heard and determined in the federal or state courts in California County of Los Angeles.

F.     Entire Agreement. This Agreement constitutes the entire agreement and understanding between the parties relating to the object and scope of this Agreement. Any representation, statement, or warranty not expressly contained in this Agreement shall not be enforceable by the parties. No non-officer representative of CACHET shall be authorized to act or make any commitment for CACHET except pursuant to written instructions made and signed by an officer of CACHET.

Signed:    Robert P Higley

Robert P Higley

My Payroll HR

5-1-19

2019_04_15

EXHIBIT C

Cachet190904-08HSMPRREV.TXT

**A** Collection:

5200903-ValueWise Co903DB                    1203298822CCDPAYROLL    190830190830    1122232220000072

*1*  627221371372 ████          0077844887          Primacy-Pioneer      PC0122232220000274

*2*  627221371372 ████          0075811482          Primacy-Pioneer      PC0122232220000275

*3*  627221371372 ████          0073284013          Primacy-Pioneer      PC0122232220000276

*4*  627221371372 ████          0071126793          Primacy-Pioneer      PC0122232220000277

*5*  627221371372 ████          0075198449          Primacy-Pioneer      PC0122232220000278

*6*  627221371372 ████          0065485433          Primacy-Pioneer      PC0122232220000279

*7*  622 ████████              0438751057          MYPAYROLLHR          PC0122232220000280

8200000007020582282100043875105700004387510571203298822                        12232220000072

**B** Disburement

5200903-ValueWise Co903DB                    1203298822PPDDIR DEP    190903190903    1122232220000073

*8*   622021000322 ████          0038987648 ████     Heutmaker            DD0122232220000281

*9*   622021000322 ████          0038857239 ████     ValueWise Corporation DD0122232220000282

*10*  622021000322 ████          0038121944 ████     Heutmaker            DD0122232220000283

*11*  622021000322 ████          0037689538 ████     ValueWise Corporation DD0122232220000284

*12*  622021000322 ████          0036765292 ████     Heutmaker            DD0122232220000285

*13*  622021000322 ████          0036518721 ████     ValueWise Corporation DD0122232220000286

18225709.2
234071-10001

Cachet190904-08HSMPRREV.TXT

| | | | | |
|---|---|---|---|---|
| *14* | 622021000322 ███████ | 0035502842 ████ | Heutmaker | DD0122232220000287 |
| *15* | 622021000322 ███████ | 0035623951 █████ | ValueWise Corporation | DD0122232220000288 |
| *16* | 622021000322 ███████ | 0037989428 ████ | Heutmaker | DD0122232220000289 |
| *17* | 622021000322 ███████ | 0037209021 ████ | ValueWise Corporation | DD0122232220000290 |
| *18* | 622021000322 ███████ | 0032987312 ████ | Heutmaker | DD0122232220000291 |
| *19* | 622021000322 ███████ | 0032498121 ████ | ValueWise Corporation | DD0122232220000292 |
| *20* | 627██████████ | 0438751057 | MYPAYROLLHR | DB0122232220000293 |

820000001300982003830004387510570004387510571203298822          122232220000073

Collection:

5200904-ValueWise Co904DB          1203298822CCDPAYROLL   190830190830   1122232220000074

| | | | |
|---|---|---|---|
| 627221371372 █████ | 0078132104 | Optix-Pioneer | PC0122232220000294 |
| 627221371372 █████ | 0075522778 | Optix-Pioneer | PC0122232220000295 |
| 627221371372 █████ | 0073074072 | Optix-Pioneer | PC0122232220000296 |
| 627221371372 ██████ | 0069922299 | Optix-Pioneer | PC0122232220000297 |
| 627221371372 █████ | 0068120693 | Optix-Pioneer | PC0122232220000298 |
| 627221371372 █████ | 0065395060 | Optix-Pioneer | PC0122232220000299 |
| 622███████████ | 0430167006 | MYPAYROLLHR | PC0122232220000300 |

820000000070205822821000430167006000043016700611203298822          122232220000074

2

Cachet190904-08HSMPRREV.TXT

Disbursement:

5200904-ValueWise Co904DB                    1203298822PPDDIR DEP    190903190903    1122232220000075

622021000322 ██████████        0039010428 ██████        ValueWise Corporation DD0122232220000301

