**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CACHET FINANCIAL SERVICES,**

                                        **Plaintiff,**

                   **v.**                                    **1:19-CV-1181**
                                                                **(FJS/CFH)**

**MYPAYROLLHR, formerly known as Cloud**
**Payroll LLC; MICHAEL MANN; VALUEWISE**
**CORPORATION; ROSS PERSONNEL**
**CONSULTANTS, INC., doing business as**
**Ross Consultants; SOUTHWESTERN**
**PAYROLL SERVICES INC., doing business**
**as Southwestern Payroll; ESSQUE, INC.,**
**doing business as Heutmaker Business**
**Advisors; and DOES 1-10,**

                                        **Defendants.**
_____

**APPERANCES**                              **OF COUNSEL**

**LOEB & LOEB LLP**                         **DONALD A. MILLER, ESQ.**
10100 Santa Monica Boulevard                **EVAN K. FARBER, ESQ.**
Suite 2200                                  **MATTHEW ANDERSON I, ESQ.**
Los Angeles, California 90067
Attorneys for Plaintiff

**MYPAYROLLHR formerly**                     **NO APPEARANCE**
**Known as Cloud Payroll LLC**
Defendant

**MICHAEL MANN**                             **NO APPEARANCE**
Defendant

**VALUEWISE CORPORATION**                    **NO APPEARANCE**
Defendant

**ROSS PERSONNEL CONSULTANTS**               **NO APPEARANCE**
**INC., doing business as Ross**
**Consultants**
Defendant

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Pending before the Court is Plaintiff's motion for entry of a default judgment against Defendants MyPayrollHR, LLC, Michael Mann, Valuewise Corporation, and Ross Personnel Consultants, Inc. (collectively "Defaulting Defendants" or "Mann Defendants").  *See* Dkt. No. 77.[1]

### II. BACKGROUND

Plaintiff filed this action against the Defaulting Defendants and others to recover damages it suffered as a result of the Defaulting Defendants' actions.  The Defaulting Defendants failed to answer or otherwise defend this action within the required time frame; and, therefore, Plaintiff requested entry of a Clerk's default, *see* Dkt. No. 68, which the Clerk of the Court entered on January 23, 2020, *see* Dkt. No. 70.  Plaintiff now moves for entry of a default judgment against the Defaulting Defendants in the amount of $108,985,455.04, which is comprised of the following: (1) general damages in the amount of $26,418,517.04; (2) consequential damages in the amount of $27,575,000.00; (3) punitive damages in the amount of $52,837,034.08; and (4) prejudgment interest in the amount of $2,154,903.92 through February

---

[1] According to Plaintiff's complaint, Defendant Mann is CEO of Defendants MyPayrollHR, LLC, Valuewise Corporation, and Ross Personnel Consultants, Inc.  *See* Dkt. No. 1, Complaint, at ¶ 11.

24, 2020. *See* Dkt. No. 77-1 at 24.[2]  In addition, Plaintiff seeks post-judgment interest at a per diem rate of 1.47%. *See id.*

Plaintiff is a national financial services company that focuses on processing automated clearing house ("ACH") transactions and providing related services for the payroll industry. *See* Dkt. No. 77-1 at 5 (citation omitted).  Plaintiff's ACH system, when used correctly, provides the electronic mechanism through which funds from employers' bank accounts are withdrawn and then ultimately deposited into the bank accounts of the employers' employees. *See id.* (citation omitted).  Payroll processors, *i.e.,* the remarketers, contract with Plaintiff to process tens-of-billions of dollars annually in ACH transactions for tens-of-thousands of employers and millions of employees. *See id.* (citation omitted).

According to Plaintiff, its patented ACH transaction process works as follows: A payroll processor, such as Defendant MyPayrollHR, sends a digital specification batch file to Plaintiff's automated system, which file includes, among other things, (1) bank and account information of each of the payroll processor's employer-clients; (2) the amount of deposits to be made by each of the payroll processor's employer-clients into Plaintiff's settlement account at Plaintiff's bank; and (3) the amounts to be directly deposited from Plaintiff's settlement account to each of the payroll processor's employer-clients' employees. *See id.* at 6 (citation omitted).  This batch file also includes the bank information for Plaintiff's settlement account, albeit through the use of a fictitious account number to protect Plaintiff, so that funds from the payroll processor's employer-clients transfer directly from their accounts to Plaintiff's settlement account. *See id.* (citation omitted).

---

[2] References to page numbers of documents in the record are to the page numbers that the Court's Electronic Case Filing System generates and are located at the top right corner of those pages.

Once Plaintiff's system receives the batch file from the payroll processor and the file is "balanced," *i.e.*, the amounts to be withdrawn from the employer-clients equals the amounts to be deposited into the employees' accounts, Plaintiff's system automatically initiates the transfer of funds from the employer-clients' accounts to Plaintiff's settlement account as delineated in the specifications batch file on the "settlement date" indicated in the file. *See id.* (citation omitted). Banks have up to two banking days to reject ACH transactions. *See id.* citation omitted).

Plaintiff contends that it had an 11-year contractual relationship with Defendant MyPayrollHR. *See* Dkt. No. 77-1 at 6. Defendant MyPayrollHR is an employer-outsource payroll processing company that contracts with employers to manage the employers' payroll. *See id.* (citation omitted). Defendant MyPayrollHR is one of Plaintiff's clients, *i.e.*, a remarketer. *See id.* (citation omitted). The business relationship between Plaintiff and Defendant MyPayrollHR is governed by two written agreements: (1) the Rules, Regulations, and Binding Policies (the "Rules") and (2) the Cachet Terms and Conditions (the "Terms"), collectively the "Agreement." *See id.* at 6-7. Defendant MyPayrollHR executed the most recent versions of these documents on May 1, 2019. *See id.* (citation omitted).

According to Plaintiff, pursuant to the Agreement, Defendant MyPayrollHR agreed, among other things, to the following:

> (1) To use Plaintiff's ACH settlement and processing services only for payroll-related transactions and not to use Plaintiff's services for non-payroll-related transactions, such as company-to-company transfers (Ex. B (Terms) at Introduction Para., §§ 1B, 2B, 7F);
>
> (2) Not to use Plaintiff's ACH settlement and processing services in a way that violates the laws of the United States (Ex. A (Rules) § 1D;
>
> (3) Not to allow unauthorized access to Plaintiff's ACH settlement and processing services (*id.* § 5B; Ex. B (Terms) § 1A);

(4) To provide accurate information in Plaintiff's specifications
batch files (Ex. A (Rules) § 4E); and

(5) To pay Plaintiff for all credit entries directed by MyPayrollHR
that were made by Plaintiff on MyPayrollHR's behalf (*id.* § 8A)
(collectively, the Security Provisions).

*See* Dkt. No. 77-1 at 7.