622021000322 ██████████        0039121676 ██████        Heutmaker Business    DD0122232220000302

622021000322 ██████████        0037646539 ██████        ValueWise Corporation DD0122232220000303

622021000322 ██████████        0037876239 ██████        Heutmaker Business    DD0122232220000304

622021000322 ██████████        0036452129 ██████        ValueWise Corporation DD0122232220000305

622021000322 ██████████        0036621943 ██████        Heutmaker Business    DD0122232220000306

622021000322 ██████████        0034821843 ██████        ValueWise Corporation DD0122232220000307

622021000322 ██████████        0035100456 ██████        Heutmaker Business    DD0122232220000308

622021000322 ██████████        0034120672 ██████        ValueWise Corporation DD0122232220000309

622021000322 ██████████        0034000021 ██████        Heutmaker Business    DD0122232220000310

622021000322 ██████████        0032687422 ██████        ValueWise Corporation DD0122232220000311

622021000322 ██████████        0032707638 ██████        Heutmaker Business    DD0122232220000312

627 ████████████              0430167006              MYPAYROLLHR            DB0122232220000313

820000001300982003830004301670060004301670061203298822                12232220000075

Collection:

5200905-ValueWise Co905DB                    1203298822CCDPAYROLL    190830190830    1122232220000076

3

Cachet190904-08HSMPRREV.TXT

627221371372█████      0077543926           Apogee-Pioneer      PC0122232220000314

627221371372█████      0075553418           Apogee-Pioneer      PC0122232220000315

627221371372█████      0073412032           Apogee-Pioneer      PC0122232220000316

627221371372█████      0069945268           Apogee-Pioneer      PC0122232220000317

627221371372█████      0068163651           Apogee-Pioneer      PC0122232220000318

622████████████        0364618295           MYPAYROLLHR         PC0122232220000319

82000000006018368568400036461829500036461829512032988822              12223222000076

Disburement

5200905-ValueWise Co905DB              1203298822PPDDIR DEP     190903190903     1122232220000077

622021000322█████      0038722472████       Heutmaker Bus.        DD0122232220000320

622021000322█████      0038821454████       ValueWise Corporation DD0122232220000321

622021000322█████      0037898451████       Heutmaker Bus.        DD0122232220000322

622021000322█████      0037654967████       ValueWise Corporation DD0122232220000323

622021000322█████      0036499128████       Heutmaker Bus.        DD0122232220000324

622021000322█████      0036912904████       ValueWise Corporation DD0122232220000325

622021000322█████      0035132840████       Heutmaker Bus.        DD0122232220000326

622021000322█████      0034812428████       ValueWise Corporation DD0122232220000327

622021000322█████      0034241803████       Heutmaker Bus.        DD0122232220000328

622021000322█████      0033921848████       ValueWise Corporation DD0122232220000329

4

Cachet190904-08HSMPRREV.TXT

627 █████████████████          0364618295          MYPAYROLLHR          DB0122232220000330

820000001100940003190003646182950003646182951203298822                    12223222000077


5200907-Ross Personn907DB                 1061107834CCDPAYROLL    190830190830    1122232220000078

627221371372████████          0077155853          Ross Consultants    PC0122232220000331

627221371372████████          0075978499          Ross Consultants    PC0122232220000332

627221371372████████          0072538455          Ross Consultants    PC0122232220000333

627221371372████████          0078219615          Ross Consultants    PC0122232220000334

622█████████████          0303892422          MYPAYROLLHR          PC0122232220000335

820000000501615485470003038924220003038924221061107834                    12223222000078

5200907-Ross Personn907DB                 1061107834PPDDIR DEP    190903190903    1122232220000079

622021000322████████          0037945218████          ValueWise Corporation DD0122232220000336

622021000322████████          0039210635████          Heutmaker Bus. Adv.    DD0122232220000337

622021000322████████          0037889047████          ValueWise Corporation DD0122232220000338

622021000322████████          0038089452████          Heutmaker Bus. Adv.    DD0122232220000339

622021000322████████          0036121983████          ValueWise Corporation DD0122232220000340

622021000322████████          0036416472████          Heutmaker Bus. Adv.    DD0122232220000341

622021000322████████          0038910684████          ValueWise Corporation DD0122232220000342

622021000322████████          0039308931████          Heutmaker Bus. Adv.    DD0122232220000343