The Agreement also provides as follows: "'4.F. Offset and Security Interest.  To secure

the payment and performance of [MyPayrollHR]'s obligations set forth herein, [MyPayrollHR]

grants CACHET a security interest in the funds collected by [MyPayrollHR] into the Settlement

Account, as collateral for the obligations contained in this Remarketer Agreement, and any other

agreement Remarketer has signed with CACHET.'"  *See id.* (quoting [Ex. A (Rules)] § 4F).

According to Plaintiff, in or about late August or early September 2019, unbeknownst to

Plaintiff at the time, Defendants MyPayrollHR and Mann manipulated Plaintiff's specifications

batch files to cause in excess of $26 million to be routed to MyPayrollHR, the Mann Entities,

and other entities (such as non-parties Millennium and P2Bi) to which Defendant Mann or

Defendant MyPayrollHR apparently owed an obligation.  *See id.* at 8 (citation omitted).  This

occurred by way of two separate sets of transactions and two different means of theft – one for

more than $19 million (the "$19 Million") and another for more than $7 million (the "$7

Million") for a total of $26 million (the "$26 Million").  *See id.* (citation and footnote omitted).

Specifically, with regard to the $19 Million, Plaintiff alleges that Defendants Mann and

MyPayrollHR used Plaintiff's settlement account for non-payroll purposes to steal the $19

Million directly from Plaintiff using classic kiting techniques.  *See* Dkt. No. 77-1 at 8 (citation

omitted).  According to Plaintiff, Defendants Mann and MyPayrollHR did this by manipulating

Plaintiff's specifications to make it appear as if the $19 Million was being transferred from

various entities that Defendant Mann controlled to Plaintiff's settlement account and that the

same amount was then being transferred from Plaintiff's settlement account to various other entities, *i.e.*, some of the Mann Entities. *See id.* (citation omitted).  Plaintiff contends that, in reality, no funds were transferred to Plaintiff's settlement account because the accounts from which the funds were supposed to be transferred, *i.e.*, some of the Mann Entities' accounts, were frozen; and the $19 Million, which was Plaintiff's money, was transferred from Plaintiff's settlement account to various accounts that the Defaulting Defendants controlled, which accounts purportedly were also then frozen by the "receiving" banks. *See id.* (citation omitted).

Furthermore, Plaintiff claims that Defendant MyPayrollHR's specifications appeared to show that the entire $19 Million that was to be credited to Plaintiff's settlement account was to come from various accounts at Pioneer Bank, *i.e.*, routing number 021000322, called "Primacy-Pioneer," "Optix-Pioneer," "Apogee-Pioneer," "Ross Consultants," and "OptumInsight" (collectively the "Mann Originating Accounts"). *See id.* (citation omitted).

Plaintiff's ACH system automatically executed the instructions indicated in the specifications that Defendant MyPayrollHR and Mann provided. *See id.*  Specifically, on Friday, August 30, 2019, the various accounts at Pioneer Bank making up the $19 Million, *i.e.*, the Mann Originating Accounts, were debited, and the $19 Million was credited to Plaintiff's settlement account (the "Collection Transactions"). *See id.* (citation omitted).  Then, according to Plaintiff, on Friday, August 30, 2019, and Tuesday, September 3, 2019, as instructed in the specifications that Defendants MyPayrollHR and Mann prepared, Plaintiff's settlement account was automatically debited and the various accounts indicated in the specifications were automatically credited. *See id.*  Significantly, Monday, September 2, 2019, was Labor Day, a bank holiday, which did not count toward the two banking days that Pioneer Bank had to reject the Collection Transactions. *See id.* (citation omitted).

According to Plaintiff, the $19 Million was then deposited as follows (the "Disbursement Transactions"):

| Entity/Account Name | Amount | Bank |
| --- | --- | --- |
| Heutmaker | $7,713,026.23 | Bank of America |
| ValueWise Corporation | $7,661,261.57 | Bank of America |
| Weitz & Associates | $669,746.99 | Well Fargo |
| Weitz & Associates | $655,006.76 | Pioneer |
| Cloud Inc. | $660,045.85 | Pioneer |
| Millennium Funding | $415,973.00 | Key Bank |
| P2B Inc. | $849,357.19 | Wells Fargo |
| FPG Bofl | $574,758.15 | Bank of Internet |
| **TOTAL** | **$19,199,175.74** | |

*See* Dkt. No. 77-1 at 9-10 (citation omitted).

Plaintiff refers to the accounts listed above collectively as the "Mann Receiving Accounts" because these accounts received the $19 Million as a result of the Disbursement Transactions. *See id.* at 10.

According to Plaintiff, on September 4, 2019, after its settlement account had already been debited, and the Mann Receiving Accounts already credited, for the Disbursement Transactions, Pioneer Bank rejected the Collection Transactions purportedly within its two-day window because, according to the returns that Pioneer Bank issued, the Mann Originating Accounts were frozen. *See id.* (citation omitted). When Plaintiff received notice of Pioneer Bank's rejection of the Collection Transactions for the frozen accounts, it immediately sought to

reverse the Disbursement Transactions and thereby claw back the $19 Million that went to the Mann Receiving Accounts.  *See id.*  However, Plaintiff learned that each of the Mann Receiving Accounts had purportedly been frozen by the relevant "receiving" banks, *i.e.*, Pioneer Bank, Bank of America, Wells Fargo, Key Bank and Bank of Internet.  *See id.*  Thus, Plaintiff could not reverse the Disbursement Transactions.  *See id.* (citation omitted).

Plaintiff further states that, because the Mann Originating Accounts were frozen, no funds were actually transferred to Plaintiff's settlement account.  *See id.*  Thus, to effectuate the Disbursement Transactions, funds were transferred from Plaintiff's settlement account to the Mann Receiving Accounts.  *See id.* (citation omitted).  However, Plaintiff never received the $19 Million from the Mann Originating Accounts or any other source.  *See id.*

With regard to the $7 Million theft, Plaintiff asserts that Defendants Mann and MyPayrollHR diverted the $7 Million from MyPayrollHR's employer-clients, which was supposed to be transferred to Plaintiff to be used for payroll for the employees of Defendant MyPayrollHR's employer-clients.  *See* Dkt. No. 77-1 at 10 (citation omitted).  Specifically, Plaintiff contends that Defendants Mann and MyPayrollHR altered account information in Plaintiff's ACH specifications so that the $7 Million, which belonged to Defendant MyPayrollHR's employer-clients, was diverted from their accounts and deposited in a bank account that Defendant MyPayrollHR and Mann controlled at Pioneer Bank (the "MPHR Account"), instead of being deposited in Plaintiff's settlement account as the Agreement required.  *See id.* (citation omitted).  Then, pursuant to the ACH specifications which Defendants Mann and MyPayrollHR created, the employees' accounts were credited via direct deposits in the amount of $7 million.  *See id.* (citation omitted).  Pioneer Bank then froze the MPHR Account, purportedly within the two bank day rejection window, which meant that the $7 million of

credits to the employees' accounts were not funded by Defendant MyPayrollHR, but instead came from Plaintiff. *See id.* (citation omitted). Plaintiff asserts that Pioneer Bank is purportedly still in possession of the $7 Million. *See id.* (citation omitted).