5

Cachet190904-08HSMPRREV.TXT

627 ██████████         0303892422        MYPAYROLLHR        DB0122232220000344

82000000090089800255000303892422000303892422 21061107834                    12223220000079

5200907-Ross Personn907DB              1061107834CCDPAYROLL    190830190830    1122232220000147

627221371372 ██████        0072698866             Ross Consultants    PC0122232220001336

627221371372 ██████        0058806395             Ross Consultants    PC0122232220001337

622 ██████████            0131505261        MYPAYROLLHR        PC0122232220001338

820000000301172742730001315052610001315052611061107834                    12223220000147

5200907-Ross Personn907DB              1061107834PPDDIR DEP     190830190830    1122232220000148

622221371372 █████       0036265928 █████      Weitz and Associates    DD0122232220001339

622221371372 █████       0036432938 █████      Cloud Inc.         DD0122232220001340

622221371372 █████       0029234748 █████      Weitz and Associates    DD0122232220001341

622221371372 █████       0029571647 █████      Cloud Inc.         DD0122232220001342

627 ██████████            0131505261        MYPAYROLLHR        DB0122232220001343

820000000501615485470001315052610001315052611061107834                    12223220000148

5200OPTUM         OPTUMDB           1203298822CCDPAYROLL    190830190830    1122232220000151

627021000322 ████████     0064064352             OptumInsight       PC0122232220001348

627021000322 ████████     0063199305             OptumInsight       PC0122232220001349

6

Cachet190904-08HSMPRREV.TXT

627021000322 ████████████  0063548879         OptumInsight        PC0122232220001350

627021000322 ████████████  0060170997         OptumInsight        PC0122232220001351

622 ████████████           0250983533         MYPAYROLLHR         PC0122232220001352

820000000500814001270002509835330002509835331203298822                122232220000151

5200OPTUM          OPTUMDB              1203298822PPDDIR DEP   190830190830  1122232220000152

622021300077 ████████████  0020909852 ██████  Millennium Funding  DD0122232220001353

622121000248 ████████████  0043154500 ██████  P2B Inc.            DD0122232220001354

622121000248 ████████████  0041140000 ██████  Weitz & Associates c/oDD0122232220001355

622122287251 ████████████  0022059305 ██████  FPG BofI            DD0122232220001356

622121000248 ████████████  0025834699 ██████  Weitz & Associates c/oDD0122232220001357

622121000248 ████████████  0021139783 ██████  P2B Inc.            DD0122232220001358

622122287251 ████████████  0016574397 ██████  FPG BofI            DD0122232220001359

622021300077 ████████████  0020687448 ██████  Millennium Funding  DD0122232220001360

622121000248 ████████████  0020641436 ██████  P2B Inc.            DD0122232220001361

622122287251 ████████████  0018842113 ██████  FPG BofI            DD0122232220001362

627 ████████████           0250983533         MYPAYROLLHR         DB0122232220001363

820000001101744463080002509835330002509835331203298822                122232220000152

# EXHIBIT D

| Debited Pioneer bank | Settlement Date 8/30/2019 |
|---|---|
| Amounts | Account Name |
| 778,448.87 | Primacy-Pioneer |
| 758,114.82 | Primacy-Pioneer |
| 732,840.13 | Primacy-Pioneer |
| 711,267.93 | Primacy-Pioneer |
| 751,984.49 | Primacy-Pioneer |
| 654,854.33 | Primacy-Pioneer |
| | |
| **4,387,510.57** | **Deposted to Cachet Settlement account** |
| | |
| Deposited to BoA | Settlement Date 9/3/2019 |
| Amounts | Account Name |
| 389,876.48 | Heutmake |
| 388,572.39 | ValueWise Corporation |
| 381,219.44 | Heutmake |
| 376,895.38 | ValueWise Corporation |
| 367,652.92 | Heutmake |
| 365,187.21 | ValueWise Corporation |
| 355,028.42 | Heutmake |
| 356,239.51 | ValueWise Corporation |
| 379,894.28 | Heutmake |
| 372,090.21 | ValueWise Corporation |
| 329,873.12 | Heutmake |
| 324,981.21 | ValueWise Corporation |
| | |
| **4,387,510.57** | **Withdrawal from Cachet Settlement account** |