On September 3, 2019, Plaintiff's Director of Operations called Defendant MyPayrollHR and spoke with one of its representatives and was informed that Defendant Mann was at Pioneer Bank attempting to have Pioneer Bank release funds to Plaintiff. *See id.* (citation omitted). On that same day, Plaintiff's Director of Sales spoke with Defendant MyPayrollHR's Chief Financial Officer, who advised him that Pioneer Bank would release the funds shortly *See id.* (citation omitted). However, when Plaintiff's President spoke with two Pioneer Bank officers, they refused to provide information on the frozen account and blamed Defendant Mann for the situation. *See id.* (citation omitted). Finally, on September 4, 2019, Plaintiff's representatives called Defendant MyPayrollHR and spoke with Defendant Mann, who said he would call them back in a few minutes. *See id.* at 12 (citation omitted). Defendant Mann never called back, and Defendant MyPayrollHR thereafter advised its employer-clients that it had ceased operations effective immediately. *See id.* (citation omitted).

Finally, Plaintiff asserts that the Defaulting Defendants stole the $26 Million from it and that, as a result, it was forced to use its own funds to cover the $26 Million loss. *See id.* (citation omitted). In addition, Plaintiff borrowed $5.050 million from National Services, Inc. ("NSI") and another $1 million from HB Foundation pursuant to Secured Promissory Notes executed on or about October 22, 2019. *See id.* at 13-14 (citation omitted).

Furthermore, on October 23, 2019, Bankcorp notified Plaintiff that it had (1) terminated its Payroll Processing ODFI Agreement with Plaintiff, thus terminating Plaintiff's ability to originate ACH transactions, (2) frozen all of Plaintiff's accounts, including its settlement account

that had more than $100 million in it, which funds were transferred by remarketers and employers, and its operating account, and (3) swept more than $5 million from Plaintiff's operating account. *See id.* at 14 (citation omitted).  Plaintiff contends that, as a result of the freeze on these accounts and its inability to process ACH transactions, it was effectively out of the ACH processing business and is no longer operating in such capacity. *See id.* (citation omitted).

Moreover, Plaintiff asserts that, as a result of Bancorp's freezing its accounts, which resulted in Plaintiff's inability to process its ACH transactions, on or around October 23, 2019, various employers and employees filed class action claims for damages against it.  *See id.* According to Plaintiff, these class actions generally allege damages for fees and penalties that employers and employees incurred as a result of overdrawn accounts, damages for being unable to pay bills and care for their families, among other things, as well as more general damages for negligence, unjust enrichment, and violation of California's unfair competition laws. *See id.*  As a result, Plaintiff filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, on January 21, 2020. *See id.* at 15.

Based on these allegations, Plaintiff asserted five causes of action against the Defaulting Defendants and others: (1) breach of contract, (2) fraud, (3) conversion, (4) unjust enrichment, (5) a RICO claim, and (6) a RICO conspiracy claim.  *See, generally,* Dkt. No. 1, Complaint. Plaintiff moves for entry of a default judgment as follows: (1) against Defendant MyPayrollHR for breach of contract; (2) against Defendants MyPayrollHR and Mann for fraud; (3) against all the Defaulting Defendants for conversion; and (4) against all the Defaulting Defendants for unjust enrichment.  *See* Dkt. No. 77-1 at 16-21.

# III. DISCUSSION

## A.     Standard of review

"Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). First, under Rule 55(a), the plaintiff must obtain a clerk's entry of default.  *See* Fed. R. Civ. P. 55(a) (providing that, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default"); N.D.N.Y. L.R. 55.1 (requiring a party seeking a clerk's entry of default to "submit an affidavit showing that (1) the party against whom it seeks a judgment of affirmative relief is not an infant, in the military, or an incompetent person (2) a party against whom it seeks a judgment for affirmative relief has failed to plead or otherwise defend the action . . . and (3) it has properly served the pleading to which the opposing party has not responded").

Second, under Rule 55(b), the plaintiff may apply for entry of a default judgment by the clerk, "[i]f the plaintiff's claim is for a sum certain" or by the court "[i]n all other cases[.]"  Fed. R. Civ. P. 55(b)(1), (2); N.D.N.Y. L.R. 55.2(b) (providing, among other things, that "[a] party shall accompany a motion to the Court for entry of a default judgment pursuant to Fed. R. Civ. P. 55(b)(2), with a **clerk's certificate of entry of default** . . ., a **proposed form of default judgment**, and a copy of the pleading to which no response has been made").  Furthermore, N.D.N.Y. L.R. 55.2(b) requires that "[t]he moving party . . . also include in its application an affidavit of the moving party or the moving party's attorney setting forth facts as required by L.R. 55.2(a)."  N.D.N.Y. L.R. 55.2(b).  These required facts include the following: (1) "The

party against whom it seeks judgment is not an infant or an incompetent person;" (2) "The party

against whom it seeks judgment is not in the military service, or if unable to set forth this fact,

the affidavit shall state that the party against whom the moving party seeks judgment by default

is in the military service or that the party seeking a default judgment is not able to determine

whether or not the party against whom it seeks judgment by default is in the military service;" (3)

"The party has defaulted in appearance in the action;" (4) "Service was properly effected under

Fed. R. Civ. P. 4;" (5) "The amount shown in the statement is justly due and owing and that no

part has been paid except as set forth in the statement this Rule requires;" and (6) "The

disbursements sought to be taxed have been made in the action or will necessarily be made or

incurred."  N.D.N.Y. L.R. 55.2(a).

 A court has significant discretion to consider numerous factors in deciding whether to

grant a default judgment, including the following:

> "(1) whether the grounds for default are clearly established; (2)
> whether the claims were pleaded in the complaint, thereby placing
> defendants on notice of the relief sought, *see* Fed. R. Civ. P. 54(c)
> (providing that "[a] default judgment must not differ in kind from,
> or exceed in amount, what is demanded in the pleadings"); *Enron
> Oil Corp.*, 10 F.3d at 95-96; *cf. King v. STL Consulting, LLC*, No.
> 05 CV 2719, 2006 WL 3335115, *4-5 (E.D.N.Y. Oct. 3, 2006)
> (holding that Rule 54(c) is not violated when a court awards
> damages that accrued during the pendency of a litigation, so long
> as the complaint provided notice that the plaintiff may seek such
> damages); and (3) the amount of money potentially involved – the
> more money involved, the less justification for entering default
> judgment.  *See Hirsch v. Innovation Int'l, Inc.*, No. 91 Civ. 4130
> (MJL), 1992 WL 316143, *2 (S.D.N.Y. Oct. 19, 1992)."

*Jiangsu Gtig Esen Co., Ltd v. Am. Fashion Network, LLC*, No. 5:20-CV-222 (MAD/ATB), 2020

WL 3453643, *3 (N.D.N.Y. June 24, 2020).