4,387,510.57

| Debited Pioneer bank | Settlement Date 8/30/2019 |
|---|---|
| Amounts | Account Name |
| 781,321.04 | Optix-Pioneer |
| 755,227.78 | Optix-Pioneer |
| 730,740.72 | Optix-Pioneer |
| 699,222.99 | Optix-Pioneer |
| 681,206.93 | Optix-Pioneer |
| 653,950.60 | Optix-Pioneer |
| | |
| **4,301,670.06** | **Deposted to Cachet Settlement account** |
| | |
| Deposited to BoA | Settlement Date 9/3/2019 |
| Amounts | Account Name |
| 390,104.28 | ValueWise Corporation |
| 391,216.76 | Heutmaker Business |
| 376,465.39 | ValueWise Corporation |
| 378,762.39 | Heutmaker Business |

|            |                       |
|-----------:|-----------------------|
| 364,521.29 | ValueWise Corporation |
| 366,219.43 | Heutmaker Business    |
| 348,218.43 | ValueWise Corporation |
| 351,004.56 | Heutmaker Business    |
| 341,206.72 | ValueWise Corporation |
| 340,000.21 | Heutmaker Business    |
| 326,874.22 | ValueWise Corporation |
| 327,076.38 | Heutmaker Business    |

**4,301,670.06  Withdrawal from Cachet Settlement account**          4,301,670.06

Debited Pioneer bank            Settlement Date 8/30/2019
Amounts                         Account Name

|            |                |
|-----------:|----------------|
| 775,439.26 | Apogee-Pioneer |
| 755,534.18 | Apogee-Pioneer |
| 734,120.32 | Apogee-Pioneer |
| 699,452.68 | Apogee-Pioneer |
| 681,636.51 | Apogee-Pioneer |

**3,646,182.95  Deposted to Cachet Settlement account**

Deposited to BoA               Settlement Date 9/3/2019
Amounts                        Account Name

|            |                       |
|-----------:|-----------------------|
| 387,224.72 | Heutmaker Bus.        |
| 388,214.54 | ValueWise Corporation |
| 378,984.51 | Heutmaker Bus.        |
| 376,549.67 | ValueWise Corporation |
| 364,991.28 | Heutmaker Bus.        |
| 369,129.04 | ValueWise Corporation |
| 351,328.40 | Heutmaker Bus.        |
| 348,124.28 | ValueWise Corporation |
| 342,418.03 | Heutmaker Bus.        |
| 339,218.48 | ValueWise Corporation |

**3,646,182.95  Withdrawal from Cachet Settlement account**          3,646,182.95

Debited Pioneer bank            Settlement Date 8/30/2019
Amounts                         Account Name

|            |                 |
|-----------:|-----------------|
| 771,558.53 | Ross Consultants |
| 759,784.99 | Ross Consultants |
| 725,384.55 | Ross Consultants |
| 782,196.15 | Ross Consultants |

**3,038,924.22  Deposted to Cachet Settlement account**

| | | |
|---|---:|---|
| Deposited to BoA | | Settlement Date 9/3/2019 |
| Amounts | | Account Name |
| | 379,452.18 | ValueWise Corporation |
| | 392,106.35 | Heutmaker Bus. Adv. |
| | 378,890.47 | ValueWise Corporation |
| | 380,894.52 | Heutmaker Bus. Adv. |
| | 361,219.83 | ValueWise Corporation |
| | 364,164.72 | Heutmaker Bus. Adv. |
| | 389,106.84 | ValueWise Corporation |
| | 393,089.31 | Heutmaker Bus. Adv. |
| | **3,038,924.22** | **Withdrawal from Cachet Settlement account** |

3,038,924.22

| | | |
|---|---:|---|
| Debited Pioneer bank | | Settlement Date 8/30/2019 |
| Amounts | | Account Name |
| | 726,988.66 | Ross Consultants |
| | 588,063.95 | Ross Consultants |
| | 1,315,052.61 | Deposted to Cachet Settlement account |
| Deposit Pioneer bank | | Settlement Date 8/30/2019 |
| Amounts | | Account Name |
| | 362,659.28 | Weitz and Associates |
| | 364,329.38 | Cloud Inc. |
| | 292,347.48 | Weitz and Associates |
| | 295,716.47 | Cloud Inc. |
| | **1,315,052.61** | **Withdrawal from Cachet Settlement account** |