 The plaintiff bears the burden of establishing its entitlement to recovery.  *See Greyhound

Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  Although the

defendants are deemed to have admitted all well-pleaded factual allegations in the complaint pertaining to liability, they are not deemed to have admitted legal conclusions or allegations relating to damages.  *See id.*  Thus, it is the plaintiff's burden to demonstrate that the uncontroverted facts establish each defendant's liability on each cause of action asserted.  *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).  In determining whether the plaintiff has met its burden, the court draws "all reasonable inferences in its favor."  *Id.* (quoting *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (noting that, where a party moves for a default judgment after another party's default, the moving party is "entitled to all reasonable inferences from the evidence offered")).

If the plaintiff is able to establish each defendant's liability, then the plaintiff must establish its entitlement to damages to a "'reasonable certainty.'"  *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012) (quotation omitted).  "[A]lthough the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing."  *Fustok v. Conticommodity Servs., Inc.*, 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (collecting cases), *aff'd*, 873 F.2d 38 (2d Cir. 1989).  "Rather, . . ., the court may rely on detailed affidavits or documentary evidence . . . to evaluate the proposed sum."  *Id.* (citations omitted).

In this case, Plaintiff has complied with the procedural requirements necessary for entry of a default judgment set forth in Rule 55(b) of the Federal Rules of Civil Procedure and Local Rule 55.2.  Specifically, Plaintiff filed the Clerk's entry of default, *see* Dkt. No. 77-10, a proposed default judgment, *see* Dkt. No. 77-11, a declaration setting forth all of the required information, *see* Dkt. No. 77-5, and a certificate of service demonstrating that service was properly effected on the Defaulting Defendants, *see* Dkt. No. 77.

**B.     Causes of action**

*1. First cause of action – breach of contract against Defendant MyPayrollHR*

"Under New York law, the elements of a breach of contract claim are (1) the existence of

an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by

the defendant; and (4) damages." *Swan Media Group, Inc. v. Staub*, 841 F. Supp. 2d 804, 807

(S.D.N.Y. 2012) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d

168, 177 (2d Cir. 2004); *Johnson v. Nextel Comm's. Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).

Plaintiff argues that there is no question that the factual allegations in its complaint

establish a breach of contract.  First, Plaintiff and Defendant MyPayrollHR entered into the

Agreement.  *See* Dkt. No. 77-1 at 17.  Second, Plaintiff performed all of its obligations under the

Agreement.  *See id.*  Third, the evidence clearly demonstrates that Defendant MyPayrollHR

breached the Agreement's Security Provisions by fraudulently manipulating Plaintiff's

specifications batch files to cause the $19 Million to be diverted from Plaintiff to the Defaulting

Defendants and others and the $7 Million to be diverted from MyPayrollHR's employer-clients

to the Defaulting Defendants.  *See id.*  In fact, Plaintiff contends that Defendant Mann, in a

criminal action in this District, *United States v. Mann*, 1:20-CR-199 (LEK), admitted that he

made a calculated "'decision to route MyPayrollHR's clients' payroll payments to an account at

Pioneer [Bank] instead of directly to Cachet.'"  *See id.* (quoting Farber Aff., Ex. 2 (Wabby Aff.)

¶ 15).[3]  Finally, Plaintiff asserts that it suffered damages in the amount of $26,418,517.04 as a

---

[3] On September 20, 2019, the United States filed a criminal complaint against Defendant Mann in this District.  On August 12, 2020, the United States filed an Information in that action after Defendant Mann waived Indictment, *United States v. Mann*, 20-CR-199 (LEK).  In that Information, the United States charged Defendant Mann with the following: (1) Conspiracy to Commit Wire Fraud, (2) Aggravated Identity Theft, (3)-(9) Bank Fraud – Pioneer, Berkshire, and Chemung, (10)-(11) Bank Fraud – BANA, and (12) Filing a False Tax Return.  *See United States*

result of Defendant MyPayrollHR's breach of the Agreement since Defendants Mann and

MyPayrollHR caused Plaintiff's ACH system to transfer the $26 Million to various accounts

without actually providing $26 million to Plaintiff to fund the transfers, thus causing Plaintiff to

fund the transfers with its own money.  *See id.*

Based on the allegations in the complaint, the Court finds that Plaintiff has plausibly

alleged that Defendant MyPayrollHR breached the contractual agreement that it had with

Plaintiff as evidenced by Defendant MyPayrollHR's execution of the most recent versions of the

"Rules, Regulations, and Binding Policies" (the "Rules") and the "Cachet Terms and Conditions"

(the "Terms").  Therefore, the Court grants Plaintiff's motion for entry of a default judgment

against Defendant MyPayrollHR with regard to Plaintiff's breach of contract claim on the issue

of liability.


### 2. Second cause of action – fraud against Defendants MyPayrollHR and Mann

With regard to its second cause of action for fraud against Defendants MyPayrollHR and

Mann, Plaintiff asserts that, to prevail on such a claim under New York law, a plaintiff must

show "'(1) a material misrepresentation or omission of fact, (2) made with knowledge of its

falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5)

that causes damages to the plaintiff.'"  *See* Dkt. No. 77-1 at 17-18 (quoting *Allstate Ins. Co. v.

Rozenberg*, 2009 U.S. Dist. LEXIS 132654 at *9-10 (E.D.N.Y. Jan. 26, 2009)).  Plaintiff asserts

that each of these elements is satisfied.  As to the first element, Plaintiff states that the

specifications batch file contained two sets of material misrepresentations – first, that the $19

---

*v. Mann*, 20-CR-199, Dkt. No. 28. The Information also contains a Forfeiture Allegation.  *See id.*
On August 12, 2020, Defendant pled guilty to all 12 counts of the Information pursuant to a Plea
Agreement.  *See id.* at Dkt. No. 30.

Million would be transferred from various entities, including Defendant MyPayrollHR, to Plaintiff's settlement account, and that the same $19 million would be transferred from the settlement account to various other entities; and, second, that Defendant MyPayrollHR's employer-clients would deposit $7 million into Defendant MyPayrollHR's account, albeit in breach of the Agreement, since the funds should have been deposited into Plaintiff' settlement account and the employer-clients' employees would be paid $7 million for Defendant MyPayrollHR's account. *See id.* at 18. Plaintiff asserts that both of these representations were false because (1) the $19 Million never went to Plaintiff's settlement account, but the same amount was diverted from the settlement account to accounts that the Defaulting Defendants and others controlled and (2) the $7 Million was never deposited in Plaintiff's settlement account but instead was diverted to accounts that the Defaulting Defendants and other entities such as non-parties Millennium and P2Bi controlled. *See id.*

With regard to the second element, Plaintiff contends that Defendants MyPayrollHR and Mann knew the misrepresentations were false because they provided the fraudulent information to Plaintiff through the specification batch files. *See id.* In fact, Plaintiff asserts that, in *United States v. Mann*, Defendant Mann admitted to borrowing large sums of money "under false pretenses" and specifically admitted to stealing and fraudulently obtaining the $7 Million. *See id.* (citing Farber TRO Decl. ¶¶ 9, 10, 13-15).