1,315,052.61

| | | |
|---|---:|---|
| Debit to BoA | | Settlement Date 8/30/2019 |
| Amounts | | Account Name |
| | 640,643.52 | OptumInsight |
| | 631,993.05 | OptumInsight |
| | 635,488.79 | OptumInsight |
| | 601,709.97 | OptumInsight |
| | 2,509,835.33 | Deposted to Cachet Settlement account |
| Deposit to Keybank | | Settlement Date 8/30/2019 |
| | 209,098.52 | Millennium Funding |
| | 206,874.48 | Millennium Funding |
| Deposit to Wells Fargo | | |
| | 431,545.00 | P2B Inc. |
| | 411,400.00 | Weitz & Associates |
| | 258,346.99 | Weitz & Associates |

|  |  |
|---|---|
| 211,397.83 | P2B Inc. |
| 206,414.36 | P2B Inc. |
| Deposit to Bank of Internet | |
| 220,593.05 | FPG BofI |
| 165,743.97 | FPG BofI |
| 188,421.13 | FPG BofI |

| **2,509,835.33** | **Withdrawal from Cachet Settlement account** | 2,509,835.33 |
|---|---|---|

19,199,175.74

| | |
|---|---|
| BoA | 15,374,287.80 |
| Poineer | 1,315,052.61 |
| Key Bank | 415,973.00 |
| Wells Fargo | 1,519,104.18 |
| Bank of Internet | 574,758.15 |
| Total | 19,199,175.74 |

| | |
|---|---:|
| BoA | 15,374,287.80 |
| Poineer | 1,315,052.61 |
| Key Bank | 415,973.00 |
| Wells Fargo | 1,519,104.18 |
| Bank of Internet | 574,758.15 |
| | |
| Total | 19,199,175.74 |

EXHIBIT E

MYPRHR19082801.TXT

$$ADD ,CLIENT=MYPRHR ,FORMAT=S

101 122232222 ███████████████ CACHETBANQ ███████ MYPRHR                MYPRHR

**A**    ███████████████              ████████ CCDPAYROLL  190829190829  1122232220000001

  *1*  627 ████████████        0002454341            ███████, Incorporated PC0122232220000001

  *2*  622221371372█████████   0002454341       MYPAYROLLHR           PC0122232220000002

  8200000000200343476640000024543410000024543411043631756              122232220000001

**B**    ███████████████              ████████ PPDDIR DEP  190830190830  1122232220000002

  *3*  622████████████         0000235742██████  █████████              DD0122232220000003

  *4*  622████████████         0000161261██████  █████████              DD0122232220000004

  *5*  622██████████           0000107960██████  █████████████          DD0122232220000005

  *6*  622███████████          0000192622██████  ████████████           DD0122232220000006

  *7*  622█████████████        0000208948██████  ██████████             DD0122232220000007

  *8*  622█████████████        0000021000██████  ████████████           DD0122232220000008

  *9*  632██████████           0000008830██████  █████████████          DD0122232220000009

  *10* 622███████████          0000009093██████  ███████                DD0122232220000010

  *11* 622████████████         0000142319██████  █████████████          DD0122232220000011

  *12* 632█████████            0000004000██████  ████████████           DD0122232220000012

  *13* 622██████████           0000142664██████  █████████              DD0122232220000013

MYPRHR19082801.TXT



| | | | | |
|---|---|---|---|---|
| 14 | 622 | 0000167154 | | DD0122232220000014 |
| 15 | 622 | 0000160490 | | DD0122232220000015 |
| 16 | 622 | 0000207152 | | DD0122232220000016 |
| 17 | 622 | 0000053750 | | DD0122232220000017 |
| 18 | 622 | 0000108560 | | DD0122232220000018 |
| 19 | 632 | 0000052237 | | DD0122232220000019 |
| 20 | 632 | 0000020000 | | DD0122232220000020 |
| 21 | 622 | 0000167767 | | DD0122232220000021 |
| 22 | 632 | 0000155534 | | DD0122232220000022 |
| 23 | 622 | 0000022500 | | DD0122232220000023 |
| 24 | 622 | 0000104758 | | DD0122232220000024 |
| 25 | 627221371372 | 0002454341 | MYPAYROLLHR | DB0122232220000025 |

EXHIBIT F

**URGENT - PAYROLL SYSTEM UPDATE**

Message

Dear Client:

We regret to inform you that due to unforeseen circumstances, we are no longer able to process any further payroll transactions. Please find alternative methods for processing your payrolls. For any payroll batches submitted during this week, including any payroll reversals from last week, please be prepared to find an alternative method to pay employees. We are working to release any funds that are in transit as a result of this matter.