Regarding the third element, Plaintiff claims that Defendants MyPayrollHR and Mann intended to defraud Plaintiff by submitting false specifications batch files upon which they knew Plaintiff would rely due to the very nature of the ACH process. *See id.* Moreover, Defendants MyPayrollHR and Mann submitted automated ACH instructions to move the $19 Million that they did not actually have in their accounts, thus clearly intending to defraud Plaintiff. *See id.* at

18-19.  With regard to the $7 Million, Defendants Mann and MyPayrollHR deposited the funds

into Defendant MyPayrollHR's account rather than into Plaintiff's accounts, and Defendant Mann

disappeared when Plaintiff attempted to rectify the $7 Million loss by recouping such funds from

Pioneer Bank.  *See id.* at 19.  Given these facts, Plaintiff argues that there can be no conclusion

other than that Defendants Mann and MyPayrollHR intended to defraud Plaintiff.  *See id.*

As to the fourth element, Plaintiff asserts that its reliance was reasonable in light of the

parties' 11-year business relationship, the fact that ACH transactions are processed automatically,

and the fact that the specifications were otherwise properly submitted.  *See id.*

Finally, Plaintiff asserts that, as a result of Defendants MyPayrollHR and Mann's

misrepresentations to Plaintiff, Plaintiff suffered a loss by having to use $26 million of its own

funds to advance the funds to cover the loss.  *See id.*

Plaintiff's fraud claim against Defendant MyPayrollHR fails because "'[a] cause of action

for fraud cannot exist when the fraud claim arises out of the same facts as a breach of contract

claim with the sole additional allegation that the defendant never intended to fulfill its express

contractual obligations.'"  *Foley v. Wilson*, No. 18-CV-504 (RA), 2020 WL 30338, *6 (S.D.N.Y.

Jan. 2, 2020) (quoting *Seifts*, 61 F. Supp. 3d at 323-24 (citation omitted)).  Therefore, the Court

denies Plaintiff's motion for entry of a default judgment against Defendant MyPayrollHR with

regard to its fraud claim.

Plaintiff's fraud claim against Defendant Mann, however, is not duplicative because

Plaintiff did not assert a breach of contract claim against Defendant Mann.  "In actions for fraud

under New York law, 'corporate officers . . . may be held individually liable if they participated

in or had knowledge of the fraud, even if they did not stand to gain personally.'"  *Coughlan v.

Jachney*, No. 18-CV-2125 (SJF) (AKT), 2020 WL 4059587, *20 (E.D.N.Y. July 20, 2020)

(quoting *Pludeman v. N. Leasing Sys.*, 10 N.Y.3d 486, 491, 860 N.Y.S.2d 422, 890 N.E.2d 184

(N.Y. 2008)); (citing *Cohen*, 25 F.3d at 1173 (holding that although "officers and directors of a

corporation cannot be held individually liable for their company's obligations[,] . . . [and] are not

generally liable for their corporation's debts or its breach of contract, . . . [they] may be held

liable for fraud if they participate in it or have actual knowledge of it.")).  Based on the

allegations in the complaint, the Court finds that Plaintiff has plausibly alleged a fraud claim

against Defendant Mann.  Therefore, the Court grants Plaintiff's motion for entry of a default

judgment on its fraud claim against Defendant Mann on the issue of liability.

Finally, with regard to the remaining Defaulting Defendants, there are no specific

allegations in Plaintiff's complaint regarding how the other Defaulting Defendants participated in

the fraud, other than that they were the depositories of certain funds as a result of Defendant

Mann's actions.  Therefore, the Court denies Plaintiff's motion for entry of a default judgment on

Plaintiff's fraud claim against Defendants Valuewise Corporation and Ross Personnel

Consultants.

### 3. Third cause of action – conversion against all Defaulting Defendants

With regard to its third cause of action for conversion against all of the Defaulting

Defendants, Plaintiff argues that New York law defines conversion as "'any unauthorized

exercise of dominion or control over property by one who is not the owner of the property which

interferes with and is in defiance of a superior possessory right of another in the property.'"  *See*

Dkt. No. 77-1 at 19 (quoting *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir.

1987)).  Furthermore, Plaintiff contends that, "'[t]o recover judgment on a theory of conversion,

the plaintiff must establish title, possession or right of possession, or some property interest in

the subject matter which [the] plaintiff claims the defendants converted for their own use and

which provides the basis for the lawsuit.'"  *See id.* (quoting *Fleet Capital Corp. v. Yamaha Motor

Corp., U.S.A.*, No. 01-cv-1047, 2002 U.S. Dist. LEXIS 18115, at *51 (S.D.N.Y. Sept. 25, 2002));

(citing *Rentrak Corp. v. Handsman*, No. 12-cv-1576, 2014 U.S. Dist. LEXIS 46919, at *24-25

(E.D.N.Y. Mar. 31, 2014) (holding corporate executive personally liable for conversion "separate

and apart from any breach of contract claim" when he "exercised dominion and control over [the

plaintiff]'s property such that he used the proceeds to pay, not only Video U.S.A.'s creditors, but

also debts that he had personally guaranteed")).

Furthermore, Plaintiff claims that "'[m]oney may be the subject of conversion if it is

specifically identifiable and there is an obligation to return it or treat it in a particular manner.

When funds are provided for a particular purpose, the use of those funds for an unauthorized

purpose constitutes conversion.'"  *See id.* at 20 (quoting *Fannie Mae v. Olympia Mortg. Corp.*,

No. 04-cv-4971, 2006 U.S. Dist. LEXIS 70715, at *45 (S.D.N.Y. Sept. 28, 2006) (citing

*Hoffman v. Unterverg,* 9 A.D.3d 386, 388 (2d Dep't 2004))).

Plaintiff argues that the Defaulting Defendants' conduct falls squarely within this

doctrine.  *See id.*  Plaintiff asserts that there is no dispute that it was forced to use its own

property, *i.e.*, $26,418,517.04, to fund the Defaulting Defendants' fraudulent activity.  *See id.*

According to Plaintiff, Defendants MyPayrollHR and Mann used its ACH system in an attempt

to move funds that did not actually exist and which these Defendants knew did not actually exist,

so that when they were caught, Plaintiff was left holding the "empty bag."  *See id.*  Specifically,

Plaintiff contends that Defendant Mann admitted to conversion with respect to the $7 Million,

and there is no dispute that Plaintiff footed the bill for Defendants' theft of the $7 Million by

disbursing Plaintiff's property to pay the employers' employees to make them whole.  *See id.*

With regard to the $19 Million, Plaintiff asserts that the Declaration of Aberash Afsaw, which it submitted in support of its motion for a Temporary Restraining Order and the exhibits attached thereto clearly demonstrate that the Defaulting Defendants converted Plaintiff's funds to their own by causing Plaintiff to transfer $19 million of its own funds to accounts controlled by one or more of the Defaulting Defendants. *See id.*