We will provide you with updates via this medium as we receive them.

# EXHIBIT G

MENU

Please Sign In and use this article's on page print button to print this article.

BANKING & FINANCIAL SERVICES

# Michael Mann arrested, charged with bank fraud in collapse of MyPayrollHR



The James T. Foley federal courthouse in downtown Albany.

DONNA ABBOTT-VLAHOS



PANIES
IS ARTICLE
Brought to you
Deloitte.

By Chelsea Diana
Reporter, Albany Business Review
Sep 23, 2019, 3:45pm EDT
Updated Sep 24, 2019, 9:20am EDT

2 OF 3 ARTICLES REMAINING    To continue    Create a FREE account   or Sign in

Case 1:19-cv-01181-FJS-CFH   Document 147   Filed 10/06/19   Page 43 of 49

Michael T. Mann — the person at the center of the collapse of MyPayrollHR — was arrested Monday and appeared in federal court on a criminal complaint, charging him with committing $70 million in bank fraud.

Seizing oppo
Learn how en
reskilling help

Accordin        mplaint filed by federal prosecutors:

Read report

- Mann fraudulently obtained at least $70 million in loans from banks and other financial institutions.

- As part of that alleged fraud, he created companies that "had no purpose other than to be used in the fraud."

- He also fraudulently represented to banks and financing companies that his fake businesses had receivables that they did not have.

- He obtained loans and lines of credit by borrowing against these non-existent receivables.

Mann, 49, is accused of starting the scheme in 2010 or 2011.

The alleged fraud first came to light at the start of the month, when on Sept. 5, his company payroll service, MyPayrollHR, suddenly shut down.

The company processed payroll for at least 1,000 clients and their employees across the country. Those companies and their employees were hit with a confusing and frustrating situation on Sept. 5 as many people had direct deposits pulled back from their accounts — in some instances twice. Employees around the country have reported overdrawn accounts and struggles to pay bills as a result of the payroll company's collapse. And businesses cannot access their withheld payroll tax money.

MyPayrollHR processed payrolls through a third-party automated clearing house provider, Cachet Financial Services, which transferred money from employers' accounts to employees based on instructions from MyPayrollHR. As part of the alleged scheme, Mann diverted clients' payroll payments to a bank account he controlled at Pioneer Bank in Colonie.

2 OF 3 ARTICLES REMAINING     To continue     Create a FREE account     or Sign in

Around the same time, both Bank of America and Pioneer Bank froze Mann's accounts, suspecting him of fraud, according to the complaint.

Bank of America told a special agent with the FBI that Mann was "kiting" millions of dollars in checks between his bank accounts at Bank of America and Pioneer Bank in the month of August. "Kiting" is when someone writes checks drawn on one account and deposits them to a second account, and then reverses the process. That inflates the balance for both accounts, and makes it look like someone has more money than they actually have.

Then on Sept. 10, Mann, joined by his attorney, was interviewed by the FBI and others. He said that he "wished to accept responsibility for his conduct, and confess to a fraudulent scheme that he had been running for years," according to the complaint. The interview was recorded.

Mann told investigators he started borrowing large amounts of money around 2010 or 2011. While MyPayrollHR was a legitimate business, he allegedly told prosecutors that he created other businesses to keep the fraud going.

Mann said he used almost all of the $70 million to sustain "certain businesses, and purchase and start new ones." The complaint said he also admitted to kiting checks.

Pioneer Bank was Mann's biggest creditor, and he diverted the money to Pioneer to reduce his debt, according to the complaint.

Pioneer Bank filed a disclosure earlier this month that it has $35 million exposed — including a $16 million commercial loan and $19 million in deposit activity — because of potentially fraudulent activity. The $16 million loan was part of a $36 million commercial credit in which Pioneer was the originating lender with other banks. Berkshire Bank and Chemung Canal Trust Co. have since filed similar disclosures.

Mann appeared today before U.S. Magistrate Judge Daniel J. Stewart. He was released on a financial bond and other conditions. Mann is represented by Michael Koenig of Hinckley Allen in Albany.