"'According to New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."'" *Ainbinder v. Money Ctr. Fin. Group, Inc.*, No. CV 10-5270 (SJF) (AKT), 2013 WL 1335997, *9 (E.D.N.Y. Feb. 28, 2013) (quoting *Thyroff v. Nationwide Mut. Ins. Co. (Thyroff I)*, 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth. of El Paso*, 87 N.Y.2d 36, 637 N.Y.S.2d 342, 660 N.E.2d 1121, 1126 (1995)) (alteration in the original)). "'[T]o recover damages for conversion, a plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights.'" *Id.* (quoting *K.C. Okoli*, 2012 WL 1605829, at *4 (quoting *Nat'l Ctr. for Crisis Mgmt., Inc. v. Lerner*, 91 A.D.3d 920, 920, 983 N.Y.S.2d 138 (2d Dep't 2012))). Finally, "'[a] conversion claim may only succeed if the party alleges a wrong that is distinct from any contractual obligations.'" *Id.* (quoting *Command Cinema Corp. v. VCA Labs. Inc.*, 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006) (citing *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 452 N.Y.S.2d 559, 600 (1st Dep't 1982)) (other citation omitted).

Again, with respect to Defendant MyPayrollHR, Plaintiff's claim for conversion is duplicative of its breach of contract claim and the wrong alleged is not distinct from any contractual obligation that Defendant MyPayrollHR had to Plaintiff. Thus, the Court denies

Plaintiff's motion for entry of a default judgment with regard to its conversion claim against Defendant MyPayrollHR.

Likewise, the Court finds that the same logic applies to Plaintiff's conversion claim against Defendant Mann, which arises from the same set of facts that form the basis for Plaintiff's fraud claim against him.  Therefore, the Court finds that Plaintiff's conversion claim is duplicative of its fraud claim against Defendant Mann and, thus, denies Plaintiff's motion for entry of a default judgment with regard to its conversion claim against Defendant Mann.

As to the other Defaulting Defendants, *i.e.*, Defendants Valuewise Corporation and Ross Personnel Consultants, Inc., Plaintiff has failed to allege any facts that would support a claim that these Defendants converted any funds that rightly belonged to Plaintiff.  Plaintiff refers to Ross Consultants as one of the Mann Originating Accounts and Defendant Valuewise Corporation as one of the Mann Receiving Accounts.  However, Plaintiff alleges that it was Defendants MyPayrollHR and Mann who caused the funds to be moved between the Originating and Receiving Accounts.  Although, according to the complaint, Defendant Mann owns or controls all of these entities, there is nothing in the complaint about how these particular Defendants – independently of Defendant MyPayrollHR's breach of contract and Defendant Mann's fraud – converted money that belonged to Plaintiff.  Therefore, the Court denies Plaintiff's motion for entry of a default judgment against Defendants Ross Personnel Consultants, Inc. and Valuewise Corporation with regard to its conversion cause of action.

### 4. Fourth cause of action – unjust enrichment against all Defaulting Defendants

"[T]o succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that '(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and

good conscience militate against permitting defendant to retain what plaintiff is seeking to recover[.]'" *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (quoting *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004), *cert. denied,* 544 U.S. 949, 125 S. Ct. 1704, 161 L. Ed. 2d 525 (2005)) (other citations omitted).  Where the relationship of the parties is contractual, "the plaintiff has no valid claim for unjust enrichment under New York law." *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014) (citations omitted).

Plaintiff argues that the evidence it has presented demonstrates that the Defaulting Defendants stole the $19 Million directly from Plaintiff and that Defendant MyPayrollHR forced Plaintiff to foot the bill for the Defaulting Defendants' theft of the $7 Million from the employer-clients by advancing the same amount to the employees.  *See* Dkt. No. 77-1 at 21.  Therefore, Plaintiff contends that the Defaulting Defendants have been unjustly enriched, and Plaintiff is entitled to restitution of the foregoing amounts.  *See id.*  For all these reasons, Plaintiff asserts that the Court should enter judgment on its fourth cause of action for unjust enrichment in the amount of $26,418,517.04 in its favor and against the Defaulting Defendants.  *See id.*

Plaintiff seeks the same amount of damages based on the same set of facts on its unjust enrichment claim against all the Defaulting Defendants as it does for its breach of contract claim against Defendant MyPayrollHR and its fraud claim against Defendant Mann.  Thus, this claim is duplicative of its breach of contract and fraud claims against these Defendants.  Therefore, the Court denies Defendant's motion for entry of a default judgment against Defendants MyPayrollHR and Mann with regard to its unjust enrichment claim.

Furthermore, the Court concludes that, although accounts in the names of the remaining Defaulting Defendants received certain funds that Plaintiff seeks to recover, they received such funds due to the actions of Defendants MyPayrollHR and Mann. Thus, this claim as to these Defaulting Defendants is duplicative of Plaintiff's claims against Defendants MyPayrollHR and Mann. Accordingly, the Court denies Plaintiff's motion for entry of a default judgment against these remaining Defaulting Defendants on its unjust enrichment claim.

## C.   Calculation of damages

In light of the above conclusions regarding the issue of liability, the Court must next determine the amount and kinds of damages Plaintiff may recover against Defendant MyPayrollHR on its breach of contract claim and against Defendant Mann on its fraud claim.

### 1. Compensatory damages

Plaintiff asserts that, based on the evidence, it incurred damages in the amount of $26,418,517.04 as a result of Defendants MyPayrollHR and Mann's actions. *See* Dkt. No. 77-1 at 21.

"Damages in breach of contract actions under New York law generally consist of '(1) restitution interest . . .; (2) reliance interest . . .; and (3) expectation interest . . . .'" *Ainbinder*, 2013 WL 1335997, at *12 (quoting *Austin Boulevard Associates*, 2007 WL 1575265, at *2 (citing *Topps*, 380 F. Supp. 2d at 261 n.11)).

In fraud cases, "'New York law follows the "out of pocket rule" that limits damages to "the actual pecuniary loss sustained as the direct result of the wrong."'" *PBR*

*Sales, LLC v. Liberty Petroleum Trading Int'l, LLC*, No. 18 Civ. 11639 (PMH) (PED),

2020 WL 4353237, *5 (S.D.N.Y. June 22, 2020) (quoting *Diamond v. Calaway*, No. 18

Civ. 3238 (KPF) (KHP), 2019 WL 8955300, at *7 (S.D.N.Y. Oct. 25, 2019), *report and*

*recommendation adopted sub nom. Diamond v. Calaway*, No .18 Civ. 3238 (KPF), 2020

WL 1228625 (S.D.N.Y. Mar. 13, 2020) (quoting *Starr Found. v. Am. Int'l Grp., Inc.*, 76

A.D.3d 25, 27-28, 901 N.Y.S.2d 246, 248-49 (2010))) (other citation omitted).