**2 OF 3** ARTICLES REMAINING    To continue    [ Create a FREE account ]   or Sign in

10/8/2019
Case 1:19-cv-01181-FJS-CFH Document 77-7 Filed 06/24/20 Page 45 of 49 Review
Case 1:19-cv-01181-FJS-CFH Document 14 Filed 10/08/19 Page 54 of 101

In an emailed statement, Koenig said:

> "2 1/2 weeks ago, I pro-actively called the United States Attorney's Office before any law enforcement or regulatory agency contacted Michael Mann. Within a few days, Michael voluntarily met with the USAO regarding the facts and circumstances that resulted in today's allegations. Michael has been cooperating with authorities since that initial meeting, and will continue to do so, in order to fully and accurately detail what occurred."

Koenig said that Mann will not be making any public statements or answering questions other than those asked by investigators.

If convicted, Mann faces up to 30 years in prison, a maximum $1 million fine and up to five years of post-release supervision.

This case is being investigated by the FBI's Albany field office, with assistance from the New York State Attorney General's Office.

**RELATED CONTENT**

**Berkshire Bank has $16 million exposed amid MyPayrollHR collapse** 🔑



**Class action lawsuits filed in response to MyPayrollHR collapse**



## MORE IN BANKING & FINANCIAL SERVICES

More ›

2 OF 3 ARTICLES REMAINING    To continue    Create a FREE account    or Sign in

10/8/2019                                                                Michael Mann, of MyPayrollHR, arrested, charged with bank fraud - Albany Business Review

Case 1:19-cv-01181-FJS-CFH   Document 77-7   Filed 06/24/20   Page 46 of 49
Case 1:19-cv-01181-FJS-CFH   Document 14   Filed 10/08/19   Page 86 of 101



**Why more of TD Bank's customers are turning to automation** ☞

BY CHELSEA DIANA



**New York state is subpoenaing payroll companies amid MyPayroll fallout** ☞

BY CHELSEA DIANA



**Pioneer Bank to delay annual report in wake of MyPayrollHR fallout** ☞

BY CHELSEA DIANA



**Beyond MyPayrollHR: Clients of Mann's other services out tax money** ☞

BY CHELSEA DIANA

**2 OF 3** ARTICLES REMAINING    To continue    Create a FREE account    or Sign in



**Chase Bank opens first Albany-area retail branch, plans 7 more**

BY CHELSEA DIANA

**Adult Care and Assisted Living Residences** 🔑

MORE LISTS

18 COMPANIES



https://www.ft.com/content/3d6726ca-dfd1-11e9-9743-db5a370481bc 🔑

FINANCIAL TIMES



**Behind WeWork leader's rise & fall: Wall St. bank playing many angles** 🔑

THE NEW YORK TIMES

**2 OF 3** ARTICLES REMAINING    To continue   [ Create a FREE account ]   or Sign in

10/8/2019 MyPayrollHR owner was also involved with hoops tournaments and academy - Albany Business Review

Case 1:19-cv-01181-FJS-CFH Document 74-7 Filed 06/24/20 Page 48 of 49
Case 1:19-cv-01181-FJS-CFH Document 14 Filed 10/08/19 Page 57 of 101



**MyPayrollHR owner was also involved with hoops tournaments and academy** 🔑

BY CHELSEA DIANA

## Latest BizSpotlight

More >





**2 OF 3** ARTICLES REMAINING    To continue    Create a FREE account    or Sign in

Come watch the Women's World Cup at one of the greatest soccer bars in America! Wolff's Biergarten specializes in 3 things: BIER (The finest German, B...

Have you visited June Farms yet?! June Farms is the newest hospitality venture by New York restaurateur, Matt Baumgartner... and it is spectacular! Sitt...



BANKING

## Wells Fargo Bank

Expansion

Wells Fargo Bank adds another Relationship Manager to the Capital Region office. With more than 140 commercial banking offices nationwide, Wells Fargo...

Back to Top ▲

## ALBANY **BUSINESS REVIEW**

User Agreement   |   Privacy Policy

Your California Privacy Rights   |   Ad Choices

© 2019 American City Business Journals. All rights reserved. Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement (updated 5/24/18) and Privacy Policy and Cookie Statement (updated 5/24/18). The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of American City Business Journals.

.

**2 OF 3** ARTICLES REMAINING    To continue    Create a FREE account    or Sign in