"'[D]amages for fraud-based claims "are to give the plaintiff what he lost because he

made the bargain, not what he could have gained had it been performed."'" *Id.* (quotation

omitted).

      Plaintiff's submissions support a finding that it incurred damages in the amount of

$26,418,517.04 as a result of Defendants Mann and MyPayrollHR's actions.  However,

after Plaintiff filed its motion for entry of a default judgment against the Defaulting

Defendants, Plaintiff and non-party P2B Inc., also referred to as P2Bi, who disagreed

about the ownership of Wells Fargo Bank Account 7099, entered into an agreement to

settle that claim in an adversary proceeding in Bankruptcy Court.  That Settlement

Agreement, which the Bankruptcy Court approved, required that Plaintiff file a motion in

this Court seeking modification of the preliminary injunction in this case to allow the

contested funds being held in Account 7099 to be disbursed, one half to Plaintiff and the

other half to P2Bi.  After Plaintiff filed the required motion, this Court modified the

preliminary injunction and ordered that "the funds in Wells Fargo Bank, N.A., Account

7099 . . . shall be released in the following manner: **$759,552.09** to Plaintiff's counsel's

client trust account on behalf of Plaintiff and the remaining **$759,552.09** to P2Bi[.]"  *See*

Dkt. No. 94 at 4-5.  Thus, it appears that Plaintiff has recovered a portion of the

$26,418,517.04 that it seeks as compensatory damages from Defendants MyPayrollHR and Mann.  Therefore, the Court instructs Plaintiff to file an affidavit setting forth its position with regard to the effect of its settlement with P2Bi on the total amount of compensatory damages it seeks against Defendants MyPayrollHR and Mann.  After the Court has reviewed Plaintiff's affidavit, it will determine the appropriate amount of compensatory damages to award Plaintiff against Defendants MyPayrollHR and Mann jointly and severally.

### 2. Consequential damages

Plaintiff seeks consequential damages "as a direct consequence of Defendants' fraudulent actions."  *See* Dkt. No. 77-1 at 21.  Since the Court granted Plaintiff's motion for entry of a default judgment on its fraud claim only against Defendant Mann, Plaintiff may only recover consequential damages from Defendant Mann.

With regard to these damages, Plaintiff asserts that it incurred $275,000.00 in legal fees related to defending class actions and asserting its rights to recover losses and paid a retainer to its bankruptcy counsel of $250,000.00 for the Bankruptcy Case as a direct consequence of Defendant Mann's fraud.  Furthermore, Plaintiff contends that it had to spend its own funds and borrow funds in order to cover the $26 Million loss because the Defaulting Defendants stole the $26 Million from Plaintiff, which required Plaintiff to fund the loss with its own funds.  To cover this loss, Plaintiff used $20 million for its cash on hand and borrowed another $7.050 million, for a total of $27,050 million.  Thus, Plaintiff asserts that the Court should award it consequential damages in the amount of $27,575,000.00.

"[A] party may be awarded out of pocket expenses stemming from a related litigation 'as consequential damages of the fraud,' when the damages are 'proximate to and . . . naturally flow from the alleged fraud.'"  *PBR Sales, LLC*, 2020 WL 4353237, at *5 (quotation and other citation omitted).  In addition, "[c]onsequential damages . . . as a form of special damages . . . are subject to Federal Rule 9(g), which requires that they be specifically stated."  *EMR (USA Holdings) Inc. v. Goldberg*, No. 18 Civ. 7849 (ER), 2020 WL 4038358, *9 (S.D.N.Y. July 17, 2020) (citing Fed. R. Civ. P. (9)(g)).

The allegations in Plaintiff's complaint leave little doubt that Defendant Mann's fraudulent actions required Plaintiff to spend its own funds and to borrow funds to cover the $26 million that Defendant Mann fraudulently stole from Plaintiff.  Moreover, Defendant Mann's fraudulent actions resulted in Plaintiff having to file for bankruptcy and also required it to defend against class actions, which would not have been filed except for Defendant Mann's fraud.  Therefore, the Court awards Plaintiff consequential damages in the amount of **$27,575,000.00** against Defendant Mann.

### 3. Prejudgment interest

Plaintiff asserts that the Court should add pre-judgment interest to its judgment using a rate of 4.75%, which is the current federal prime rate.  *See* Dkt. No. 77-1 at 22 (citing *Frommert v. Conkright*, 913 F.3d 101, 109-110 (2d Cir. 2019)).  According to Plaintiff, this results in pre-judgment interest in the amount of $2,154,903.92 from the filing of the complaint through February 24, 2020.  *See id.* at 22-23.

"'Under New York law, prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract.'"  *Perfume Distributors, Inc. v.*

*Camrose Trading, Inc.*, No. 2:18-cv-04305 (ADS) (SIL), 2020 WL 1289667, *1

(E.D.N.Y. Mar. 17, 2020) (quoting *Graham v. James*, 144 F.3d 229, 239 (2d Cir. 1998))

(citing N.Y. C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded

because of a breach of performance of a contract.")).  Furthermore, "'[i]nterest shall be

computed from the earliest ascertainable date the cause of action existed,' N.Y. C.P.L.R.

5001(b), 'at the rate of nine per centum per annum,' *id.* § 5004." *Id.*

    Similarly, "'NewYork law provides for prejudgment interest on fraud claims, and

dictates that "[i]nterest shall be computed from the earliest ascertainable date the cause of

action existed."'" *Dukes Bridge, LLC v. Security Life of Denver Ins. Co.*, No. 10-CV-

5491-SJB, 2020 WL 4070094, *6 (E.D.N.Y. July 20, 2020) (quoting *Allstate Ins. Co. v.

Abramov*, No. 16-CV-1465, 2020 WL 1172697, at *15 (E.D.N.Y. Feb. 21, 2020)

(quoting N.Y. C.P.L.R. § 5001(b)), *report and recommendation adopted*, 2020 WL

1166498 (Mar. 11, 2020)).  "The interest is calculated at the non-compoundable rate of

9% per year." *Id.* (citing N.Y. C.P.L.R. § 5004; *Allstate Ins. Co. v. A & F Med. P.C.*, No.

14-CV-6756, 2019 WL 7842516, at *7 (E.D.N.Y. Sept. 11, 2019) ("New York law

provides for the award of prejudgment interest on damages for fraud computed from the

earliest ascertainable date the cause of action existed at the non-compoundable rate of

nine percent (9%) per annum.  An award of interest on damages for fraud is mandatory

under New York law."  (citations and quotations omitted)), *report and recommendation

adopted*, 2020 WL 132387 (Jan. 13, 2020)).

    Despite the fact that, under New York law, Plaintiff is entitled to recover

prejudgment interest on both its breach of contract and fraud claims at a rate of 9% per

annum, Plaintiff, instead, seeks pre-judgment interest at the current federal prime rate

from the date of the filing of its complaint until the date judgment is entered based on the

Second Circuit's decision in *Frommert v. Conkright*, 913 F.3d 101 (2d Cir. 2019).

The plaintiffs in *Frommert* brought their claims under ERISA.  The Second

Circuit noted that the district court "enjoyed broad discretion to decide whether to award

prejudgment interest in this case."  *Id.* at 109 (citing *S.E.C. v. First Jersey Sec., Inc.*, 101

F.3d 1450, 1476 (2d Cir. 1996)).  The factors that the court had to consider in exercising

that discretion were "'(i) the need to fully compensate the wronged party for actual

damages suffered, (ii) . . . fairness and the relative equities of the award, (iii) the remedial

purpose of the statute involved, and/or (iv) such other general principles as are deemed

relevant by the court.'"  *Id.* (quoting *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130,

139 (2d Cir. 2000) (quotation marks omitted)).  In addition, these "same factors also

inform a district court's choice of a particular interest rate, . . ., which 'must not result in

over-compensation of the plaintiff,' *Wickham Contracting Co. v. Local Union No. 3,

IBEW*, 955 F.2d 831, 834 (2d Cir. 1992)."  *Id.* (internal citation omitted).

In *Frommert*, the district court awarded prejudgment interest based on the federal

prime rate.  The Second Circuit affirmed the district court's decision to do so because the

district court had found that the prime rate struck an appropriate balance and fairly

compensated the plaintiffs.  *See id.* at 110 (citation and footnote omitted).  The Second

Circuit also concluded that the district court had "carefully explained why it rejected the

New York statutory rate of nine percent . . . as too high and the federal post-judgment

interest rate of 0.66 percent . . . as too low."  *Id.* (citation omitted).

In its decision explaining why it chose the federal prime rate, the district court

explained that "[u]sing either the New York or federal rate . . . could result in a windfall

for one side or the other."  *Frommert v. Becker*, 216 F. Supp. 3d 309, 316 (W.D.N.Y. 2016) (citations omitted), *order clarified on reconsideration sub nom. Frommert v. Conkright*, No. 00-CV-6311L, 2017 WL 3867795 (W.D.N.Y. May 4, 2017), and *aff'd sub nom. Frommert v. Conkright*, 913 F.3d 101 (2d Cir. 2019).  The court concluded that "use of the prime rate strikes an appropriate balance, and will fairly compensate plaintiffs for the period of time during which they were improperly denied the use of the funds to which they were entitled."  *Id.* (citing *Continental Transfer Technique Ltd. v. Federal Gov't of Nigeria*, 603 Fed. Appx. 1, 5 (D.C. Cir. 2015) ("This court has repeatedly concluded that the use of the prime rate in the award of prejudgment interest reflects an appropriate exercise of the district court's discretion")).

The Court agrees with the *Frommert* court's assessment that use of the federal prime rate strikes the appropriate balance; and, therefore, the Court will apply the current prime rate, as of the date the Court enters judgment, to calculate prejudgment interest. Furthermore, the Court will apply this rate from the date that the Plaintiff filed its complaint in this action, *i.e.*, September 23, 2019, until the date of entry of judgment.

### 4. Punitive damages

"To state a claim warranting punitive damages under New York law, a plaintiff must allege the following: '(1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature . . .; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally.'"  *Kruglov v. Copart of Conn., Inc.*, 771 F. App'x 117, 120 (2d Cir. 2019) (summary order) (quoting *New York Univ. v. Cont'l Ins.*, 87 N.Y.2d 308, 316, 639

NY.S.2d 283, 662 N.E.2d 763 (1995)).  "Because the purpose of punitive damages 'is not to remedy private wrongs but to vindicate public rights,' a defendant's conduct must 'involve[] a fraud evincing a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations.'" *Id.* (quoting *Rocanovva v. Equitable Life Assurance Soc'y of the U.S.*, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994) (internal quotation marks omitted)).  "Punitive damages are 'refused in the "ordinary" fraud and deceit case.'" *Id.* (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961)).

Plaintiff contends that Defendant Mann evidenced a complete disregard for moral guidelines and his civil obligations not only to Plaintiff but to all of Plaintiff's remarketers, the remarketers' employer-clients, and the employers' employees.  *See* Dkt. No. 77-1 at 23.  It is clear from Plaintiff's complaint and other submissions that Defendant Mann's fraud was far-reaching.  Moreover, it is clear that Defendant Mann's fraudulent scheme was egregious and evinced a high degree of moral turpitude and wanton dishonesty.  Moreover, part of Defendant Mann's egregious conduct was directed at Plaintiff and was part of a pattern of fraud that was directed and financial institutions and the community.  For all these reasons, the Court awards Plaintiff punitive damages on its fraud claim against Defendant Mann equal to the amount of compensatory damages awarded in this case.

## IV. CONCLUSION

Having reviewed the entire file in this matter, Plaintiffs' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for entry of a default judgment on its breach of contract claim against Defendant MyPayrollHR, LLC is **GRANTED** on the issue of liability; and the Court further

**ORDERS** that Plaintiff's motion for entry of a default judgment on its fraud claim is **GRANTED** as to Defendant Mann and **DENIED** as to Defendant MyPayrollHR, LLC on the issue of liability; and the Court further

**ORDERS** that Plaintiff's motion for entry of a default judgment on its conversion and unjust enrichment claims is **DENIED in its entirety**; and the Court further

**ORDERS** that Plaintiff shall file an affidavit with the Court, on or before **September 9, 2020**, setting forth its position with the regard to the effect that its recovery of $759,552.09 as a result of its settlement with P2Bi has on its request for $26,418,517.04 in compensatory damages against Defendants MyPayrollHR, LLC and Mann; and the Court further

**ORDERS** that Plaintiff's request for consequential damages related to its fraud claim is **GRANTED** in the amount of **$27,575,000.00** against Defendant Mann; and the Court further

**ORDERS** that Plaintiff's request for punitive damages related to its fraud claim is **GRANTED** in an amount equal to the compensatory damages, which the Court will determine after reviewing Plaintiff's affidavit regarding that issue; and the Court further

**ORDERS** that Plaintiff's request for prejudgment interest at the current federal prime rate as of the date that the Court enters judgment is GRANTED and shall run from the date that Plaintiff filed its complaint in this action, September 23, 2019, until the date that judgment is entered; and the Court further

**ORDERS** that Plaintiff's request for post-judgment interest is **GRANTED** at the rate set forth in 28 U.S.C. § 1961 and shall run from the date that the Court enters judgment until the date payment is made in full; and the Court further

**ORDERS** that the Clerk of the Court shall **not** enter judgment in this case at the present time.  After the Court has had an opportunity to review Plaintiff's affidavit regarding the issue of compensatory damages, the Court will issue a final order setting forth the total amount of damages to be awarded to Plaintiff against Defendants MyPayrollHR, LLC and Mann and, at that time, will instruct the Clerk of the Court to file a final judgment as to the Defaulting Defendants in the appropriate amount.

**IT IS SO ORDERED.**

Dated: September 2, 2020
      Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge

- 32 -